U.S. COURT OF APPEALS DOCKET NO. 15-50217

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

THE UNITED STATES OF AMERICA,

Plaintiff/Appellee,

vs.

LUIS MANUAL TAPIA,

Defendant/Appellant.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
D. CT. CASE NO. CR-11-1068-ODW
[THE HONORABLE OTIS D. WRIGHT]

---

APPELLANT'S OPENING BRIEF

---

Marilyn E. Bednarski, SBN105322
KAYE, McLANE, BEDNARSKI & LITT, LLP
234 East Colorado Boulevard, Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670
E-Mail: mbednarski@kmbllaw.com

# TABLE OF CONTENTS

I.   STATEMENT OF ISSUES PRESENTED ................................................- 1 -

II.  STATEMENT OF THE CASE ...........................................................- 1 -

    A.  JURISDICTIONAL STATEMENT.........................................- 1 -

    B.  COURSE OF PROCEEDINGS & DISPOSITION............................- 2 -

    C.  BAIL STATUS OF DEFENDANT .........................................- 3 -

III. STATEMENT OF FACTS ...............................................................- 3 -

    A.  DENIAL OF REQUEST TO COMPEL PRESENCE OF DEFENSE
        WITNESS ...................................................................- 3 -

    B.  PRE-TRIAL MOTIONS ....................................................- 5 -

        1.  Inflammatory Statements..................................................- 5 -

        2.  Opinion Testimony Regarding Violent Gang Activity ...................- 6 -

    C.  Trial......................................................................- 9 -

    D.  Sentencing ............................................................- 14 -

IV.  SUMMARY OF ARGUMENT .....................................................- 14 -

V.   STANDARDS OF REVIEW ......................................................- 16 -

VI.  ARGUMENT ......................................................................- 17 -

    A.  The District Court's Failure to Exclude the Gang Evidence Under
        Rules 402 & 403, denied Mr. Tapia a Fair Trial....................- 17 -

        1.  The Gang Evidence was of Little Probative Value Relative to the Direct
            Evidence of the Continuing Criminal Enterprise or Other Charges - 19 -

        2.  The Government's Burden Was To Prove Beyond A Reasonable Doubt
            That Mr. Tapia Engaged In A Continuing Criminal Enterprise, Not
            How He Was Able To Do So Or Why He Did So. ..........................- 20 -

        3.  The Gang Evidence was Extremely Attenuated From the Charges. - 22 -

        4.  The Evidence Did Not Support The Government's Theory    That The
            Source Of Mr. Tapia's Leadership Within The Enterprise Flowed From
            COCH And The Mexican Mafia.......................................- 25 -

        5.  The Gang Evidence Became the Trial's Underlying Theme............- 28 -

        6.  The Gang Evidence was Highly Inflammatory and Unfairly Prejudicial.
          ....................................................................- 29 -

B. The District Court's Failure To Exclude The Inflammatory Statements
Under Rules 402 & 403 Denied Mr. Tapia A Fair Trial........................- 35 -
1. The Inflammatory Statements Were Highly Prejudicial and
Cumulative of Other Evidence..........................................................- 36 -
2. The District Court Should Have Excluded Evidence of the
Uncharged Violence.........................................................................- 39 -
3. The District Court Should Have Excluded Evidence of Mr. Tapia's
Stated Interest in the Purchase of Certain Weapons and Weapon
Accessories, None of Which Provided the Basis for Any Charge......- 42 -

C. The District Court Denied Mr. Tapia A Fair Trial When It Refused To
Compel The Attendance Of Chs-1, A Necessary Defense Witness ......- 44 -
VII. CONCLUSION .........................................................................................- 53 -

# TABLE OF AUTHORITIES

## FEDERAL CASES

Crane v. Kentucky
    476 U.S. 683, 106 S.Ct. 2142 (1986)....................................................45

Daubert v. Merrell Dow Pharmaceuticals, Inc.
    509 U.S. 579, 113 S.Ct. 2786 (1993)....................................................31

Kennedy v. Lockyer
    379 F.3d 1041 (9th Cir. 2004), cert. denied, 544 U.S. 992, 125 S.Ct. 1823
    (2005) ............................................................................................29, 30

Old Chief v. United States
    519 U.S. 172, 117 S.Ct. 664 (1997)................................................18, 38

Press-Enterprise Co. v. Superior Court of Cal., Riverside Cnty.
    464 U.S. 501, 104 S.Ct. 819 (1984)....................................................35

United States v. Boros
    668 F.3d 901 (7th Cir. 2012) ........................................................36, 38

United States v. Cerna
    CR 08-0730-WHA, 2010 WL 2347406 (N.D. Cal. June 8, 2010) .....................33

United States v. Cooper
    591 F.3d 582 (7th Cir.), cert. denied, 561 U.S. 1036, 130 S.Ct. 3530
    (2010) ............................................................................................36, 38

United States v. Curtin
    489 F.3d 935 (9th Cir. 2007) (en banc) (Kleinfeld, J., concurring) ...................34

United States v. Cutler
    806 F.2d 993 (9th Cir. 1986) ............................................................32

United States v. Echavarria-Olarte
    904 F.2d 1391 (9th Cir. 1990), cert. denied, 534 U.S. 851, 122 S.Ct. 118
    (2001) ............................................................................................24, 25

United States v. Ellis
    147 F.3d 1131 (9th Cir. 1998) ...........................................................18

United States v. Evans
     728 F.3d 953 (9th Cir. 2013) ...............................................................17

United States v. Gonzalez-Flores
     418 F.3d 1093 (9th Cir. 2005) .......................................................18, 19

United States v. Hankey
     203 F.3d 1160 (9th Cir.), cert. denied, 530 U.S. 1268, 120 S.Ct. 2733
     (2000) .................................................................................29, 33, 34

United States v. Hardy
     643 F.3d 143 (6th Cir.), cert. denied, 132 S.Ct. 762 (2011)..............................38

United States v. Hitt
     981 F.2d 422 (9th Cir. 1992) .......................................................18, 25

United States v. Kassir
     2009 WL 976821 (S.D.N.Y. April 9, 2009) ................................................39, 40

United States v. Khan
     591 F.Supp.2d 202 (E.D.N.Y. 2008) ..................................................39

United States v. Livoti
     196 F.3d 322 (2d Cir. 1999), cert. denied, 529 U.S. 1108, 120 S.Ct. 1961
     (2000) .....................................................................................40

United States v. Major
     676 F.3d 803 (9th Cir. 2012) ...............................................................31

United States v. Masters
     622 F.2d 83 (4th Cir. 1980) ...............................................................18

United States v. Owen
     580 F.2d 365 (9th Cir. 1978) ...............................................................17

United States v. Padilla
     387 F.3d 1087 (9th Cir. 2004) ...............................................................33

United States v. Pineda-Doval
     614 F.3d 1019 (9th Cir. 2010) ...............................................................16

United States v. Rinchack
     820 F.2d 1557 (11th Cir.1987) ...............................................................44

iv

United States v. Roark
  924 F.2d 1426 (8th Cir. 1991) ...............................................................29, 30, 34

United States v. Rodriguez
  766 F.3d 970 (9th Cir. 2014), <u>cert</u>. <u>denied</u>, 135 S.Ct. 1013 (2015)....................31

United States v. Santiago
  46 F.3d 885 (9th Cir. 1995) ...........................................................................31, 32

United States v. Sims
  637 F.2d 625 (9th Cir.1980) .................................................................................45

United States v. Skillman
  922 F.2d 1370 (9th Cir. 1990) ......................................................................17, 32

United States v. Smith
  924 F.2d 889 (9th Cir. 1991) .......................................................................17, 45

United States v. Street
  548 F.3d 618 (8th Cir. 2008) ...............................................................................28

United States v. Takahashi
  205 F.3d 1161 (9th Cir. 2000) ............................................................................33

United States v. W.R. Grace
  504 F.3d 745 (9th Cir. 2007), <u>cert</u>. <u>denied</u>, 554 U.S. 918, 128 S.Ct. 2964
  (2008) ......................................................................................................................38

United States v. Whittemore
  776 F.3d 1074 (9th Cir.), <u>cert</u>. <u>denied</u>, 136 S.Ct. 89 (2015)..............................16

United States v. Williams
  205 F.3d 23 (2d Cir.), <u>cert</u>. <u>denied</u>, 531 U.S. 885, 121 S.Ct. 203 (2000)...........40

United States v. Winslow
  962 F.2d 845 (9th Cir. 1992) ...............................................................................32

Washington v. Texas
  388 U.S. 14, 87 S.Ct. 1920 (1967).........................................................45, 46, 52

Windham v. Merkle
  163 F.3d 1092 (9th Cir. 1998), <u>cert</u>. <u>denied</u>, 541 U.S. 950, 124 S.Ct. 1689 ......32

## FEDERAL STATUTES

18 U.S.C. § 371 .................................................................................21

18 U.S.C. § 3231 .................................................................................1

18 U.S.C. § 3742(a) .............................................................................1

21 U.S.C. § 851 ...................................................................................2

21 U.S.C. § 846 .................................................................................21

21 U.S.C. § 848(b)(1)..........................................................................21

28 U.S.C. § 1291 .................................................................................1

RICO .................................................................................................33

## OTHER STATUTES

California Penal Code §417(a)(2)......................................................47

## RULES

Fed.R.Crim.Proc. 17(b)..........................................................44, 50, 52

Federal Rule of Appellate Procedure 32(a)(7)(C) .............................56

FRE 402 ..........................................................5, 7, 15, 17, 118, 35

FRE 403 ..........................................................5, 7, 15, 17, 18, 35

Rule 32-1, I .......................................................................................56

Rule 401 ...........................................................................................38

Rule 404(b) .......................................................................31, 32, 34

## CONSTITUTIONAL PROVISIONS

U.S. Const. Amendment XIV .............................................................45

U.S. Const. Amendment V ...........................................16, 17, 34, 54

U.S. Const. Amendment VI ........................................16, 45, 50, 53, 54

22 C. Wright & K. Graham, Federal Practice and Procedure § 5250 at 546-47 (1978) ..................................................................................38, 41, 43

1 J. Weinstein, M. Berger, & J. McLaughlin, <u>Weinstein's Evidence</u> ¶ 403[03] (1996) ...................................................................................18

# I.

## STATEMENT OF ISSUES PRESENTED

A. DID THE DISTRICT COURT'S FAILURE TO EXCLUDE THE EXPERTS' GANG EVIDENCE DENY MR. TAPIA A FAIR TRIAL?

B. DID THE DISTRICT COURT'S FAILURE TO EXCLUDE THE INFLAMMATORY STATEMENTS DENY MR. TAPIA A FAIR TRIAL?

C. DID THE DISTRICT COURT'S DENIAL OF THE WRIT COMPELLING THE ATTENDANCE OF CHS-1 AS A WITNESS DENY MR. TAPIA A FAIR TRIAL?

# II.

## STATEMENT OF THE CASE

### A. JURISDICTIONAL STATEMENT

This appeal is from a final judgment of conviction following a jury trial on 27 counts of an Indictment. ER 1, 34. Mr. Tapia was sentenced on April 27, 2014 to serve multiple life terms plus 55 years. ER 100, CR 322.

The district court had jurisdiction pursuant to 18 U.S.C. §3231. This Court has jurisdiction pursuant to 28 U.S.C. §1291 and 18 U.S.C. §3742(a). A timely notice of appeal timely was filed on May 8, 2015. ER 110, 331.

* * *

## B.    COURSE OF PROCEEDINGS & DISPOSITION

The Indictment in this case was filed on November 8, 2011.  ER 1, CR 1.

Mr. Tapia was arraigned on the indictment and pled not guilty on November 14,

2011.  CR 49.  The government filed a sentence enhancement under Title 21

U.S.C. 851 alleging two prior felony narcotic convictions.  ER 47, CR 50.

Mr. Tapia and five others were charged in the multi-count Indictment. [1]  Mr.

Tapia went to trial and was convicted on all counts charged against him, including

numerous substantive narcotics and firearms violations, conspiracies to possess

and traffic in narcotics and firearms, and engaging in a continuing criminal

enterprise "CCE" to distribute methamphetamine.  ER 1, CR 34.  The nine day trial

of the case commenced on September 2, 2014 and ended on September 12, 2014

with guilty verdicts as to all counts.  RT 1448-1455.  Mr. Tapia appeals the

conviction on all counts.

Mr. Tapia filed a pretrial motion to preclude admission of certain

inflammatory statements he had made in recorded conversations with the

informants (CR 227), and a pretrial motion to exclude expert opinion testimony

concerning the Colonia Chiques "COCH" and Mexican Mafia "MM" gangs (CR

217).  Mr. Tapia also requested that the Court issue a writ to compel the attendance

---

[1]     The Indictment originally contained 29 counts.  Count 1 was vacated at
sentencing as duplicative of count 29.  Counts 22 and 23 did not charge Mr. Tapia.

at trial of informant CHS-1 who was in custody in a Ventura County jail. ER 54, CR 214 & 214-1; ER 58, CR 231 & 231-1.

## C.     BAIL STATUS OF DEFENDANT

Mr. Tapia is presently in custody in the U.S. Penitentiary in Beaumont, Texas serving the multiple concurrent life and terms of years sentences imposed.

## III.

## STATEMENT OF FACTS

## A.     DENIAL OF REQUEST TO COMPEL PRESENCE OF DEFENSE WITNESS

The District Court initially granted Mr. Tapia's request for a Writ[2] to compel the presence of the informant CHS-1 for testimony at trial.  ER 57, CR 215. When the trial date changed, Mr. Tapia again requested a Writ to compel the presence of CHS-1.  ER 58, CR 231 & 231-1.  These documents generally set forth that CHS-1 was an eyewitness to, and participant in, several events described in the Indictment including Count 1 (the conspiracy to distribute drugs), Count 2 (conspiracy to distribute firearms), and Count 5 (unlawful possession and transfer of firearms on June 8, 2011), and that his testimony of what occurred prior to and during those events is relevant to the defendant's case.  CR 231-1.  The government filed a Motion to Quash the Writ arguing CHS-1's testimony was irrelevant and

---

[2]     Mr. Tapia's first Application for Writ and Supplement to that Application requested that CHS-1 be produced for the July 29 trial. ER 54, CR 214 & 214-1.

unnecessary to the defense.  CR 228.  Mr. Tapia opposed the government's Motion, and presented his factual basis supported by the declaration of Bednarski and Exhibits A to D justifying the need for CHS-1's testimony.  ER 162-239. [3]

In his factual showing, Mr. Tapia presented facts supporting that CHS-1 was necessary to an adequate defense for several reasons including that: some of the alleged CCE supervisees, including Roger Armendariz  (who called CHS-1 "Chief") and Ernesto Salazar were in fact working for and supervised by CHS-1, not Mr. Tapia (ER 172-175); that rather than Mr. Tapia organizing and leading the group at a June 14, 2011 "gang meeting," in fact CHS-1 had organized the meeting and directed many of the attendees to come (ER at 172-172); that CHS-1-- without his handler's knowledge --supplied Mr. Tapia with many of the firearms that he sold to CHS-2 (ER 173-175), which the agents agreed if that had occurred would have violated his informant agreement (RT 989); and, furthermore that CHS-1 was conducting his own illegal gun and drug business, another fact that would have violated his informant agreement  (ER at 174).

The government argued that the court should weigh safety, fiscal and logistical concerns against the defendant's purported need for the witness.  CR 228.  At the pretrial motion's hearing, before the district court ruled on the Writ for

---

[3]      This factual showing was filed under seal and in camera. CR 236. A separate document setting forth the procedural support for the *under seal* and *in camera* nature of the factual filing was simultaneously filed and served on the government. ER 61, CR 244.

the September 2 trial date, the district court opined that "I don't see the purpose of it other than . . . maybe to intimidate or send some other message. I don't know." ER 80-81, Excerpt July 29, 2014 RT 33: 24-34:1.  The Court subsequently issued a minute order denying the Writ "on the basis of an inadequate showing of the necessity or relevance of his [the witness'] testimony." ER 67, CR 246.

## B.  PRE-TRIAL MOTIONS

### 1.  Inflammatory Statements

Mr. Tapia filed a pretrial motion to preclude admission of certain inflammatory statements he had made in conversations recorded by the task force agents through its informants.  CR 216.  Mr. Tapia moved to exclude of statements in seven categories, or other similar statements, including his statements that he: 1. burned down a police station in his neighborhood, 2. was interested in the price of grenades, 3. his heroin [was] so strong it killed six people already, 4. he was interested in obtaining silencers and knew someone who could make them, 5. could provide guns that fire ammunition capable of piercing law enforcement vests, 6. wanted a gun that shoots people, and 7. references to SKS, AR-15, M-16s, etc., i.e., inflammatory firearm names.

Mr. Tapia requested the exclusion of these statements under Federal Rule of Evidence (hereafter FRE) 402 as irrelevant and under FRE 403 as unduly prejudicial.  The government argued that the statements were admissible as

evidence of Mr. Tapia's intent, capabilities and expertise, and that his statements about violent activity showed his ability to occupy the position of organizer, supervisor, and manager of the criminal enterprise. CR 227, Govt. Opp. Mot. at 6.

Other evidence at trial established the high purity and quality of the narcotics, including the scientific test results (RT 1162-65) and statements by Mr. Tapia about the high quality, his ability to supply large consistent volumes, and the delivery of ten pounds of methamphetamine on October 25. Other than Mr. Tapia's recorded statements, there was no evidence in that case that anyone died as a result of drugs Mr. Tapia sold, nor any evidence that he had committed any assault, shooting or physical crime of violence, or sold or possessed a silencer[4], armor piercing ammunition or a grenade.

The district court denied the defense request to preclude statements falling within the seven categories with the exception of the exclusion of statement No. 1, that he had blown up a police station. ER 67; ER 69:22-25 Excerpt of Transcript; July 29, 2014 RT 17:22-18:6 (finding [that] one had no purpose at all").

## 2. Opinion Testimony Regarding Violent Gang Activity

Before trial, Mr. Tapia moved the Court to preclude the government from presenting expert testimony of the hierarchy and operations of the MM, a violent

---

[4]     CHS-2 had introduced the subject of silencers, asking Mr. Tapia if he could get them made, or knew anyone who could do that. CHS-2 provided a picture of a silencer to show Mr. Tapia what it looked like. Govt. Exh. 247 (audio 10/19/11), RT 1215

prison gang and its activities (e.g. murder, robbery, extortion, and assaults), which associates with people in and out of prison, and controls local street drug trafficking and other criminal activity. CR 217, Def. Mot. Mr. Tapia moved to exclude such testimony as irrelevant under FRE 402 and unduly prejudicial under FRE 403. This pretrial motion was made after the government noticed its intent to call experts to testify about the Colonia Chiques "COCH" and Mexican Mafia "MM" gangs[5]. At trial witness Guillermo Moreno was added to the government's witness list in place of expert Casteneda. At the pretrial hearing, defense counsel advised the court that this new additional expert compounded the problem objected to in the Motion. July 29, 2014 RT 20: 9-10. Mr. Tapia objected to the expert testimony about the COCH violent gang operations; COCH ties to the MM prison gang, COCH leadership structure – as being based in part of authority from the MM; criminal acts engaged in by COCH; that the COCH gang, like all Sureno gangs, obtains its power in part from its affiliation with the MM prison gang; and,

---

[5]    Pretrial, the government noticed its intent to call experts Long and Hamilton; therefore, the defendant's Motion addressed those two experts. CR 217. Before the hearing on the Motion, the government gave notice of intent to call Mr. Castenada, an expert from the California Department of Corrections (CDC), to testify about the MM prison gang, the CDC validation process, and the control and influence of the MM over the prisons, jails and narcotics trafficking and other criminal activity on the streets. July 29, 2014 RT 20-21. At the hearing defense counsel objected to his testimony for the same reasons she had objected to expert Long. *Id.* at 20:9-20. The government at trial called CDC official, Guillermo Moreno instead of Castenada. Hamilton was a firearms' expert and his testimony is not the subject of this appeal.

that the COCH gang is one of the largest and most violent street gangs in Ventura County; and, to the admission of evidence that Mr. Tapia was documented by the California Department of Corrections and Rehabilitation ("CDCR") as a validated Mexican Mafia associate.

The government advised the court on multiple occasions that its expert testimony on the COCH and MM topics would be very limited.[6] The district court "tentatively" denied the defense pretrial motion to exclude testimony, stating that "it did not have a problem with [the experts] talking "factually" about how things work, about how Mexican gangs operating in Southern California do so at the pleasure of the Mexican Mafia, and that is how Tapia and his organization are permitted to continue to do business. ER 72-73, July 29, 2014 RT 27:8-18; 28:6-7. The district court reasoned "that is a necessary part of the background the jury is going to need." ER 72:15-16, July 29, RT 27:15-16. The only limitation the court put on the testimony was that the government could not talk about how Mr. Tapia's affiliation with any organization would affect, motivate or frighten anyone. ER 72: 19-22, July 29, 2014 RT 27:19-22.

---

[6] The government told the court multiple times, orally and in writing, that the expert gang testimony would be very brief. See, July 29 2014 RT 23: 9-10 (AUSA: "I do propose that it'll be very brief testimony about the Mexican Mafia"); see also Govt. Trial Memo CR 269 at 4-5("SA [Moreno] would briefly testify as an expert on the Mexican Mafia and the CDCR validation process" and Long would "briefly testify as a gang expert . . .on the Colonia Chiques"); and Govt. Opp. to Def. Mot. CR 230 at 11: 17 and 12:16 ("Officer Long's limited testimony").

## C.   TRIAL[7]

The expert testimony was not brief, limited or merely "background."  The government called eleven witnesses at trial, all law enforcement witnesses.  Officer Long and Moreno testified extensively about the COCH and MM gangs, for most of the first two days of testimony.  RT 136- RT 340.  In addition, two other officers testified about MM and COCH activity.[8]  The government argued repeatedly in closing and on rebuttal that the Mexican Mafia controlled and authorized Mr. Tapia's activities and those of the COCH gang.  RT 1134, 1343, 1336-7, 1433 and 1438. Tapia objected throughout the trial to the expert gang testimony.  *See* e.g., RT 160, 426-427, 755-756, 759, 1003-4.

The government framed the trial from the start in its opening statement as Mr. Tapia being a leader of the COCH gang in Oxnard, that the COCH is not just a street gang but operated under the authority of the MM, a powerful prison gang which interacted with members and associates in and out of prison and controlled

---

[7]     The trial transcripts, referred to as "RT" (without date), start at volume 1, p. 1 and are consecutively numbered.

[8]     Agent Easter testified that: RT 448 "he had been investigating COCH narcotics activity since 2008;  RT 715 "COCH is largest gang in Ventura County;" RT 697, he worked "many cases in[volving] the COCH gang and there [are] guns in the gang; RT 422-24, 457-8 he explained his understanding of the Mexican Mafia references in a March 31 meeting and the June 14 meeting.  Detective Marquez testified: RT 750, identifying an armed COCH member at June 14 meeting; RT 754 that Mr. Tapia was in a position of power and could direct someone from inside custody to get a gun, or do something; RT 1004, that the Mexican Mafia authorized Tapia to give the COCH gang members instructions.

narcotics trafficking and other criminal conduct on the streets, that Mr. Tapia had direct connections with the MM, and thereby derived his power to control the methamphetamine trade in Ventura County. RT 109-110.

Expert Long was a senior gang detective who works gang investigations in Oxnard. RT 136. He described the COCH as the largest gang in the area, whose business is narcotics, robbery, violent assaults and firearms sales. RT 141, 145-147. He spoke about the MM being a violent prison gang in California that requires the local street gangs to pay tax to the MM. RT 151-152. He testified that Mr. Tapia is a member and leader in COCH, and is well known to the gang officers. RT 153-160, 288. Officer Long also testified about a recorded meeting on June 14, 2011, when Mr. Tapia spoke to a group of 20 men in a beach parking lot in Oxnard. Govt. Exh. 110, RT 164. He described Mr. Tapia as leading the meeting and instructing the COCH gang members about how they can run the neighborhood better, that they can tighten things up, that it is their responsibility, and is offering to get guns or flood the neighborhood with drugs, if they want him to do that. RT 173-175, 190-191, 265.

Expert Moreno was a special agent with the CDCR and worked gang investigations. RT 293. He testified extensively about the MM prison gang. He talked about surenos, the foot soldiers for the MM, who attack informants and others in bad standing. RT 302. He testified about how the MM started as a prison

- 10 -

gang but now was powerful with drug cartels, and had members throughout California. RT 303-4. He explained in detail how the CDCR validated members and associates of the MM, including Mr. Tapia in 2001. RT 307-320. He testified that MM member Michael Moreno who controlled the gangs in areas of California including Oxnard, where the COCH gang is. RT 321-322. The MM influenced COCH criminal activities including narcotics, prostitution and weapons. RT 329. He testified that a validated associate would leave prison with the connections and support of the MM to distribute pound quantities of narcotics. RT 323.

In its case, the government played 25 recordings between Mr. Tapia and the informants concerning narcotics and/or firearms transactions. CR 286, Govt. Exh. List. CHS-1 was a childhood friend of Mr. Tapia. RT 469. He was signed up as an informant after he was caught on parole with a large amount of methamphetamine. He agreed to make surreptitious recordings of conversations with Mr. Tapia and introduce him to another informant CHS-2. RT 378, 596-600. CHS-1 and CHS-2 were also paid for their assistance. RT 380, 990. CHS-2 had a history of working as an FBI informant. RT 1026.

The recordings spanned eight months starting with a March 8, recording of Mr. Tapia and CHS-1 and ending with the recorded meeting between Mr. Tapia and CHS-2 on October 25, 2011. Govt. Exh List, CR 286. On April 15, 2011, CHS-1 introduced Mr. Tapia to the second informant who portrayed himself as a

rich man from Vegas connected to a lucrative call girl service in Vegas. RT 949, 1078. Part of CHS-2's cover story was that he knew guns, and wanted to buy guns from Mr. Tapia. RT 381. CHS-2 told Mr. Tapia that he wants to teach him gun business.[9] RT 673.

Mr. Tapia tells CHS-2 early in the investigation that he can get guns, but not in quantities. RT 470. Thereafter, CHS-2 has several recorded meetings with Mr. Tapia during which he buys 14 weapons[10]. In addition, on June 22, agents seized two handguns from a car associated with Mr. Tapia (RT 783-4) and on October 25, seized a shotgun and an AK-47 from his parents' home (RT 1242-9) and a handgun from inside the car Mr. Tapia drove to deliver the ten pounds of methamphetamine (RT 1146-8).

Mr. Tapia tells CHs-2 he can get all kinds of drugs, and thereafter sells him various amounts of different types of illegal narcotics: four ounces of methamphetamine on May 19, 2011; an ounce of methamphetamine and sample of heroin on June 17, 2011, and the ten pounds of methamphetamine on October 25,

---

[9]     On numerous occasions throughout the trial CHS-2 schools Mr. Tapia about guns, describing: the price and values of guns, the parts that make a gun automatic; giving him a manual about guns, describing how to make a silencer and giving Mr. Tapia a diagram of a silencer. RT 664, 964, 982-3, 1103, 1118, 1215-18.
[10]     The evidence included all of the purchased and seized weapons and photographs of them. The purchases included: on June 8 two rifles; on June 17 one rifle; on July 19 three handguns; on August 25 three handguns; on September 8 three handguns; on October 19 one handgun and an AK-47 fully automatic machinegun.

2011.  Govt. Exh. List CR 286.  In addition on June 21, 2011, Diana Zamora is stopped while driving a Honda that Mr. Tapia often drove and officers found in a hidden compartment containing a half pound of heroin, 9.6 ounces of methamphetamine, over nineteen ounces of cocaine, two handguns and $10,000 cash. [11]  After Mr. Tapia's arrest on October 25, the car he drove to deliver the 10 pounds of methamphetamine was searched and in a hidden trap the agents found another pound of methamphetamine.  RT 1155.

There were numerous statements in the recordings that showed Mr. Tapia had high quality drugs in quantity to sell.  On September 8, 2011, Mr. Tapia and CHS-2 discuss meeting CHS-2's boss in Las Vegas, and the kind of drugs he would be interested in buying. When asked the amount of methamphetamine Mr. Tapia can produce monthly, Mr. Tapia says, "anywhere from 10 to 20 pounds of methamphetamine.  RT 901.  On September 16 and 17, 2011, Mr. Tapia introduces Pancho to CHS-2 and CHS-2's boss (an FBI undercover agent), at which meetings Mr. Tapia says he can provide a consistent flow of methamphetamine, and can provide heroin, cocaine and marijuana.

Mr. Tapia suggests starting with 10 [pounds] of methamphetamine, says that he can do more after that deal.  RT 1056. On October 19, he and CHS-2 discuss the 10 pounds [of methamphetamine ] he is going to deliver, and Mr. Tapia says he

---

[11]     He later tells CHS-2 that his loss from that June 21 car seizure was about $100,000.  RT 775.

just got 15 pounds the day before so there is no problem (RT 1127).  On October

25, 2011, Mr. Tapia arrives at the hotel parking lot with 10 pounds of

methamphetamine places it CHS-2's car, and goes inside to meet CHS-2 where he

tells him that he is still waiting on the four kilograms of cocaine ordered.  He is

then arrested.  RT 1137.

**D.     SENTENCING**

Mr. Tapia was sentenced on April 27, 2015 to multiple concurrent life

sentences on nine counts (Counts 3, 6, 9, 10, 11, 15, 20, 21 and 29).  ER 100, CR

322.  He was not sentenced on Count 1 which count was vacated at sentencing as

duplicative of Count 29.  April 7, 2015 RT 8:10.  Mr. Tapia was sentenced to terms

of years on the remaining counts which terms were imposed concurrently with

each other and the life counts, with the exception of the terms of years on Counts

12 (5 years), 24 (20 years) and 26 (20 years). Those terms were imposed

consecutively to each other and to the other counts of conviction.  ER 100.  In sum,

Mr. Tapia was sentenced to multiple life terms plus 55 years, concurrent with

multiple terms of years.  ER 100, CR 322.

## IV.

### SUMMARY OF ARGUMENT

The defense was that Mr. Tapia sold drugs for his own gain and profit and

not as the leader of a conspiracy or enterprise to distribute narcotics. Furthermore

that he was not in the business of selling firearms before CHS-2 convinced him to find weapons to sell to him, and CHS-1, supplied at least some of the firearms to Mr. Tapia which he then sold to CHS-2. This was not a MM prison gang case.

Once tainted by the government's opening statement and first two lengthy expert witnesses --who repeatedly testified about the MM and how it ran the drug trade on the street level, and controlled and directed the COCH gang's narcotics and firearms and other criminal activities, the jury could not fairly evaluate the case based on the relevant and admissible evidence. The district court's error in failing to properly exclude evidence under Federal Rules of Evidence 402 & 403 was compounded by references of later witnesses to MM and COCH gang structures and activities and the government's reliance on that evidence in its closing and rebuttal arguments. The expert gang evidence was extremely attenuated from the charges and of little probative value, especially relative to the government's direct evidence from audio/video recordings and percipient law enforcement witnesses.

The district court also admitted highly inflammatory and unnecessary statements by Mr. Tapia that had been surreptitiously captured as part of audio/video recordings or by a government informant. The statements, which had nothing to do with any charged offenses, included, among other things, references to deaths resulting from overdoses of drugs supplied by Mr. Tapia, serious acts of

uncharged violence and ability to get frightening weaponry (grenades, armor piercing ammunition and silencers).

The cumulative effect of the district court's various evidentiary errors amounted to an abdication of its gatekeeping duty, thereby denying Mr. Tapia his right to a fair trial under the Fifth Amendment. Compounding the prejudice from these erroneous evidentiary rulings, the district court prevented Mr. Tapia from presenting the testimony of CHS-1. His testimony was necessary to rebut very significant allegations against Mr. Tapia. The district court's refusal to issue Mr. Tapia's writ denied him his Sixth Amendment right to compulsory process to obtain a witness in his favor.

This Court should reverse Mr. Tapia's conviction and remand for a new trial.

## V.

## STANDARDS OF REVIEW

"Evidentiary rulings [are reviewed] for abuse of discretion." United States v. Whittemore, 776 F.3d 1074, 1077 (9th Cir.), cert. denied, 136 S.Ct. 89 (2015). "Evidentiary rulings will be reversed for abuse of discretion only if such nonconstitutional error more likely than not affected the verdict." Whittemore, 776 F.3d at 1077-78. This court "review[s] de novo whether an evidentiary error rises to the level of a constitutional violation." United States v. Pineda-Doval, 614 F.3d

1019, 1032 (9th Cir. 2010).  "A constitutional error is harmless if it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  United States v. Evans, 728 F.3d 953, 959 (9th Cir. 2013) (quotation marks omitted).

The denial of a writ of habeas corpus *ad testificandum* is reviewed for abuse of discretion.  United States v. Owen, 580 F.2d 365, 368 (9th Cir. 1978); United States v. Smith, 924 F.2d 889, 896 (9th Cir. 1991).

## VI.

## ARGUMENT

### A. The District Court's Failure to Exclude the Gang Evidence Under Rules 402 & 403, denied Mr. Tapia a Fair Trial

This Court should reverse Mr. Tapia's conviction and remand for a new trial because the district court failed to exclude the gang evidence under Federal Rules of Evidence 402 and 403, thereby denying Mr. Tapia his Fifth Amendment[12] right to a fair trial.  "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403.  "[Unfair prejudice] is evidence which . . . 'may cause a jury to base its decision on something other than the established propositions in the case.'"  United States v. Skillman, 922 F.2d 1370, 1374 (9th Cir. 1990), quoting 1 J. Weinstein & M.

---

[12]     The Fifth Amendment to the United States Constitution provides in relevant part: "No person shall be . . . deprived of life, liberty or property, without due process of law; . . ." U.S. Const. amend V.

Berger, <u>Weinstein's Evidence</u>, ¶ 403[03], at 403–36 to 403–39 (1989 ed.). "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." <u>Old Chief v. United States</u>, 519 U.S. 172, 180, 117 S.Ct. 664 (1997), citing generally, 1 J. Weinstein, M. Berger, & J. McLaughlin, <u>Weinstein's Evidence</u> ¶ 403[03] (1996) (discussing the meaning of "unfair prejudice" under Rule 403); <u>see</u> <u>also</u> <u>United States v. Masters</u>, 622 F.2d 83, 87 (4th Cir. 1980) (holding evidence is unduly prejudicial if it creates "a genuine risk that the emotions of the jury will be excited to irrational behavior" and "the risk is disproportionate to the probative value of the offered evidence").

"Where evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury." <u>United States v. Hitt</u>, 981 F.2d 422, 424 (9th Cir. 1992) (finding error in admission of evidence that was "highly prejudicial[,] . . . at most marginally probative[,]" and misleading). "The probative value of evidence against a defendant is low where the evidence does not go to an element of the charge." <u>United States v. Gonzalez-Flores</u>, 418 F.3d 1093, 1098 (9th Cir. 2005); <u>see</u> <u>e.g.</u> <u>United States v. Ellis</u>, 147 F.3d 1131, 1135 (9th Cir. 1998) ("[P]rejudicial books and manuals . . . are normally inadmissible when they are

entirely unnecessary to support the charge of possession.") (quotation marks omitted).

## 1. The Gang Evidence was of Little Probative Value Relative to the Direct Evidence of the Continuing Criminal Enterprise or Other Charges.

The expert gang evidence, admitted for the stated purpose of providing background and context to the CCE charge, was at best tangential to the elements of the charge.  See Gonzalez-Flores, 418 F.3d at 1098 ("The probative value of evidence against a defendant is low where the evidence does not go to an element of the charge.").  The months of surveillance and hours of clandestine audio and video recordings of Mr. Tapia were enough, without the introduction of the unnecessary gang evidence, for the jury to make a determination as to whether the government met its burden.  Indeed the government admitted as much in its Trial Memorandum: "Each of the charged transactions, whether for guns or drugs, was recorded -- in many cases on video.  The government will not need to rely on the testimony of the [confidential human sources] involved in the transactions, but will let defendant's words and actions speak for themselves."  CR 269 at 6, Govt. Trial Memo.  The audio/video surveillance captured numerous drug and firearm sales, and detailed explanations of Mr. Tapia's enterprise.  The seizures themselves were powerful evidence: 19 weapons, 4,990 grams of methamphetamine, 1,104 grams of heroin, and 501.6 grams of cocaine.  Govt. Exh. 409 & 410 (summary charts).

But during trial, the government did not rely, as it said it could, just on Mr. Tapia's words and actions. Rather, the government injected expert testimony about the violent gang operations, COCH ties to the MM prison gang, and the COCH and MM leadership structure. Agents Long and Moreno testified for nearly the first two days of the trial about the history of the MM, common MM tattoos, the CDCR process to determine MM validation, how powerful the MM was in California essentially controlling all narcotics and firearms criminal activity on the streets and the power the MM and COCH gangs gave Mr. Tapia to control the distribution of narcotics and firearms in Oxnard.

Unlike the audio/video recordings and other evidence about the actual transactions charged, neither Long's testimony nor Moreno's testimony went directly towards an element of the CCE, conspiracies or substantive transactions charged.

**2.      The Government's Burden Was To Prove Beyond A Reasonable Doubt That Mr. Tapia Engaged In A Continuing Criminal Enterprise, Not How He Was Able To Do So Or Why He Did So.**

The audio/video recordings did not require "context for understanding defendant's statements" or "context to the necessary elements to sustain the CCE or other charges. The jury watched surveillance recordings of Mr. Tapia on numerous occasions selling firearms and drugs, and heard testimony and

recordings of his meetings, activities, and conversations, demonstrating that he was a principal administrator, organizer, or leader of the enterprise. See Title 21 U.S.C. §848(b)(1) ("such person is the principal administrator, organizer, or leader." The conspiracies charged did not require him to be a leader to prove that he had entered into an unlawful agreement with others to possess and distribute firearms or narcotics and that acts in furtherance had been committed (i.e. the numerous sales and discussions preceding the sales). Title 21 U.S.C. §846 (Count 1) and Title 18 U.S.C. §371 (Count 2). Mr. Tapia's words and actions were captured in 25 audio and/or video recordings and indeed "spoke for themselves." The extensive recorded statements belie the government's theory of admission that "without explanation of the source of defendant's power (the COCH gang and the Mexican Mafia), the jury will not be able to perceive or understand defendant's ability to lead such a prolific criminal enterprise[.]" Cf. CR 230, Govt. Opp. To Def. Motion at 5-6.

The government was not tasked with, nor did it bear the burden of, providing the jury context or an explanation of how or why Mr. Tapia was engaged in the enterprise. Again, Mr. Tapia's words and actions spoke for themselves. While background and context may sometimes assist a jury and help a party to present its case in a coherent manner, in this case the recorded audio/video surveillance communicated all the jury needed to know. The government's theory that Mr.

Tapia's gang membership -- and by extension the MM -- was the source of Mr. Tapia's "ability to lead" the CCE, or conspiracies, or his "influence over the other members," and "his source of criminal assets," was simply not at issue in this case, and therefore the expert evidence was not essential to understand any of those things.

The government did not bear the burden of proving all factors that contributed to Mr. Tapia's ability to carry out the CCE, that is, how he had access to the resources to engage in the CCE or why others worked with or for him. Rather, the government's burden was to prove beyond a reasonable doubt that Mr. Tapia actually engaged in a CCE, the conspiracies or the substantive counts. Here each of the charged transactions, whether for guns or drugs, was recorded -- in many cases on video. The court should not have admitted the gang evidence based on the government's argument that the evidence showed the jury how Mr. Tapia was able to engage in the enterprise and why he did so. Those points were not at issue and were not "essential" for the jury to understand Mr. Tapia's leadership role in the enterprise.

**3.      The Gang Evidence was Extremely Attenuated From the Charges.**

Next, the gang evidence, admitted purportedly to provide background and context for the CCE charge, was extremely attenuated from the elements of that crime. The jury was presented with direct evidence of the CCE, in the form of

audio/video recordings of firearm sales in hotel rooms, drug deals in parking lots, and Mr. Tapia's own recorded statements indicating that people worked for him in connection with the ongoing transactions of drugs and firearms. This evidence did not involve gangs and did not require an understanding of gang history or structure. The evidence, like Mr. Tapia's words, spoke for itself.

Indeed, the expert testimony about the COCH and the MM was so far removed from the direct, recorded evidence of Mr. Tapia and the enterprise that it could have been from a different trial altogether. In a case where the enterprise was, for all intents and purposes, captured on film in various hotel rooms and parking lots, the government presented extensive gang expert testimony about COCH ties to the MM prison gang, the COCH leadership structure, and acts engaged in by COCH, including drug trafficking and firearm sales, murder, robbery, and extortion. These experts presented a lengthy and inflammatory history of the MM and COCH which was not necessary.

The government's theory was that of influence cascading seamlessly from the MM prison gang, to COCH, to Mr. Tapia, and eventually to Mr. Tapia's control over the CCE supervisees: (1) Mr. Tapia obtained his "position of leadership in the enterprise as a direct corollary to his leadership position within [COCH]" and that COCH "obtains its power in part from its affiliation with the MM prison gang." See CR 269, Trial Memo at 6-7; July 29, 2015 RT 21-24. But

this theory required a number of significant leaps.

Indeed, the gang evidence was so far removed from Mr. Tapia's acts and the charges in this case, that the government's theory of cascading influence, taken to its logical conclusion, should also have included evidence of the source of the MM's leadership and influence.[13] That is, Mexican drug cartels importing narcotics into the United States fueled by an increasing demand for narcotics throughout the United States. Of course, evidence about Mexican drug cartels would have been transparently tangential, of little, if any, probative value, and unfairly prejudicial. See United States v. Echavarria-Olarte, 904 F.2d 1391, 1398 (9th Cir. 1990), cert. denied, 534 U.S. 851, 122 S.Ct. 118 (2001) (finding of little probative value and very prejudicial expert testimony about the methods of a Columbian drug cartel where the testimony "did not bear squarely on any part" of the main drug trafficking organizations at issue). Injecting such clearly attenuated evidence into the trial, over a defense objection, would have been in error because establishing the source of the MM's leadership and influence was not at issue in this case, much like establishing the source of COCH's and Mr. Tapia's leadership and influence was not at issue in this case. The issue was whether Mr. Tapia engaged in the CCE, not how he was able to do so, why he did so, or the source of

---

[13]     See CR 230, Govt. Opp. To Def. Motion at 5-6 ("The government believes that without explanation of the source of defendant's power . . . the jury will not be able to perceive or understand defendant's ability to lead such a prolific criminal enterprise.")).

his leadership.

But this is precisely the same logic that the district court used in admitting evidence of COCH and the MM in this case: to explain the source of Mr. Tapia's leadership within the enterprise, flowing from COCH, and ultimately from the MM prison gang. The probative value of Mexican drug cartel evidence to establish the source of the MM's influence is low and the prejudice high. See Echavarria-Olarte, 904 F.2d at 1398. Similarly, the probative value of COCH and MM evidence to establish the source of Mr. Tapia's influence is low and the prejudice high. Simply put, Mr. Tapia's leadership of the enterprise was evidenced in hours of audio and video recordings and by percipient witnesses with direct evidence of Mr. Tapia's involvement with the enterprise; evidence of COCH and the MM prison gang -- purportedly to establish the source of Mr. Tapia's leadership and influence -- was of very little probative value, if any. See Hitt, 981 F.2d at 424 ("Where evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury.").

**4.    The Evidence Did Not Support The Government's Theory That The Source Of Mr. Tapia's Leadership Within The Enterprise Flowed From COCH And The Mexican Mafia.**

Additionally, the evidence did not support the government's theory that the CCE supervisees participated in the CCE because of Mr. Tapia's membership in or

association with any gang.  Rather, the enterprise appeared to operate as a business driven by desire for personal financial gain.  Specifically, supervisees Dibble and Hynes were not COCH members and Mr. Tapia was amorous with Hynes.  RT 281, 1184-5.  There was no evidence that Ms. Dibble, Ms. Hynes, or any supervisee participated in the enterprise because of Mr. Tapia's connection to COCH or the MM.  Indeed, there was no evidence that any supervisee participated in the enterprise as a result of threats, coercion, or intimidation in connection with any gang.  To the contrary, Mr. Tapia invited two alleged supervisees, Cardenas and Aguilar, to Las Vegas as a treat for people working hard.  RT 866-868.  The opportunity to have fun in Las Vegas was motivating the alleged supervisees, not a connection to COCH or MM.

Although the government argued that Mr. Tapia's influence flowed from the MM, to COCH, to the enterprise, the evidence about the enterprise simply did not support that theory.  The government provided ample evidence of Mr. Tapia's connection to, and involvement with, COCH, but there was no evidence directly tying his COCH involvement to his involvement with the enterprise.  Indeed, the only connection was not evidentiary in nature, but rather argumentative, as set forth in the government's pre-trial briefing and summation to the jury.  (See generally, CR 230, Gov't Opp.; see also Transcript, September 12, 2015 Trial, Day 9 at 1344, 1359-1364).  While Mr. Tapia may have been involved with COCH,

especially in years past, the actual evidence did not demonstrate his COCH involvement was necessarily intertwined with his involvement in the enterprise. If anything, the evidence demonstrated that Mr. Tapia's involvement in the enterprise was driven by his general experience with drugs and firearms, his access to capital, and his desire for personal financial gain. He often spoke of how much profit he made. See e.g., Govt. Exh. 21 ("my goal is to make 100 grand each transaction); RT 1382 ("I'm all about the money"); RT 892 (made the $100,000 back that he'd lost in the June seizure); and Govt. Exh 54 (audio 6/8/11) "I buy a kilo [heroin] every week, two weeks.. . It's real good money"). There is simply no direct evidence on any recording or from any percipient witness that Mr. Tapia's involvement with any gang enabled him to manage the enterprise.

This directly contradicts any argument that "defendant's leadership of the CCE (a necessary element) is based almost entirely upon his position as the head of the COCH and as a validated Mexican Mafia associate." See CR 230, Govt. Opp. at 11 (emphasis added). The indictment alleged that Mr. Tapia organized and supervised people. See ER 45, CR 34 (Count 29). The indictment did not allege that he did so on behalf of COCH or the MM. *Id.* Moreover, the recordings and surveillance demonstrate that Mr. Tapia acted for his own gain, not that he was dealing drugs or firearms for a gang. That he was ever a member of COCH or associate of MM is at best tangential to the issues in this case.

**5.      The Gang Evidence Became the Trial's Underlying Theme.**

Contrary to the government's pre-trial assurances to the district court that the expert testimony on gang evidence would be "very limited" and "very brief," the gang evidence became a wide-ranging inquiry into the criminality and violent dispositions of COCH and the MM.  The gang evidence transformed the trial from what it should have been -- as set forth in the indictment, whether Mr. Tapia sold or possessed drugs and firearms, and whether he held a leadership role within that enterprise -- into a trial about the MM, murder, robbery, and extortion, none of which appear in the indictment, and all of which were inflammatory and unfairly prejudicial.

The gang evidence became the trial's underlying theme, much more than a mere "unavoidable incident" or "passing reference."  See United States v. Street, 548 F.3d 618, 632 (8th Cir. 2008).[14]  Indeed, the government actively petitioned the district court to allow experts to testify about gang evidence over Mr. Tapia's objections.  See generally CR 230, Govt. Opp. To Def. Mot.; CR 269, Govt. Trial Memo. at 24; July 29, 2014 RT at 21-25.  Having convinced the district court to permit the gang evidence, the government abandoned all subtlety and began its

---

[14] "[W]hen mention of gang membership is allowed it is generally an unavoidable incident of presenting other permissible evidence."  Street, 548 F.3d at 632 (emphasis in original).  "[A] passing reference to gang membership has been upheld where it is relevant to explain police investigatory tactics."  Id. citing United States v. Lemon, 239 F.3d 968, 971-72 (8th Cir. 2001), cert. denied, 540 U.S. 931, 124 S.Ct. 347 (2003).

case in chief with more than two days of expert gang testimony, ranging from COCH's violent exploits in Ventura County and Mexico, and the MM's stranglehold on U.S. prisons.  Following the government's dramatic opening act, "the jury could not [then] disregard the entire theme of the trial: guilty by association."  See United States v. Roark, 924 F.2d 1426, 1434 (8th Cir. 1991) (finding reversible error in the government's attempt to tie appellant's guilt directly to his association with the Hells Angels motorcycle club).

> **6.    The Gang Evidence was Highly Inflammatory and Unfairly Prejudicial.**

Not only did the attenuated gang evidence play an unnecessarily outsized, entirely avoidable role in the government's case against Mr. Tapia, it was also highly inflammatory and unfairly prejudicial.  "[E]vidence relating to gang involvement will almost always be prejudicial and will constitute reversible error." Kennedy v. Lockyer, 379 F.3d 1041, 1055 (9th Cir. 2004), cert. denied, 544 U.S. 992, 125 S.Ct. 1823 (2005).  "Evidence of gang membership may not be introduced . . . to prove intent or culpability."  Lockyer, 379 F.3d at 1055, citing United States v. Garcia, 151 F.3d 1243, 1244-46 (9th Cir. 1998) (reversing conviction and stating that it would be "contrary to fundamental principles of our justice system" to find a defendant guilty on the basis of his association with gang members).  "Testimony regarding gang membership creates a risk that the jury will probably equate gang membership with the charged crimes."  United States v.

Hankey, 203 F.3d 1160, 1170 (9th Cir.), cert. denied, 530 U.S. 1268, 120 S.Ct. 2733 (2000) (quotation marks and alteration marks omitted). Thus, "where gang evidence is proffered to prove a substantive element of the crime (and not for impeachment purposes), it [is likely] unduly prejudicial." Lockyer, 379 F.3d at 1056 (quotation marks omitted); see also United States v. Roark, 924 F.2d 1426, 1434 (8th Cir. 1991) ("Evidence of uncharged misconduct to show criminal propensity is inadmissible not because it is logically irrelevant, but because it is inherently and unfairly prejudicial. It deflects the jury's attention from the immediate charges and causes it to prejudge a person with a disreputable past, thereby denying that person a fair opportunity to defend against the offense that is charged."), citing Michelson v. United States, 335 U.S. 469, 475-76, 69 S.Ct. 213 (1948) ("The overriding policy of excluding [evidence of a defendant's 'evil character'] despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.").

The gang evidence, on its face, was inherently and unfairly prejudicial. See Lockyer, 379 F.3d at 1055-56 ("[E]vidence relating to gang involvement will almost always be prejudicial and will constitute reversible error[,]" and "where gang evidence is proffered to prove a substantive element of the crime (and not for

impeachment purposes), it [is likely] unduly prejudicial.") (quotation marks omitted).

Even assuming relevance to the government's theory, relevance is never a court's only consideration and courts frequently exclude relevant evidence. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597, 113 S.Ct. 2786 (1993) ("We recognize that, in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes."). This Circuit has permitted the admission of gang evidence to establish motive. United States v. Santiago, 46 F.3d 885, 889 (9th Cir. 1995); United States v. Major, 676 F.3d 803, 810 (9th Cir. 2012)). However, not only did Santiago and Major consider factually scenarios distinct from this case, more importantly, in those cases this Court sanctioned the more focused application of gang evidence to establish motive, in part because of Rule 404(b)'s "exception for evidence regarding motive." See United States v. Rodriguez, 766 F.3d 970, 986 (9th Cir. 2014), cert. denied, 135 S.Ct. 1013 (2015), citing United States v. Santiago, 46 F.3d 885, 888-89 (9th Cir. 1995).

In Rodriguez and Santiago the evidence of gang membership and practices was offered for the specific, focused purpose of showing a motive to commit the murder of another prison inmate.  See Rodriguez, 766 F.3d at 973, 987 (concluding "the district court did not abuse its discretion in admitting evidence pertaining to the connection between the Surenos and the MM as relevant to Appellants' motive in attacking [the deceased]") (emphasis added),  citing Major, 676 F.3d at 810 (holding that the district court did not abuse its discretion in admitting gang affiliation evidence as relevant to motive); Santiago, 46 F.3d at 888-90 (finding Mexican Mafia evidence admissible under Rule 404(b) "as proof of motive" and citing examples of this Court "specifically admitt[ing] evidence relating to gangs and other organizations when relevant to the issue of motive") (emphasis added); see also, e.g., United States v. Cutler, 806 F.2d 993, 936 (9th Cir. 1986) (admitting evidence of affiliation with Aryan Nation to show defendant's motive to hire hit man to kill persons who might testify against the group and to rebut entrapment defense); United States v. Skillman, 922 F.2d 1370, 1374 (9th Cir. 1990) (admitting testimony that defendant asked to attend a "skinhead" picnic as tending to establish defendant's racial animus and possibility that he would act on his beliefs in civil rights case);  United States v. Winslow, 962 F.2d 845, 850 (9th Cir. 1992) (admitting testimony on Aryan Nation as relevant to bombing of "gay bar" by group members); Windham v. Merkle, 163 F.3d 1092, 1103-04 (9th Cir. 1998),

cert. denied, 541 U.S. 950, 124 S.Ct. 1689 (holding gang evidence admissible to demonstrate defendant's motive for participating in the alleged crimes). Here, at the government's request, the district court admitted the gang evidence for the sole purpose of providing background for the jury. ER 72, July 29, 2015 RT 27:15-17 (emphasis added).

In United States v. Cerna, CR 08-0730-WHA, 2010 WL 2347406, *5 (N.D. Cal. June 8, 2010) (unreported), a RICO case based on drug trafficking and other activity in support of an alleged drug organization outside prison, the district court considered and rejected the use of gang expert testimony in a factual scenario very similar to the one here. Cerna expressly noted and discussed the Ninth Circuit cases that have considered the admissibility of gang expert testimony in this context and explained their limitations.

In Hankey, Padilla and Takahashi, the Ninth Circuit allowed the introduction of law enforcement expert opinion regarding the existence, structure, and history of gangs, only as rebuttal testimony and for the limited purpose of impeaching a defense witness. In United States v. Hankey, 203 F.3d 1160, 1164 (9th Cir. 2000), (expert testimony permitted regarding a gang's "code of silence" to provide the jury with an explanation for why a defendant would lie on a co-defendant's behalf); United States v. Padilla, 387 F.3d 1087, 1094 (9th Cir. 2004)( expert testimony permitted regarding punishment for junior members of the gang who

failed to support senior members, only for the limited purpose of impeaching the exculpatory testimony of a witness who was a junior member of the gang); and, United States v. Takahashi, 205 F.3d 1161, 1165 (9th Cir. 2000)(expert testimony permitted regarding the loyalty oaths sworn by members of the Yakuza gang for the limited purpose of impeaching a witness).

In this case, in contrast, the trial court permitted the government to submit extensive gang evidence in its case in chief, to describe the evidence in detail in its opening statement and to consume the first two days of testimony with such expert testimony. It was hardly "limited," "brief," or "some background." Unlike the narrow exception for motive, as set forth in Rule 404(b), and this Court's approval of gang expert testimony for impeachment, no exception exists for admitting gang evidence for the sole purpose of giving background or context. As discussed above, in this case, context in the form of the gang evidence was unnecessary, of little probative value, if any, highly inflammatory, extremely prejudicial, and should have been excluded under Rule 403. See United States v. Curtin, 489 F.3d 935, 961, 964 (9th Cir. 2007) (en banc) (Kleinfeld, J., concurring) ("Trial courts should exclude marginally relevant but extremely prejudicial evidence.") (concurring in reversal of conviction but arguing that the evidence in question should have been excluded for lack of relevance and held inadmissible to show intent). Here, two full days of gang evidence infected the trial and became its

underlying theme (see <u>Roark</u>, 924 F.2d at 1434), and the jury inevitably "equate[d]

gang membership with the charged crimes[.]"  <u>See</u> <u>Hankey</u>, 203 F.3d at 1170.

Thus, Mr. Tapia lost any hope for the fair trial to which he is entitled.  <u>See</u> U.S.

Const. amend. V; <u>see</u> <u>also</u> <u>Press-Enterprise Co. v. Superior Court of Cal., Riverside

Cnty.</u>, 464 U.S. 501, 508, 104 S.Ct. 819 (1984) ("No right ranks higher than the

right of the accused to a fair trial.").

**B.    THE DISTRICT COURT'S FAILURE TO EXCLUDE THE
       INFLAMMATORY STATEMENTS UNDER RULES 402 & 403
       DENIED MR. TAPIA A FAIR TRIAL**

Over Mr. Tapia's objection, the district court admitted five highly

inflammatory and unnecessary statements by Mr. Tapia.  ER 67, CR 246, Minute

Order.  The statements included, among other things, references to deaths resulting

from drug overdoses of drugs supplied by Mr. Tapia, serious acts of uncharged

violence or interest in frightening weaponry (grenades, armor piercing ammunition

and silencers).  Mr. Tapia was not charged with any such crimes or any

enhancement related to death or serious bodily injury resulting from any narcotics

traced to him.  <u>See</u> <u>generally</u>, Indictment, ER 1, CR 34.  References to those acts

had no place in this trial.  The statements at issue were not necessary to establish

Mr. Tapia's knowledge of the illegality of the firearms possessed or transferred.

That was evident from the clandestine nature of the transactions and coded

language used when speaking of the firearms on the phone as well as statements

other than the inflammatory ones. Even assuming some marginal probative value of these inflammatory statements, they could have been easily replicated with other, less prejudicial evidence.

## 1. The Inflammatory Statements Were Highly Prejudicial and Cumulative of Other Evidence.

With respect to Mr. Tapia's statements regarding narcotics, the district court should have excluded any reference or allusion to an uncharged overdose or death under Rule 403. See United States v. Cooper, 591 F.3d 582, 589-90 (7th Cir.), cert. denied, 561 U.S. 1036, 130 S.Ct. 3530 (2010) (holding that "evidence of what happened to [defendant's] customers after they bought heroin from him had nothing to do with the charges" and finding error in the admission of evidence that a customer had died after using heroin purchased from him); see also, United States v. Boros, 668 F.3d 901, 910 (7th Cir. 2012) (holding expert testimony "about the drug's side effects and birth defects had a meaningful potential for unfair prejudice, which substantially outweighed the limited probative value of the background evidence.").

As an example, one of the statements, recorded on June 17, 2011, consisted of Mr. Tapia stating the following about heroin he was selling: "Honestly, [the heroin is] so strong it killed six people already. . . . [I]t killed six people." Govt. Exh. 116 (audio recording of 6/17/11). In a transparent effort to paint this highly inflammatory statement, and the others, with a gloss of legitimacy, the government

argued that the statements served as "enticements to do more business with defendant, to choose him over other suppliers, and not to double-cross him: his drugs are the strongest, his firearm connections the best, his organization the most ruthless and most powerful." See CR 227, Govt. Opp. To Def. Motion at 5. The government also claimed the statements went to Mr. Tapia's "intent, capabilities, and expertise." *Id.*

However, putting aside the statements' exceedingly low probative value, the evidence was wholly unnecessary in light of other, more direct, less prejudicial statements made by Mr. Tapia regarding the quality and supply of his narcotics. Indeed, the government's recorded evidence played for the jury included several statements with much higher probative value and significantly less risk of unfair prejudice:

- Mr. Tapia states: "my coke . . . its high high grade" Govt. Exh 21 (audio 5/19/11) and "It's good Dom, even when, even when you break down the stuff it's all good." *Id.*
- Mr. Tapia talked about having Heroin that "looked likes hot cocoa. Its real high potent ." Govt. Exh 54 (audio 6/8/11) Tapia stated he gets in kilo quantity and pays $33,500 per kilo. *Id.* Tapia stated he is the only one that controls the market on that, he has people coming from Orange County, Central Coast, and Santa Barbara. Tapia states he gets a kilo like every one or two weeks." *Id.*
- Mr. Tapia states he does heroin, powder, glass and weed. Govt. Exh. 239 (audio 9/16/11). Mr. Tapia states "Mine business [sic] is consistent . . . . I deal with everything." He "then discussed the quality of the different types of methamphetamine and he knew the quality they were getting[,]" stating "[w]e are like Walmart [sic]. I will give you the stuff, if you don't want it, give it back."). *Id.*

These example alternative recorded statements go directly to the quality and supply of Mr. Tapia's narcotics, without the substantial risk of unfair prejudice inherent in references or allusions to an uncharged overdose or death in a drug case. See Cooper, 591 F.3d at 589-90 ("evidence of what happened to [defendant's] customers after they bought heroin from him had nothing to do with the charges"); Boros, 668 F.3d at 910 (holding expert testimony "about the drug's side effects and birth defects had a meaningful potential for unfair prejudice, which substantially outweighed the limited probative value of the background evidence"). The existence of these other, less prejudicial statements on the same topic greatly diminished the already slight probative value of the extremely inflammatory and prejudicial statements admitted by the court and used by the government. See 22 C. Wright & K. Graham, Federal Practice and Procedure § 5250 at 546-47 (1978) ("The probative worth of any particular bit of evidence is obviously affected by the scarcity or abundance of other evidence on the same point[.]"); Old Chief, 519 U.S. at 184, 117 S.Ct. 664 ("[W]hat counts as the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives."); United States v. W.R. Grace, 504 F.3d 745, 759 n. 6 (9th Cir. 2007), cert. denied, 554 U.S. 918, 128 S.Ct. 2964 (2008) ("'[A]vailability of other means of proof may also be an appropriate factor' of determining when there is unfair prejudice.") (quoting Advisory Comm. Notes,

Fed. R. Evid 403 (1972)); <u>United States v. Hardy</u>, 643 F.3d 143, 150 (6th Cir.),

<u>cert</u>. <u>denied</u>, 132 S.Ct. 762 (2011) ("One factor in that assessment [under Rule 403]

is the availability of other means of proof[.]").  The district court should have

excluded the statements under Rule 403.

## 2. The District Court Should Have Excluded Evidence of the Uncharged Violence.

Mr. Tapia was not charged with any crime of violence.  Statements

regarding past acts of extreme violence, or wanting a gun that shoots people,

therefore were of very little probative value.  The statements unambiguously

implied that Mr. Tapia intended to commit murder and that he was willing to

provide ammunition for use in the murder of law enforcement officers: September

17, 2011: Mr. Tapia "could provide . . . guns that fire ammunition capable of

piercing law enforcement vests[.]" Exh. 242 (Audio meeting 9/17/11).  Then on

October 19, 2011: Mr. Tapia states that he just wanted a gun that "shoots

people[.]" Exh 247.

Needless to say, the statements were highly prejudicial. Uncharged murder

evidence is highly prejudicial for "obvious reasons."  <u>United States v. Kassir</u>, 2009

WL 976821, *7 (S.D.N.Y. April 9, 2009); <u>see</u> <u>also</u> <u>United States v. Khan</u>, 591

F.Supp.2d 202, 206 (E.D.N.Y. 2008) (finding after considering whether to exclude

evidence of uncharged murder evidence, the "probative value gained -- proof of

defendant's leadership role -- is substantially outweighed by the risk of undue

prejudice"). Additionally, appellate courts have declined to find undue prejudice, in part because the evidence of uncharged criminal conduct was not "more serious than the charged crime." See e.g. United States v. Williams, 205 F.3d 23, 34 (2d Cir.), cert. denied, 531 U.S. 885, 121 S.Ct. 203 (2000); United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999), cert. denied, 529 U.S. 1108, 120 S.Ct. 1961 (2000) ("the evidence did not involve conduct more inflammatory than the charged crime").

Here, statements evincing a desire to shoot people or have ammunition that could pierce an officer's vest are much more serious and inflammatory than the evidence of Mr. Tapia's business selling firearms and drugs. See Williams, 205 F.3d at 34 (finding no undue prejudice, in part because the evidence of uncharged criminal conduct was not "more serious than the charged crime."); Livoti, 196 F.3d at 326 ("the evidence did not involve conduct more inflammatory than the charged crime"). Indeed, the extraneous evidence of uncharged murder in this drug case presented a substantial and prejudicial shift in the emotional tenor of the evidence. Furthermore, not only was the admission of murder evidence highly prejudicial (see Kassir, 2009 WL 976821, at *7 (uncharged murder evidence is highly prejudicial for "obvious reasons")), it was of little or no probative value because Mr. Tapia was not charged with any crime of violence. See Fed. R. Evid. 403.

These inflammatory statements about acts of violence were exceedingly attenuated from the CCE charge or accusation of leadership in the charged conspiracies. A CCE charge does not give the government cart blanche to admit any and all evidence that tends to show a defendant is an experienced criminal capable of holding a leadership position in the CCE.

Furthermore, separate from the inflammatory statements, the jury watched surveillance recordings of Mr. Tapia on numerous occasions selling firearms and drugs, and heard testimony and recordings of his meetings, activities, and conversations. Hours of audio and video surveillance of Mr. Tapia actually engaging in and leading the business at the heart of the CCE charge greatly diminished the already slight probative value of the extremely inflammatory and prejudicial statements of violence. See 22 C. Wright & K. Graham, Federal Practice and Procedure § 5250 at 546-47 (1978) ("The probative worth of any particular bit of evidence is obviously affected by the scarcity or abundance of other evidence on the same point[.]"). Separate and apart from his statements regarding acts of violence, Mr. Tapia's words and actions in the surveillance recordings "sp[oke] for themselves." (See CR 269, Government's Trial Mem. at 6). The district court should not have admitted the statements.

3. **The District Court Should Have Excluded Evidence of Mr. Tapia's Stated Interest in the Purchase of Certain Weapons and Weapon Accessories, None of Which Provided the Basis for Any Charge**.

As with the evidence of death related to drug overdose, and the evidence of uncharged violence, Mr. Tapia was not charged with attempting to obtain grenades, silencers, or armor piercing ammunition.[15]  However, the court nonetheless admitted Mr. Tapia's statements that he "was interested in the price of grenades" Govt. Exh. 116 (audio recording 6/17/11 meeting), and that he "was interested in obtaining silencers and had a source that could make them."  Govt. Exh. 224 (audio recording 9/8/11 meeting).

The probative value of these statements is especially low.  As the government conceded, these statements are merely "expressions of defendant's interest[.]"  CR 227, Govt. Opp. to Def. Motion at 9-10.  Indeed, contrary to the government's pre-trial argument, Mr. Tapia's inquiry of CHS-2 regarding the price of certain items does not demonstrate Mr. Tapia's "bona fides" or show that "his firearm connections [are] the best[,]" as the government argued.  CR 227, Govt. Opp. to Def. Motion at 5 (emphasis added).  Nor do Mr. Tapia's inquiries help the government establish "the source and magnitude of his power within the COCH gang" or his "network of connections and resources[,]" as the government also

---

[15] The parties stipulated that Mr. Tapia "was a convicted felon prior to March 2011 and the first conduct charged against him in the Indictment in this matter[,]" so the fact that he was prohibited from possessing firearms was not in dispute.  CR 275.

argued.  See CR 227, Statement Opp. at 6.  If anything, Mr. Tapia's statements

undercut the government's argument because the statements indicate that Mr.

Tapia's access to weapons and ammunition was far from unfettered.

Furthermore, similar to the evidence of death by heroin overdose and

uncharged murder evidence, the government had other, equally effective evidence

which actually supported the government's argument, unlike the highly prejudicial,

extraneous statements admitted by the court. Examples include:

- "Tapia took the money and asked the CHS-2 about doing a larger gun deal for approximately 70 firearms." RT 814-815
- "Tapia told CHS-2 he knows a Marine that can get him assault rifles and has contacts in Mexico who can get him 300 guns. Exh. 54 (audio recording meeting 6/8/11)
- "Tapia again told the CHS that he can get CHS-2 "assaults [rifles] all day long" Exh. 177 (audio recording meeting 7/19/11)

The existence of this other, less prejudicial evidence on the same topic

greatly diminished the already slight probative value of the inflammatory and

prejudicial statements admitted by the court.  See 22 C. Wright & K. Graham,

Federal Practice and Procedure § 5250 at 546-47 (1978) ("The probative worth of

any particular bit of evidence is obviously affected by the scarcity or abundance of

other evidence on the same point[.]").  Indeed, this other, less prejudicial evidence

achieved the government's stated goal of demonstrating Mr. Tapia's "bona fides"

and showing that "his firearm connections [are] the best[.]"  (See CR 227,

Statement Opp. at 5).

The government's purported goal behind introducing Mr. Tapia's statements about grenades and silencers could have been accomplished more effectively through the much less inflammatory evidence that actually supported the government's position. Instead, consistent with the district court's repeated abdication of its role as gatekeeper in this case, the district court admitted the highly inflammatory statements about grenades and silencers, thereby exposing Mr. Tapia to yet another barrage of unfair prejudice, which substantially outweighed its minimal probative value. The district court should have excluded evidence of Mr. Tapia's stated interest in the price of grenades and the purchase of silencers, neither of which provided the basis for any charge.

## C. THE DISTRICT COURT DENIED MR. TAPIA A FAIR TRIAL WHEN IT REFUSED TO COMPEL THE ATTENDANCE OF CHS-1, A NECESSARY DEFENSE WITNESS

The district court abused its discretion in denying the defense request for a Writ to issue compelling the presence of CHS-1 as a witness at trial. The Court found that he had not shown "necessity or relevance" of his testimony, which finding is contradicted by the specific showing made to the court. Courts have generally required criminal defendants requesting such writs to comply with Fed.R.Crim.Proc. 17(b), which looks for "a satisfactory showing ... that the presence of the witness is necessary to an adequate defense." *See*, e.g., United States v. Rinchack, 820 F.2d 1557, 1567 (11th Cir.1987). This Circuit has stated:

"If the accused avers facts which, if true, would be relevant to any issue in the case, the requests for subpoenas must be granted, unless the averments are inherently incredible on their face, or unless the Government shows, either by introducing evidence or from matters already of record, that the averments are untrue or that the request is otherwise frivolous."

United States v. Sims, 637 F.2d 625, 627 (9th Cir.1980) (quotation omitted);

United States v. Smith, 924 F.2d 889, 896 (9th Cir. 1991).

The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law. Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920 (1967). "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment[16], the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142 (1986) (citations and quotation marks omitted).

---

[16] The Sixth Amendment to the United States Constitution states in relevant part that "In all criminal prosecutions, the accused shall enjoy the right . . .to have compulsory process for obtaining witnesses in his favor, . . . " U.S. Const. amend. VI.

Mr. Tapia sought to introduce through CHS-1 evidence rebutting certain significant government allegations with respect to the nature and extent of Mr. Tapia's leadership within the alleged conspiracies or CCE.  See Washington v. Texas, 388 U.S. at 19.  (discussing a defendant's "right to present his own witnesses to establish a defense" as a "fundamental element of due process of law").  However, the district court declined to issue the writ "on the basis of an inadequate showing of the necessity or relevance of his testimony."  (See CR 246, Minute Order: Motions in Limine Hearing, July 29, 2014).

The jury returned verdicts of guilty on all counts.  The jury also returned a special verdict form finding specific drug amounts and, with respect to the CCE count (29), that Mr. Tapia had supervised, five or more persons and named those persons Zamora, Cardenas, Dibble, Jimenez and Aguilar.  One of those persons was Roger Armendariz.  As set forth in the pretrial proffer in support of the defense  request to writ informant CHS-1 to trial to call him as a defense witness, if Roger Armendariz was in fact working for CHS-1 at his direction rather than at the direction of Mr. Tapia, he could not be included in the required number of supervisees to support a CCE conviction.

Specifically, as presented to the district court in counsel's declaration filed *under seal* and *in camera*, defense counsel had a good faith reason to believe that many of the alleged supervisees necessary for the CCE conviction were in fact

working for and supervised by CHS-1, not Mr. Tapia.  ER 162-239, Defendants

Factual Basis in Support of Defendant's Opposition to Government's Motion in

Limine to Quash the Writ of Government Informant.

The defense sought the testimony of CHS-1 to establish that:

■CHS-1 was close personal friends with several persons alleged to be supervisees
of Mr. Tapia[17] (ER 172);
■That CHS-1 was crime partners with Ernesto Salazar (if CHS-1 denied this at

trial, court records would have established that CHS-1 and Salazar plead guilty to

threatening a victim with a firearm in violation of California Penal Code 417(a)(2))

on April 19, 2012 (ER 174-175);

■that CHS-1 coordinated the June 14, 2011 beach meeting which many COCH

gang members attended, arranged for his "right hand" man Roger Armendariz to

use his mobile home to collect up local young men to bring them to the meeting,

(ER 172-173);

■that CHS-1 could have identified Armendariz in the surveillance photo, as the

driver of his mobile home at the June 14 beach meeting, a necessary identification

as the agents testified they could not see or recognize the driver in their

surveillance photo capturing the mobile home (Def. Exh. 1031; RT 684, 930) or

whether persons had exited the mobile home that drove to the meeting place—facts

---

[17]      The government filed a Bill of Particulars pretrial identifying the persons
whom it alleged were organized, supervised or managed by Tapia.  ER 50, CR
200-1.  The list included amongst others: Roger Armendariz, Ernesto Salazar, and
the persons present at the June 14, 2011 beach parking lot meeting.

which would undermine that Mr. Tapia organized and controlled that meeting, (ER 172-173);

■that CHS-1 could have assisted the jury in understanding that in the portion of the June 14 recording that preceded the part the government played at trial, that he was calling gang members on the phone, giving directions and reminding them to attend (ER at 172-173). At trial, the government argued that Mr. Tapia organized and led the June 14, 2011 meeting. The government pointed to, among other things, Mr. Tapia's statements of support to the meeting's attendees. However, defense counsel had a good faith basis to believe that Armendariz, not Mr. Tapia organized the meeting, provided transportation for attendees, and eventually determined there was a quorum before beginning the meeting. To rebut the government's allegation that Mr. Tapia organized and led the meeting, Mr. Tapia sought to introduce CHS-1's testimony about Armendariz's role in connection with the June 14, 2011 meeting;

■that CHS-1 could have assisted the jury in this difficult to hear recording that he was introducing several attendees to Mr. Tapia, because he knew them and Mr. Tapia did not, a fact which undercut the government's position that Mr. Tapia was the leader/organizer of the June 14 group (ER 172-173);

■That CHS-1 could have confirmed he stashed illegal firearms in his mobile home and later gave some of those to Mr. Tapia to sell to CHS-2, (ER at 173-174).

CHS-1's testimony would have established he supplied at least some of the illegal firearms to Tapia, and undermined the inference (from the agent's testimony that they searched CHS-1 before and after transactions RT 600-601) that Mr. Tapia-- and not CHS-1 --was the source of weapons sold to CHS-2, thereby undermining the government's theory as to Count Two that "Defendant Tapia would lead, direct, and manage a firearms trafficking organization[.]" ER 16, CR 1;

■CHS-1 would have had to admit that he possessed and sold drugs and firearms for his own profit and business separate from Mr. Tapia (ER at 174) and undermined the government's theory of the case that Mr. Tapia controlled narcotics and firearms trafficking in Oxnard. CHS-1 criminal activity before, during and after this investigation supported the defense position. CHS-1 had been convicted of felony narcotics sales not involving Mr. Tapia in 2001 and in February 2011 was caught in possession of a large amount of methamphetamine while on parole (ER at 174). Given his prior criminal history, he had to admit familiarity with, and access to, illegal firearms.

■The absence of CHS-1 at trial denied the defense a meaningful opportunity to reveal CHS-1's true nature, and extreme motivation to make a case for these agents. He had a pending parole violation, and potentially very large prison exposure if he were charged with the felony methamphetamine possession having previously been convicted of a felony narcotics offense. His criminal activity

continued through 2011 and 2012 yet Mr. Tapia was denied the opportunity to confront him with his illegal possession of weapons, threats, extortion and burglary within the same year he had become an informant (ER at 174-176);

■CHS-1 would have had to explain what occurred in his numerous unrecorded conversations and meetings with Mr. Tapia when CHS-1 was not being watched or wearing a recorder. RT 597-8. Denial of his presence at the trial deprived the jury of the chance to understand his strong motive to promote Mr. Tapia's illegal conduct–without the agents' knowledge.

■The absence of CHS-1 allowed the agent to testify without meaningful challenge to the inference that CHS-got significant help from them in staying out of jail. RT 597 (FBI investigators advised the parole board that he was vital to their investigation but did not specifically request that he not be sent to prison).

　　　Additionally, defense counsel had a good faith basis to believe that had the district court granted the writ, CHS-1 would have testified that Mr. Tapia was able to get access to the larger amounts of drugs and sell them because he knew the area, was experienced and had developed suppliers and customers at greater volume, and not as the government theorized, that he was able to do that because of the power and authority of the MM prison gang. The entire recording of the beach meeting on June 14, 2011 was much longer than the 15 to 20 minute segment the government excerpted and played for the jury. Without CHS-1 the

government was able to argue that Mr. Tapia would not have talked about his higher level "gang business" with the underlings, but that it was still gang driven business. CHS-1 could have said that the business with CHS-2 was separate and was his separate business. That is why Mr. Tapia did not mention anything about CHS-2 to those men, or about his business opportunity in Las Vegas with CHS-2's boss. This important evidence would have enabled Mr. Tapia to argue that his business dealings in Las Vegas -- with Pancho, and eventually with "John" (CHS-2's boss) were for Mr. Tapia's personal financial gain, not pursuant to the authority of the MM or COCH. Without access to CHS-1, Mr. Tapia was prevented from factually supporting this critical argument.

The safety and identity concerns raised by the government -- that the MM would likely harm CHS-1 or his family if it learned of his cooperation with the government -- did not eclipse Mr. Tapia's right to an adequate defense and "to present his own witnesses to establish a defense." See Washington v. Texas, 388 U.S. at 19 ("This right is a fundamental element of due process of law."); see also Fed. R. Crim. P. 17(b) (Courts shall order a subpoena for a named witness where the defendant shows his inability to pay and shows that "the presence of the witness is necessary to an adequate defense."). Indeed, CHS-1's identity was well known before Mr. Tapia submitted the writ. Specifically, CHS-1 was a longtime associate of Mr. Tapia, and his voice and image appeared in numerous recordings

produced in discovery (none of which were subject to any protective order), which the government played at trial.  Mr. Tapia knew CHS-1 and had been aware of CHS-1's identity for quite some time; knew him from childhood and had participated in numerous recorded calls and meetings with him.  Mr. Tapia had been arraigned on the Indictment three years before the trial (CR 49), the Indictment essentially revealed CHS-1's identify by its specific description of multiple conversations with Mr. Tapia (ER 1, CR 34), and the audio and visual discovery was not under any protective order (July 29, 2014 RT 35:1-10)  The government's argument that calling him to testify would increase his risk beyond what was already known was speculative and even if it did, the government conceded he was being held in protective custody in the jail.  July 29, 2014 RT 35:20-25.

Long before Mr. Tapia submitted the writ, CHS-1 had already been "outed" as a "known" government informant,  the discovery included the recorded meetings and or conversations between CHS-1 and Mr. Tapia, revealed after Mr. Tapia's arraignment on the Indictment in 2011 –three years before the trial, CHS-1 had been housed without incident in the Southern California jail facilities largely controlled by the MM since April 2012.  Neither the government nor the district court identified any reason why if CHS-1 were called, he or his family would be placed in any danger in addition to the danger inherent in acting as a government

informant and based on the fact that he was already a known informant within his Southern California custodial facility.

While the government's safety and identity concerns may have applied in other cases, in this case CHS-1's identity was not protected, and he had already been exposed for years to the custodial risks that the motion to quash purported to prevent.  In short, the motion to quash served no purpose other than to deny Mr. Tapia his Sixth Amendment right to compulsory process for obtaining witnesses in his favor.  The district court's refusal to issue the writ, or even to allow Mr. Tapia to play certain audio/video recordings of CHS-1, effectively buried this material, percipient witness and denied Mr. Tapia a fair trial. Like the gang evidence and the inflammatory statements, the district court's refusal to grant the writ was yet another example of its abdication of its gatekeeping role and its denial of Mr. Tapia's right to a fair trial.

## VII.

### CONCLUSION

The cumulative effect of the district court's various evidentiary errors amounted to an abdication of its gatekeeping duty, and so infected the fairness of the trial thereby denying Mr. Tapia his right to a fair trial under the Fifth Amendment due process clause.  Furthermore, the court's denial of Mr. Tapia's Writ to compel the presence of CHS-1 at trial denied him his Sixth amendment

right to compel the attendance of the witness necessary to his defense. This Court should reverse Mr. Tapia's convictions and remand for a new trial.

Respectfully submitted,

KAYE, McLANE, BEDNARSKI & LITT, LLP

DATED: April 7, 2016        By: ___/S/ by Marilyn E. Bednarski_____
                                 MARILYN E. BEDNARSKI
                                 Attorney for Defendant-Appellant Luis Tapia

CERTIFICATE OF RELATED CASES

Counsel for appellant certifies that he is unaware of any pending related cases or cases presenting an issue related to those in this brief.


DATED: April 7, 2016          By:    /S/ by Marilyn E. Bednarski
                                     MARILYN E. BEDNARSKI
                                     Attorney for Defendant-Appellant Luis Tapia

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Circuit

Rule 32-1, I certify that this  brief is proportionally spaced, has a typeface of 14

points or more, and excluding the tables of contents and authorities contains

13,533 words.


DATED: April 7, 2016        By: _____/S/ by Marilyn E. Bednarski_____
                                          MARILYN E. BEDNARSKI
                                          Attorney for Defendant-Appellant Luis Tapia

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 7, 2016, I electronically filed the foregoing Appellant's Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


DATED: April 7, 2016     By:     /S/ by Marilyn E. Bednarski
                                     MARILYN E. BEDNARSKI
                                     Attorney for Defendant-Appellant Luis Tapia