# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

LUIS MANUEL TAPIA,
*Defendant-Appellant.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT NO. CR 11-1068-ODW-1*

## GOVERNMENT'S ANSWERING BRIEF

EILEEN M. DECKER
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

MACK E. JENKINS
CAMERON L. SCHROEDER
Assistant United States Attorneys

1500 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012
Telephone: (213) 894-2091/0596
Email: mack.jenkins@usdoj.gov
        cameron.schroeder@usdoj.gov

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

I ISSUES PRESENTED ................................................................................1

II STATEMENT OF THE CASE ...............................................................2

    A.    Jurisdiction, Timeliness, and Bail Status................................3

    B.    Statement of Facts and Procedural History ..........................4

        1.    The offenses.....................................................................4

        2.    Pretrial Motions .............................................................7

        3.    Trial ...............................................................................16

        4.    Sentencing ....................................................................34

III SUMMARY OF ARGUMENT ...........................................................34

IV ARGUMENT......................................................................................38

    A.    The District Court Did Not Abuse Its Discretion in Permitting Foundational Evidence of Defendant's Gang Leadership and Source of Power and Resources .................38

        1.    Standard of review.......................................................38

        2.    The district court did not abuse its discretion in admitting gang evidence; the testimony was directly relevant to defendant's leadership of the CCE and helpful in understanding defendant's own recorded statements..............................................39

        3.    The district court did not abuse its discretion by not excluding the evidence under Rule 403; the

# TABLE OF CONTENTS (continued)

**PAGE**

danger of unfair prejudice did not outweigh the probative value................................................................47

4. The probative value of the testimony outweighed any unfair prejudice to defendant................................55

5. Any error was harmless..............................................56

B. The District Court Did Not Plainly Err In Admitting Defendant's Statements Regarding Drugs And Weaponry................................................................58

1. Standard of review......................................................58

2. The district court did not err in admitting defendant's statements regarding the strength of his heroin................................................................60

3. The court did not err in admitting defendant's statement about just wanting a gun that "shoots people"........................................................................63

4. The court did not err in admitting defendant's other statements regarding particular types of weaponry..................................................................66

5. There was no plain or obvious error...........................69

6. The evidence did not affect defendant's substantial rights or the fairness, integrity or public reputation of the proceedings............................70

C. The Court Did Not Abuse its Discretion in Denying the Writ Application for Testimony from an Unnecessary Confidential Source Whose Safety Would Be Further Jeopardized if Testimony Was Required ..............................71

**TABLE OF CONTENTS (continued)**

**PAGE**

1. Standard of review...........................................................71

2. Defendant's application to the district court failed to establish that CHS-1's testimony was necessary to his defense ...............................................72

3. Defendant's new claims on appeal also fail to establish necessity .........................................................79

4. Publically exposing a confidential government informant in a case involving the Mexican Mafia escalates the safety risk ..............................................81

V CONCLUSION ..........................................................................84

# TABLE OF AUTHORITIES

**PAGE(S)**

Cases

*Adkins v. Mireles,*
526 F.3d 531 (9th Cir. 2008) ........................................................ 60

*John–Charles v. California,*
646 F.3d 1243 (9th Cir. 2011). ................................................. 79, 81

*Puckett v. United States,*
556 U.S. 129 (2009) ...................................................................... 70

*Simmons v. United States,*
390 U.S. 377 (1968). ..................................................................... 76

*United States v. Avila,*
960 F.2d 152 (9th Cir. April 16, 1992) ........................................ 44

*United States v. Bailleaux,*
685 F.2d 1105 (9th Cir. 1982) ................................................. 65, 66

*United States v. Begay,*
673 F.3d 1038 (9th Cir. 2011) ............................................ 59, 73, 80

*United States v. Boros,*
668 F. 3d 901 (7th Cir. 2012) ....................................................... 63

*United States v. Bottom,*
469 F.2d 95 (9th Cir. 1972) .......................................................... 74

*United States v. Campos,*
217 F.3d 707 (9th Cir. 2000) ........................................................ 70

*United States v. Cooper,*
591 F.3d 582 (7th Cir. 2010). ....................................................... 62

*United States v. Cruz-Garcia,*
344 F.3d 951 (9th Cir. 2003) ........................................................ 68

*United States v. Cruz-Jiminez*,
    977 F.2d 95 (3d Cir. 1992)..........................................................74, 80

*United States v. Cutler*,
    806 F.2d 933 (9th Cir. 1986), ............................................................42

*United States v. Diaz*,
    864 F.2d 544 (7th Cir. 1988) ..............................................................53

*United States v. Easter*,
    66 F.3d 1018 (9th Cir. 1995) ......................................................passim

*United States v. Echavarria-Olarte*,
    904 F.2d 1391, 1398 (9th Cir. 1990) .................................................45

*United States v. Edwards*,
    235 F.3d 1173 (9th Cir. 2000) .....................................................40, 73

*United States v. Espinoza-Baza*,
    647 F.3d 1182 (9th Cir. 2011). ...........................................................40

*United States v. Ganoe*,
    538 F.3d 1117 (9th Cir. 2008) ............................................................63

*United States v. Gomez-Norena*,
    908 F.2d 497 (9th Cir. 1990) ..............................................................59

*United States v. Gonzalez*,
    307 F.3d 906 (9th Cir. 2002). ............................................................39

*United States v. Hankey*,
    203 F.3d 1160 (9th Cir. 2000) .................................................55, 57, 63

*United States v. Hinkson*,
    585 F.3d 1247 (9th Cir. 2009) ...............................................39, 60, 72

# TABLE OF AUTHORITIES (continued)

PAGE(S)

*United States v. Howell,*
  231 F.3d 615 (9th Cir. 2000) ..................................................55, 72

*United States v. Johnson,*
  28 F.3d 1487 (8th Cir. 1994) ..................................................42, 53

*United States v. Judd,*
  42 Fed. Appx. 140 (10th Cir. 2002)................................................ 44

*United States v. Kamahele,*
  748 F.3d 984 (10th Cir. 2014) ....................................................... 45

*United States v. Kassir,*
  2009 WL 976821, *7 (S.D.N.Y. April 9, 2009),........................64, 65

*United States v. Livoti,*
  196 F.3d 322 (2d Cir. 1999)............................................................ 48

*United States v. Lomeli,*
  637 Fed. App'x 358 (9th Cir. 2016)................................................ 80

*United States v. Major,*
  676 F.3d 803 (9th Cir. 2012) .......................................................... 41

*United States v. Marcus,*
  560 U.S. 258 (2010) ........................................................................ 60

*United States v. Mende,*
  43 F.3d 1298 (9th Cir. 1995) .......................................................... 62

*United States v. Mills,*
  704 F.2d 1553 (11th Cir. 1983) ......................................................57

*United States v. Morales-Aldahondo,*
  524 F.3d 115 (1st Cir. 2008)............................................................ 63

*United States v. Murphy,*
    460 Fed. App'x 122 (3d Cir. 2012) ................................. 81

*United States v. Owen,*
    580 F.2d 365 (9th Cir. 1978) ......................................... 72

*United States v. Patterson,*
    819 F.2d 1495 (9th Cir. 1987) ...................................... 56

*United States v. Rigdon,*
    459 F.2d 379 (6th Cir. 1972) ......................................... 74

*United States v. Rios,*
    No. 14-2495, 2016 WL 3923881, at *3 (6th Cir. July 21, 2016) .... 45

*United States v. Rodriguez,*
    766 F.3d 970 (9th Cir. 2014) ......................................... 49

*United States v. Romero-Avila,*
    210 F.3d 1017 (9th Cir. 2000). ....................................... 71

*United States v. Santiago,*
    46 F.3d 885 (9th Cir. 1995) ........................................... 41

*United States v. Shirley,*
    884 F.2d 1130 (9th Cir. 1989) ...................................... 82

*United States v. Sims,*
    637 F.2d 625 (9th Cir. 1980) ......................................... 80

*United States v. Skillman,*
    922 F.2d 1370 (9th Cir. 1991) ...................................... 41

*United States v. Smith,*
    924 F.2d 889 (9th Cir. 1991) ......................................... 73

*United States v. Studley,*
 783 F.2d 934 (9th Cir. 1986) .......................................................... 71

*United States v. Takahashi,*
 205 F.3d 1161 (9th Cir. 2000) .................................................. 40, 54

*United States v. Thomas,*
 86 F.3d 647 (7th Cir. 1996) ........................................................... 42

*United States v. Tocco,*
 200 F.3d 401 (6th Cir. 2000) ......................................................... 42

*United States v. Turman,*
 122 F.3d 1167 (9th Cir. 1997). ...................................................... 81

*United States v. Whittemore,*
 776 F.3d 1074 (9th Cir. 2015) ....................................................... 60

*United States v. Young,*
 470 U.S. 1 (1985) ........................................................................... 60

*Wiggins v. County of Alameda,*
 717 F.2d 466 (9th Cir. 1983) ......................................................... 82

Statutes

18 U.S.C. § 3231 ................................................................................. 3

18 U.S.C. § 371 ................................................................................... 4

21 U.S.C. § 846 ................................................................................... 4

28 U.S.C. § 1291 ................................................................................. 3

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

LUIS MANUEL TAPIA,
*Defendant-Appellant.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT NO. CR 11-1068-ODW-1*

## GOVERNMENT'S ANSWERING BRIEF

# I

# ISSUES PRESENTED

A.    Whether the district court abused its discretion in allowing the testimony of expert witnesses regarding the structure of defendant's organization and the source of his authority and resources in a continuing criminal enterprise case, where defendant argued that he was operating on his own and not as part of any enterprise.

B.     Whether the district court plainly erred by refusing to

exclude defendant's own recorded statements, made during the

charged drug trafficking and firearms offenses, regarding the

following: (1) the potency of the drugs he distributed, including

deaths resulting therefrom; (2) defendant's interest in a gun that

"shoots people"; (3) defendant's interest in the market for grenades

and in obtaining silencers, and (4) defendant's familiarity with

guns that fire armor-piercing ammunition.

C.     Whether the district court abused its discretion in denying

defendant's request for a writ to compel the presence of a

confidential informant, where the proffered testimony did not go

to any element of, or defense to, the charges, and the government

established its interest in protecting the safety of the confidential

informant.

## II

## STATEMENT OF THE CASE

Defendant Luis Manuel Tapia ("defendant"), a Colonia Chiques

gang leader, validated Mexican Mafia associate, and twice previously

convicted drug trafficker, was convicted following a nine-day jury trial

of each of the charges against him, including engaging in a continuing criminal enterprise; conspiring to distribute, distributing, and possessing with intent to distribute multiple controlled substances; conspiring to distribute firearms and illegally transferring a machinegun; repeatedly possessing firearms as a felon; and possessing firearms in furtherance of his drug crimes. On appeal, defendant makes three challenges to his convictions based on the district court's pre-trial evidentiary rulings, namely, that the court should have (1) excluded expert testimony regarding defendant's organization and authority; (2) excluded certain statements defendant himself made about weapons and drugs; and (3) granted defendant's writ to compel the testimony of a confidential informant.

A.    **Jurisdiction, Timeliness, and Bail Status**

The district court's jurisdiction rested on 18 U.S.C. § 3231. This Court's jurisdiction rests on 28 U.S.C. § 1291. The district court entered judgment on April 27, 2015. (CR 322, ER 100.[1]) Defendant

---

[1] "CR" refers to the Clerk's Record in the district court and is followed by the docket number. "ER" refers to the Excerpts of Record filed by appellant; "AOB" refers to Appellant's Opening Brief; and "GER" refers to the Government's Excerpts of Record. All such

filed a notice of appeal on May 8, 2015.  (CR 331, ER 110.)  The notice

was timely.  *See* Fed. R. App. P. 4(b)(1)(A)(i).  Defendant is in custody

serving the multiple life sentences imposed in his case.

## B.   Statement of Facts and Procedural History

### 1.   *The offenses*

Defendant was charged in an indictment filed on November 8,

2011 with violations of 21 U.S.C. § 846: Conspiracy to Possess with

Intent to Distribute and to Distribute Controlled Substances; 18 U.S.C.

§ 371: Conspiracy to Engage in the Business of Dealing in Firearms

without a License; 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(i), (b)(1)(A)(viii),

(b)(1)(B)(viii), (b)(1)(C): Possession with Intent to Distribute and

Distribution of Heroin, Methamphetamine, and Cocaine; 18 U.S.C.

§ 924(c)(1)(A): Use and Carry a Firearm During and in Relation to, and

Possession of a Firearm in Furtherance of, a Drug Trafficking Crime; 18

---

references are followed by the applicable page references.  "Gov. Ex. #A"
refers to transcripts of recordings that were played for the jury.   The
recordings were admitted into evidence.  The transcripts were used as a
listening aid during trial, but not admitted into evidence.  For ease of
review, because there was no dispute as to the accuracy of the
transcripts, the government has included certain transcripts in the
GER.  If the court would like copies of the recordings, the government
will provide them.

U.S.C. § 922(g)(1): Felon in Possession of a Firearm; 26 U.S.C.
§ 5861(e): Illegal Transfer of a Firearm; and 21 U.S.C. §§ 848(a),(b),(s):
Continuing Criminal Enterprise. (CR 34, ER 1-46.)

The Continuing Criminal Enterprise ("CCE") count charged that
defendant was engaged in a criminal enterprise pursuant to which he
violated 21 U.S.C. §§ 846 and 841 as part of a continuing series of felony
violations, from which he obtained substantial income and resources,
undertaken with at least five other persons with respect to whom
defendant occupied a position of organizer, supervisor, and manager.
(ER 45-46.) The government also alleged that defendant was a
principal administrator, organizer, supervisor or leader of the criminal
enterprise, and that it involved the possession with intent to distribute
or distribution of at least 1,000 grams of actual methamphetamine.
(*Id.*)

During the eight-month investigation conducted by a joint task
force of the Federal Bureau of Investigation ("FBI") and the Oxnard
Police Department ("OPD"), defendant was video- and audio-recorded
distributing methamphetamine, heroin, cocaine, and 14 different
firearms to a confidential source ("CHS-2"), including a fully automatic

machinegun.  (ER 1-46.)  CHS-2 had been introduced to defendant by someone defendant previously knew from his criminal and gang activities, another confidential source ("CHS-1").  (GER 377-83.)  No transactions took place with CHS-1 during the investigation, but CHS-1 did record meetings at which defendant discussed his various illegal businesses and gang politics, including a June 4, 2011 night-time gathering of Colonia Chiques gang members to discuss improving the drug and criminal operations of the gang, which defendant led ("the June 2011 gang meeting").  (GER 395-426.)

During the investigation, law enforcement also conducted searches of defendant's cars and residences, which led to the discovery of additional large quantities of drugs, five additional firearms, and over $20,000 in cash.  (ER 1-46.)  The government charged that defendant possessed those five firearms – three handguns, an assault rifle with bayonet, and a pistol-grip shotgun – in connection with his drug trafficking activities.  (ER 27, 40, 42.)  The investigation culminated in defendant's agreement to provide 10 pounds of methamphetamine and four kilograms of cocaine to persons he believed to be part of the Italian mob in Las Vegas, and to become a regular

supplier of such quantities via CHS-2.  (ER 1-46, GER 381, 872, 1059, 1065, 1078.)  Defendant was arrested when he delivered the first 10 pounds of methamphetamine to CHS-2; at the time, he had an additional pound of methamphetamine and a handgun in a concealed compartment in his car.  (GER 1144-53.)

## 2. *Pretrial Motions*

Prior to the start of trial, the parties litigated the issues defendant now raises on appeal.  During the motions hearing, the court recognized its gatekeeping duties and sought to constrain certain evidence so that it would "not go too far."   (GER 1600.)

### a. *Expert Testimony*

Defendant moved to exclude expert testimony regarding the Mexican Mafia prison gang and the Colonia Chiques street gang, as well as expert testimony regarding the purposes for which persons engaged in drug trafficking and criminal organizations use firearms, on various grounds, including relevance under Federal Rule of Evidence ("Rule") 402 and unfair prejudice under Rule 403.  (GER 1469.)  The government responded that the proposed testimony was relevant and not unfairly prejudicial.  Specifically, the government argued expert

testimony was relevant to prove the government's theory that the defendant was able to occupy, and did occupy, his position of leadership in the enterprise as a consequence of his leadership within the Colonia Chiques gang, and that the authority of the gang – and of defendant specifically – to deal drugs in such quantities in his territory derived from the gang's and defendant's personal connections to the Mexican Mafia prison gang. (GER 1504-05.) Further, the testimony would explain gang jargon and coded language defendant used in recorded conversations that would be played at trial. (GER 1498.) It was also relevant to the specific elements of the CCE charge, namely that defendant was a principal organizer, supervisor, or leader, and to explain how and why the other members of his enterprise followed him. (GER 1504-05.) As a result, the probative value of the testimony did not approach being outweighed by any prejudice, let alone *substantially* outweighed by any *unfair* prejudice, as required for exclusion under Rule 403. (GER 1505-08.)

The court tentatively denied the motion, stating:

I am assuming -- but do not know -- that during the course of the trial and certainly for the benefit of the jury, there will be some explanation regarding how Mexican gangs operating in Southern California do so at the pleasure of the Mexican Mafia.

And I am assuming that there's going to be some sort of a tie-in between the Colonia Chiques and the Mexican Mafia, and how it is that Mr. Tapia and his organization are permitted to continue to do business. This is simply going to be a necessary part of some of the background that the jury is going to need, so I certainly don't have a problem in having Hamilton and Long talk about how -- factually about how things work. You're right, they -- they certainly won't be permitted to get into the state of mind of anybody and how Mr. Tapia's affiliation or non affiliation with any organization, how it's going to affect or motivate or frighten anyone.

(GER 1616.)

### b.  *Defendant's Statements*

Defendant moved to exclude several statements he made during recorded conversations as inadmissible under Rules 402 and 403.  (CR 216, GER 1528-1542.)  The specific statements to which defendant objected that are also the subject of this appeal[2] are as follows:

i.  <u>*The selling price of grenades*</u>

TAPIA       How much do those go for?  Just so I know….
            How much do those normally go for?

CHS-2       The fully auto?

TAPIA       No, the grenades.

---

[2] The court sustained defendant's objection to a statement in which he described the burning down of a police substation, and that statement was not introduced at trial.  (ER 67.)

| CHS-2 | The grenades? |
|---|---|
| TAPIA | [UI]. |
| CHS-2 | Um, around 400, 500 apiece. |
| TAPIA | Oh, ok….Is there, is there like any kind of certain mark that sells good? |
| CHS-2 | No.  No, they're just -- |
| TAPIA | They're all good? |
| CHS-2 | Yeah, as long as they're current grenades.  [OV] |
| TAPIA | [OV] [UI] before they used to sell 'em, years ago, I don't know how it is nowadays, you could get 'em for 50 bucks.  50 to 100 bucks. [OV] |

(Gov. Ex. 116A, GER 1690.)

ii. *The strength of defendant's heroin*

| CHS-2 | Uh, 'cause I'd like to see the – the brown[3] I don't know that much about.  I'd just like to send it over there and see if they would be interested in it. |
|---|---|
| TAPIA | Eh, eh, eh – honestly, that's so strong that it killed six people already. |
| CHS-2 | Huh? |
| TAPIA | It killed six people. |
| CHS-2 | Killed six people? |

---

[3] "Brown" is a code word defendant used for heroin.  (GER 539, 566, 567.)

| | |
|---|---|
| TAPIA | Yeah.  Yeah, it killed like six people. |
| CHS-2 | Must be pretty strong. |
| TAPIA | Yeah, it's real strong.  It killed a frien-, a childhood friend of [UI], but he's from a whole different neighborhood, you know. |
| CHS-2 | Mm hmm. |
| TAPIA | Yeah, he just [UI].  But uh, but uh, it's real strong, it's real strong. |

(Gov. Ex. 116A, GER 1684-85.)

### iii. *Obtaining silencers*

| | |
|---|---|
| TAPIA | I was going to ask you, hey um. Hey hey hey hey Dom, do you. I was going to ask you is there any way you can get me a silencer? |
| CHS-2 | A silencer? |
| TAPIA | Uh huh. I want to buy a silencer. |
| CHS-2 | Well any time I find them I buy them and sell them. |
| TAPIA | Oh ok. |
| … | |
| TAPIA | 'Cause he is a machinist. He was trying to get a replica of a silencer so he can do silencers. |
| CHS-2 | So the guy that does the conversion ought to be able to make you one. |
| TAPIA | Yeah well he said he never made one. But he would like to see one. |

CHS-2    Is he a machinist?

TAPIA    He is a machinist. He does all that. He is a
         welder. He has a welding machine. And he does-

CHS-2    Well how about if I get plans for one?

TAPIA    Yeah, I'll show him one and he probably could. I
         know they are pretty expensive for a silencers
         [*sic*].

(Gov. Ex. 225A, GER 1721-22.)

    iv.   *Guns that fire armor-piercing ammunition*

TAPIA    If he can get five 'cause I can get someone else,
         he, he [UI].  I get 'em here and there-there's some
         smaller ones, smaller hand tools.[4]  But he said he
         could get 'em-he's gonna have a buddy try to get
         him, five at time.  The dude he knows, he said he
         could get us two a month, huh?  I want full [UI].

...

PANCHO[5] What about those five point sevens?  Do you know
         what those are?

CHS-2    Five point seven?

PANCHO   Five point seven.  It's a--it's a, handgun… twenty
         shots.  And it's like bullet like a AK forty-seven; it
         goes through the vest.

---

[4] "Hand tools" is a code word defendant used for handguns.  (GER
626.)

[5] "Pancho" is a still-unidentified co-conspirator, charged in the
indictment.  (GER 1114-15.)

…

TAPIA    In Mexico they call 'em like *mata puerco* [pig/cop killer]

PANCHO   *Mata puerco.*

TAPIA    Yeah they call em [UI].  They kill, they kill all the, that's what they kill all the cops with.

PANCHO   It's a-- it's a bullet, as long as they keep it small like a .22, it goes through the the vest…

TAPIA    …it goes through the vest…They call it *mata puerco* [cop killer] 'cause that's what they use it for.

(Gov. Ex. 242A, GER 1758.)

v.    *Defendant wants a gun that "shoots people"*

TAPIA    He told me this, that, he goes, 'cause where he lives, he lives in a rich area [UI], like kinda where I live. And he said, 'cause he had just built this, this is his last one. He wanted to paint it and make it look nicer. I told him nah it's ok. I told him like that, however, as long as it shoots people I told him [chuckles]. So he goes, um, he tested it. So he says it's kinda loud cause he had two of them for me. He, he, he was, I bargained with him, just give me two of 'em, and I'll take care of it, I had already told him, he had plans to try to make a certain kind of silencer real real cheap you know.

(Gov. Ex. 248A, GER 1766.)

vi.  *Government's response*

The government argued that these statements were relevant,
direct evidence of the charged crimes, particularly the CCE and
firearms charges, and were not unfairly prejudicial.  (GER 1549-1556)

vii.  *Hearing*

At the pretrial motions hearing, the court declined to exclude the
above statements,[6] noting that defense counsel had not addressed the
CCE count (Count 29) and:

> . . . when you look at not only the things that he had actually sold
> but the things that he had indicated he had available to him in his
> Walmart storeroom, it does go to Count 29 as evidence of this
> continuing criminal enterprise and his willingness and ability to
> supply a large, vast array of contraband material, and it ought to
> be relevant at least for that.

(GER 1604.)

The court explicitly stated that its ruling was tentative and "as we
get closer to trial and certainly in trial and I have a much better grasp
on the evidence . . . [a]nd how it plays into the government establishing
the elements of these various counts, then maybe—maybe I'll change
my mind."  (GER 1606-07.)

---

[6] As noted, the district court did exclude one other statement.
(GER 1627.)

Nonetheless, defendant did not raise any objection to any of the statements at trial.

### c. *Attempt to compel testimony of CHS-1*

Defendant filed a writ to compel the presence of CHS-1. (ER 58-60.) The government moved to quash the writ, or in the alternative to exclude CHS-1's irrelevant testimony, and appoint an attorney for CHS-1. (GER 1563-1589.) The government argued that defendant's writ application did not satisfy Fed. R. Crim. P. 17 because defendant had not shown, and could not show, that CHS-1's testimony was necessary to an adequate defense. (GER 1571-1574.)

Defendant opposed the government's motion on the basis of an under seal and in camera proffer (ER 61-65) that: (a) CHS-1's testimony would show that some of defendant's alleged supervisees were "close personal friends and associates of CHS-1," and were "'working for' and supervised by CHS-1, not Mr. Tapia" (ER 168); (b) CHS-1 was responsible for getting many of the participants to attend the June 2011 gang meeting (*id*.); (c) CHS-1 supplied "many of the firearms charged in this case" and "operated his own 'separate conspiracy' in that regard"

(ER 169).  Defendant termed the government's concerns about CHS-1's safety "specious."  (ER 169-70.)

At the pretrial motions hearing, the court stated:

> I don't understand the relevance of it, but that doesn't mean it can't be established at trial. As it—I sit here right now, I don't see the purpose of it other than—I don't know—maybe to intimidate or send some other…Let me take another look at that. And I'm not a big fan of just bringing people out of prison presumably to testify in cases anyway when the real reason for wanting them out of prison is for other reasons. So I'm going to look at this closely.

(GER 1623.)  After the hearing, the district court denied the writ in a written order, "on the basis of an inadequate showing of the necessity or relevance of [CHS-1's] testimony."  (ER 67.)   Defendant did not make any further request for CHS-1's appearance at trial.

3.   ***Trial***

Trial commenced on September 2, 2014.  (GER 1.)  Jury selection and opening statements consumed most of the first day.  (*See* GER 7-135.)

As outlined in their opening statements, the parties' main area of contention was whether defendant in fact was leading, supervising, or organizing others in a CCE, as the government maintained, or was just selling drugs "for his own gain and profit and not as the leader of a

conspiracy or enterprise to distribute narcotics," as the defense claimed (AOB 14; GER 132-135.)  Defendant specifically argued that the individuals involved in his transactions were just people he knew, and that he did not control, supervise, or organize them; that there was no hierarchy underneath him; and that CHS-1 was really behind the drug transactions with CHS-2.  (GER 129-30, 132, 135.)  Defendant portrayed himself as "a man who believed in a fake story" from CHS-2 and "a dream about one deal."  (GER 129, 135.)  Defendant also argued that he really did not know anything about guns and was manipulated into selling them.  (GER 129-131.)

The government sought to counter the defense assertions that defendant was not a leader and was not operating a criminal enterprise.

### a.    *Expert Testimony and Limiting Instruction*

Oxnard Police Department Senior Officer Jeff Long ("Long") testified as an expert on the Colonia Chiques gang, its structure, and defendant's leadership role within it.  (GER 145-201.)  He described the role the Colonia Chiques gang played in running and protecting the narcotics trade in the Oxnard area, and described the gang's relationship of "taxation" with the Mexican Mafia prison gang.  (GER

151-152.)  He described how an "associate" of the Mexican Mafia would have a higher status within the Colonia Chiques, and would be followed by younger gang members.  (GER 152.)  He also described how Colonia Chiques members used tattoos to self-identify, and identified defendant's Colonia Chiques tattoos.  (GER 158-160.)

Long then spent the bulk of the remainder of his testimony reviewing photographs from, and a recording of, the June 2011 gang meeting at which defendant delivered a monologue to approximately 20 younger gang members and associates regarding the gang's drug trafficking activity, the need to protect its territory, and the need to root out informants, among other things.  (GER 165-191.)  The government played approximately 22 minutes of the recording, in pieces, with Long identifying participants and interpreting and explaining for the jury statements defendant made using coded language.  (*Id.*)  As Long explained, in the recording, defendant told the younger gang members how one could identify an informant within the gang, and instructed them that they needed to "tighten up" the gang's territory by ousting informants so as to protect the business.  (GER 172-175.)  Defendant offered to deal with any issues the attendees encountered with certain

powerful gang members and directed them to set up a communication structure by choosing three gang representatives ("three homies") to communicate with him about any issues that came up.  (GER 177-79.)

Long also explained a number of other statements defendant made using gang jargon, including: "nobody should take a position and start telling you *vatos* what to do unless he's a rider" (meaning only persons such as defendant who had put in "work" for the gang could lead and give instructions) (GER 181); "But look at, you guys got *vatos* that sell dope in Colonia, *p[a]isas*, you know what I mean?  Homies don't—…Say homie, that's illegal" (meaning that Mexican nationals were selling drugs in Colonia Chiques territory and gang members needed to be telling them that they could not do that without the gang's authorization) (GER 185-186); defendant's turn was "past," it was now someone else's turn, and "we're trying to come up big time" (meaning that defendant and others like him had already paid their dues in terms of violent gang-banging, and now was their time to make large amounts of money) (GER 188).

After the jurors were dismissed for the day, the court discussed defendant's ongoing objections to the expert testimony and a limiting

instruction.  (GER 201-211.)  Government counsel pointed out that Long's testimony and the recording of defendant's statements at the June 2011 gang meeting went directly toward refuting the claims defendant had made in opening statement that he was just a poor person from the Colonia neighborhood, not a leader or supervisor of anyone.  (GER 203.)  The government's basic proposition was that defendant's sales of drugs to CHS-2 were part of defendant's overall enterprise and ability to sell drugs in the gang's territory, which he ran as authorized by the Mexican Mafia.  (*Id*.)  Further, the government contended that defendant had been dealing with large quantities of narcotics in this specific role for some time, and therefore was not enticed into anything by CHS-2, contrary to defense counsel's arguments.  (GER 204.)  Defense counsel renewed her objections and asked that the expert testimony be stricken.  The court declined, but discussed a limiting instruction.  (GER 208-09.)

After further argument the following morning, defense counsel proposed a limiting instruction that the jury only consider the expert testimony as it related to the question of defendant's leadership.  (GER

226-227.) The court agreed and read the following instruction to the jury:

> The government has offered evidence of Mr. Tapia's alleged gang membership. You may consider that evidence only on the limited issue of leadership. It is up to you to decide what weight to give to this evidence. You may give it whatever weight you feel it deserves. This evidence is not admitted to show bad character and that would be an impermissible purpose.

(GER 230-31.)

Long then resumed his testimony. The government briefly asked about the identity of attendees at the gang meeting, the role of female associates in gang activities, and the use and typical locations of guns possessed by gang members. (GER 231-245.) On cross examination, defense counsel asked Long about CHS-1's gang membership, the history and territory of the Colonia Chiques gang, whether certain other individuals were Colonia Chiques gang members, and what was said by various persons, including defendant and CHS-1, during the recording of the gang meeting. (GER 245-282.) Redirect and recross were brief. (GER 283-293.)

### b. *Special Agent Guillermo Moreno*

The second expert, California Department of Corrections Special Agent Guillermo Moreno ("Moreno") testified regarding the Mexican Mafia and its oversight and financial relationship to Hispanic street gangs in Southern California, including the Colonia Chiques. (GER 304-307.) Specifically, Moreno described how the Mexican Mafia controls the Southern California Hispanic street gang drug trade by ensuring that only those persons with its authority, and who pay "taxes" on drug sales, are allowed to distribute drugs. (GER 308, 330, 338.) Moreno also described the process of validating a prisoner as a Mexican Mafia "member" or "associate"; defendant's status as a validated "associate"; and the benefits of being validated, including that that person would have more power (or "juice"), could traffic in larger quantities of drugs, and could exercise control over younger gang members and associates, allowing that person to "oversee [the geographic area] as he sees fit." (GER 308, 319-21 323-324.) Finally, SA Moreno explained certain terms and references that appeared in recorded conversations with defendant that were played later in the trial, including references to "The Black Hand," which is a book about

the Mexican Mafia, and Michael "Boo Boo" Moreno, who is the Mexican Mafia member in control of Ventura County, where defendant operated. (GER 309, 321.)

The parties completed direct, cross, and redirect examination, followed by additional discussion about another limiting instruction outside the presence of the jury, before the court broke for the noon recess. (GER 339-40.)

### c. Transcripts, Translations, and Timeline of the Investigation

After the lunch break, the trial resumed with testimony regarding the transcripts and translations to be used throughout the remainder of the trial (GER 341-70), followed by testimony of the FBI case agent, SA Michael Easter ("Easter"), who discussed the background of the investigation and described the contexts for the meetings and recorded conversations. (GER 373-87.) Through Easter, the government introduced recordings of the following meetings and transactions:

(1) a March 8, 2011 meeting involving defendant, CHS-1, and co-defendant Edgar Aguilar, at which defendant described the hidden compartment in his car, his trips to Mexico to obtain drugs for his "*burro*" [mule] to transport back, how he was "pushing" various drugs

out to different "*varrios*" (gang territories) in the area, various activities of Mexican drug cartels in Mexico and their interactions with gang members from the United States, and defendant's various sources of supply, their connections to cartels, and their inability to keep up with the quantity of drugs he was able to sell (GER 391-426);

(2) a March 18, 2011 meeting involving defendant, CHS-1, and co-defendant Roger Armendariz ("Armendariz"), during which defendant discussed his narcotics sources of supply (GER 451-54);

(3) a March 31, 2011 meeting involving defendant, CHS-1, Armendariz, co-defendant Jaime Cardenas ("Cardenas"), and another gang member, in which they discussed a possible informant in their midst and defendant referenced Mexican Mafia member Michael Moreno, noting that people needed to come through defendant and could not deal with Moreno directly (GER 454-63);

(4) the April 29, 2011 introduction of CHS-2 to defendant, including their discussion of future narcotics and firearms sales and defendant's representation to CHS-2 that he generally had $120,000 to $140,000 to "play with" at any given time (GER 465-72, 484-90);

(5)  a lengthy meeting on May 19, 2011, during which defendant
sold four ounces of methamphetamine to CHS-2 and discussed
employing other persons to transport guns or drugs, not wanting to
drive "flashy" cars so as to avoid drawing attention to himself, picking
up $60,000 to $80,000 worth of narcotics on every trip he made, and the
manner in which he "monopolized" the drug business in his area.  (GER
490-514);

(6) a May 23, 2011 telephone call between defendant and CHS-2,
in which defendant told CHS-2 that defendant had a gun and more
drugs available (GER 522-24);

(7) a June 8, 2011 meeting at which defendant (a) sold CHS-2 an
SKS assault rifle, an AR-15 assault rifle, and ammunition; (b) provided
half an ounce of cocaine as a sample; (c) stated that he had been getting
"a lot" of guns recently and was "going to stockpile a lot of them";
(d) told CHS-2 about accidentally losing $10,000 in cash; (e) discussed
the business of trading drugs for guns; (f) described cutting another
drug dealer out of the market so that person now had to buy from him;
and (g) told CHS-2 that he could provide any drugs CHS-2 wanted

because he controlled the market on the brown powder heroin he had (GER 524-60); and

(8) a June 17, 2011 meeting at which defendant and co-defendant Diana Zamora sold CHS-2 an ITM Arms Model MK-99 assault rifle, ammunition, and an ounce of methamphetamine; provided a small amount of heroin as another sample; and told CHS-2 that he could get large quantities ("caches") of guns and more drugs (GER 560-83).

Throughout Easter's testimony and the presentation of the recordings, the jury heard numerous references to terms and concepts the two expert witnesses had explained. For example, defendant made several references to "Mike," "Boo," and "the big homie," meaning, as the expert testimony had explained, Michael "Boo Boo" Moreno, the Mexican Mafia member overseeing defendant's territory. (GER 418, 424-26, 459.)

Defendant also repeatedly discussed gang politics, using references that demonstrated his own leadership or supervisory role, when placed in the contexts provided by the experts. For example, defendant described how he told Moreno to "get rid of" a person who was trying to go around defendant and deal directly with Moreno and to

"let me do it," i.e. handle the person, instead.  (GER 424-25.)  Defendant also discussed "running" a "yard" or a "building," meaning, as the experts described, controlling prison activities of Southern California gang members and associates, and described disciplining ("tongue-lashing") an associate for trying to go around defendant.  (GER 460.) Referencing his own validation as a Mexican Mafia associate and the power on the street that it conferred (as described by SA Moreno), defendant commented that he told someone who was challenging his authority, "You get validated, and I'll see you back."  (GER 460-61.)

Defendant's recorded statements also directly tied this validated status to his dealings with CHS-2: he said in their first meeting, as described by SA Easter, "As long as you know, though, who you're messing with."  (GER 471.)   He also described to CHS-2 that he "monopolized" his "geographic region" with regard to drug trafficking, exactly as explained by the experts earlier in the trial.  (GER 505.)

### d.  *Traffic Stop Testimony*

OPD Officer Rocky Marquez testified regarding a June 21, 2011 traffic stop on of one of defendant's cars, being driven by co-defendant Diana Zamora.  (GER 717-36.)

### e. TFO Richard Marquez

Next, through Task Force Officer ("TFO") Richard Marquez ("Marquez"), the government presented additional testimony regarding the recording of the June 2011 gang meeting. During the portion of the recording played with Marquez, defendant again made references to Michael Moreno, noting that instructions were coming from Moreno, the "big dog," and that the Mexican Mafia "overall ha[s] the power to dismantle our *varrio* [neighborhood/gang]." (GER 765-66.) On cross-examination, defense counsel suggested that the gang meeting recording contained no orders or threats from defendant, only "advice." (GER 938-39.) On re-direct, however, Marquez's testimony established that defendant's statements during the meeting, as contextualized by the prior experts, indicated that defendant's instructions were sanctioned by the Mexican Mafia and therefore must be obeyed. Marquez noted that, as described by Long and reflected in defendant's statements at the meeting about "dismantling" the "*varrio*," the Mexican Mafia had the power to put the entire gang on "green light" status, where anyone from the gang could be assaulted when they next went to prison. (GER 1009-10.)

Marquez also testified that the search of defendant's car following the June 21, 2011 traffic stop revealed two hidden compartments, one of which contained 234 grams of methamphetamine; 1.13 kilograms of heroin; 532 grams of cocaine; a loaded Taurus 19 .38 caliber revolver; a loaded Smith & Wesson 9mm handgun; two Smith & Wesson 9mm law-enforcement-only, high-capacity magazines; 50 rounds of .45 caliber ammunition; 51 rounds of .357 caliber ammunition; 35 rounds of .380 caliber ammunition; five rounds of .38 caliber ammunition; one shotgun shell; six rounds of 9mm ammunition; and $10,020 in cash. (GER 778-98.)

Marquez also described the following recorded transactions with defendant, which comprised additional counts in the indictment:

(1) a July 19, 2011 transaction, in which defendant sold CHS-2 three handguns (GER 810-30);

(2) an August 25, 2011 transaction, in which defendant sold CHS-2 three more handguns and discussed sending "muscle" to deal with someone who had lost $100,000 worth of methamphetamine (GER 860-90); and

(3) a September 8, 2011 transaction, in which defendant sold CHS-2 three more handguns, and discussed his narcotics suppliers, converting guns to fully automatic, and that he had a machinist who could make silencers (GER 890-917).

### f. Undercover Agent

Day seven of the trial began with testimony from an undercover FBI agent ("UC"), who had posed as a member of the Italian mob and CHS-2's boss and met with defendant in Las Vegas to negotiate an ongoing, steady supply of large quantities of methamphetamine and other drugs. (GER 1031-46.) At that meeting, which was recorded, defendant agreed to provide ten pounds of methamphetamine and four kilograms of cocaine the following month, with expectations of more thereafter. (GER 1062-69, 1078-81.) Defendant also discussed his problem with the person who had lost the $100,000 of methamphetamine, and the UC agreed to help defendant deal with that problem for a cut of the owed money. (GER 1078-81.)

### g. Defendant's Final Transactions and Arrest

SA Easter then retook the stand to testify regarding the remaining recorded meetings and transactions with defendant. Easter

described a recorded meeting the day after the meeting with the UC, at which defendant told CHS-2 he would agree to double the order of drugs the second time, provided location details for the person who owed him for the lost drugs, and discussed a gun he had just acquired that had a bayonet on the end. (GER 1103-15.) Easter then described defendant's sale of two more guns to CHS-2 on October 19, 2011, including a fully automatic machinegun, which defendant demonstrated for CHS-2. (GER 1116-38.) During that meeting, defendant again made reference to the source of his power, noting that the people he "runs with" "have a book too" (i.e., *The Black Hand* book about the Mexican Mafia described by Senior Officer Long) and that "this organization I'm under follows all the way to the federal penitentiary. They're the ones who…they control all of the…" (GER 1127, 1130.) While defendant didn't finish his thought, his reference to his "organization" following to the "federal penitentiary" matches the description of the Mexican Mafia – and the control it exerts over Southern California gangs and prisons – as elucidated by the experts earlier.

Finally, Easter testified to defendant's arrest after he delivered 10 pounds of methamphetamine to CHS-2, as agreed at the Las Vegas

meeting, and how an additional pound of methamphetamine and a gun were found in a hidden compartment in the car defendant used to transport the methamphetamine.  (GER 1140-62.)

### h.   Searches of Defendant's Stash Locations and Firearm Testimony

Two additional FBI agents testified to searches of defendant's and his parents' residence, finding indicia of defendant's occupancy at both, and finding, at his parents' residence, an AK-47 with a bayonet, a sawed-off shotgun, and $10,000 in cash.  (GER 1236-58, 1262-72.)

Finally, a firearms expert testified regarding the machine gun defendant sold during the investigation, interstate nexus, and the types and purposes of weapons used by drug traffickers. (GER 1277-1303.)

### i.   Closing Arguments

In closings, the parties reiterated their opposing positions regarding defendant's organization and leadership role.  Defendant specifically argued that there simply was no organization, no structure at all – defendant simply had "friends."  (GER 1396, 1401, 1405, 1422.) Defendant repeatedly highlighted the argument that he didn't know anything about guns, wasn't in the business of selling them, and was not trying to promote such a line of business.  (GER 1402-05.)

The government asserted in rebuttal that, contrary to defendant's assertions that the expert testimony had been "rammed down [the jury's] throat," the experts did not provide the evidence against defendant. Rather, they provided a vocabulary and context to understand what defendant himself said in recorded conversations, and defendant was the one who actually asserted – and explained the source of – his power and leadership, and then demonstrated it on video. (GER 1451.)

### a. Verdicts and Findings

The jury returned verdicts of guilty on all counts. (ER 84-99.) They made specific findings with regard to drug quantity on every count for which such a finding was relevant. (*Id*.) They also made specific findings regarding the CCE charge, namely: 1) that the offenses charged in counts 1, 3, 4, 6, 7, 9, 10, 11, 15, 20, and 21 of the indictment were part of the series of violations committed by defendant during the course of the offense; 2) that defendant occupied a position of management in relation to five or more persons; 3) that those persons included [Diana] Zamora, [Jaime] Cardenas, [Melissa] Dibble, [Juan] Jimenez, and [Edgar] Aguilar; 4) that defendant was a principal

administrator, organizer, or leader of the criminal enterprise; and

5) that the charged enterprise offense involved at least 1000 grams of

methamphetamine. (*Id*.)

### 4. *Sentencing*

Defendant was sentenced to life in prison plus 55 years on April

27, 2015. (ER 100-01.)[7] At sentencing, Count 1 of the indictment (the

drug trafficking conspiracy) was vacated by agreement of the parties as

a lesser-included offense of Count 29, the CCE count. (CR 319, ER 157.)

## III

## SUMMARY OF ARGUMENT

This was a case caught on video and audio tape. Defendant's

challenges to his convictions are without merit. That defendant sold

drugs and various weapons to persons working with law enforcement

was essentially indisputable because the jury saw and heard the

negotiations and transactions that formed the basis of the case. What

defendant did dispute was the government's allegation that he was

engaging in these transactions as part of an ongoing criminal

---

[7] This included concurrent life sentences on nine counts. (ER 101.)

enterprise, in which he occupied a leadership role and supervised or managed at least five other persons.

The government accordingly introduced evidence regarding the structure of defendant's criminal organization, including the source of his authority and leadership position – namely, his high-ranking membership in the Colonia Chiques street gang and his authority as a validated Mexican Mafia associate. This evidence took the form of (a) expert testimony about the gangs, and their relationship to drug trafficking and other illegal activity in the geographic area defendant claimed to control, and (b) statements by defendant himself which repeatedly referenced his power and its source – namely, the Colonia Chiques and the Mexican Mafia.

The court did not abuse its discretion in allowing the expert evidence because it was directly relevant to proving defendant's leadership, an element of the CCE charge, and was inextricably intertwined with the other evidence in the case. Admission of the expert evidence was particularly appropriate here because defendant maintained that the assertions of leadership and authority he made in the recordings were vain boasting. The expert evidence rebutted that

claim and showed that defendant was, indeed, what he claimed to be, a leader with a direct pipeline to a higher authority that gave him the ability to control drug trafficking in his gang's area. Moreover, as requested by the defense, the Court provided a limiting instruction that the gang evidence was to be used only to establish leadership, and the government argued the evidence consistent with that instruction.

Defendant's appeal from the admission of "inflammatory" statements he himself made during recorded conversations in the course and furtherance of the charged conspiracy is subject to plain error review because the court's in limine ruling on those statements was tentative and defendant made no objection to them at trial. The district court did not commit plain error by admitting defendant's own statements regarding the strength of his heroin; his interest in grenades, silencers, and a gun that "shoots people"; and his familiarity with guns that fire ammunition that can pierce law-enforcement vests. Each of the statements was relevant to the CCE charge, the drug conspiracy charge, or the various firearms charges, and several of them directly rebutted defendant's theory of the case regarding his firearms sales. Their probative value substantially outweighed any prejudicial

effect and their admission did not affect defendant's substantial rights or the fairness, integrity or public reputation of the proceedings.

Finally, the district court did not abuse its discretion in denying defendant's writ for the testimony of CHS-1. Defendant's in camera application to the district court provided no evidentiary basis to support the claim that CHS-1 would provide the testimony defendant hypothesized; failed to establish that the hypothesized testimony was necessary to the defense; and failed to establish that CHS-1 would provide the testimony that defendant wanted, given that it would have incriminated CHS-1.

Defendant was convicted following a fair trial in which his own recorded words and conduct overwhelmingly established his guilt. Accordingly, his convictions should be affirmed.

# IV

## ARGUMENT

A. **The District Court Did Not Abuse Its Discretion in Permitting Foundational Evidence of Defendant's Gang Leadership and Source of Power and Resources**

1. ***Standard of review***

A district court's decision to admit expert testimony is reviewed for abuse of discretion and will not be reversed unless "manifestly erroneous." *United States v. Gonzalez*, 307 F.3d 906, 909 (9th Cir. 2002). Challenges to the admission of evidence under Rule 403 are "subject to great deference, because the considerations arising under Rule 403 are susceptible only to case-by-case determinations, requiring examination of the surrounding facts, circumstances, and issues." *United States v. Hinkson*, 585 F.3d 1247, 1267 (9th Cir. 2009) (en banc). Since "trial judges are better able to sense the dynamics of a trial than [courts of appeals] can ever be," "broad discretion must be accorded them in balancing probative value against prejudice" and this Court "generally will not disturb such a ruling unless it lies beyond the pale of reasonable justification under the circumstances." *United States v. Espinoza-Baza*, 647 F.3d 1182, 1189 (9th Cir. 2011). Moreover,

"evidentiary decisions will be reversed for an abuse of discretion only if such . . . error more likely than not affected the verdict." *United States v. Edwards*, 235 F.3d 1173, 1178-79 (9th Cir. 2000).

2. ***The district court did not abuse its discretion in admitting gang evidence; the testimony was directly relevant to defendant's leadership of the CCE and helpful in understanding defendant's own recorded statements***

"Evidence of gang affiliation is admissible when it is relevant to a material issue in the case." *United States v. Takahashi*, 205 F.3d 1161, 1164 (9th Cir. 2000) (issue of witness bias); *accord*, *United States v. Easter*, 66 F.3d 1018 (9th Cir. 1995) (issue of identity). Though often invoked in connection with motive, this principle is not limited to any particular issue or "narrow exception" for motive or impeachment evidence, as defendant claims. (AOB 34.) Under Rule 402, relevant evidence (i.e., evidence that has any tendency to make a fact more or less probable than it would be without the evidence" (Fed. R. Evid. 401)) is admissible unless another rule, statute or the Constitution provides otherwise.[8]

---

[8] Contrary to the suggestion in defendant's brief (AOB 34), Rule 404(b) is irrelevant to the analysis where the proffered evidence is

Thus, courts have long allowed the admission of gang expert testimony in cases where, as here, an understanding of a gang was material to the government's case and instructive to the jury. *See, e.g., United States v. Major*, 676 F.3d 803, 810 (9th Cir. 2012) (gang affiliation evidence properly admitted as relevant to identity and motive); *United States v. Santiago*, 46 F.3d 885, 889 (9th Cir. 1995) (gang evidence permissibly admitted to establish motive and "to show how and why other inmates assisted [defendant]" in the crime); *United States v. Skillman,* 922 F.2d 1370, 1373 (9th Cir. 1991) (skinhead evidence properly admitted as relevant to racial animus and to rebutting defense that defendant was a passive bystander to cross burning); *United States v. Thomas*, 86 F.3d 647, 652 (7th Cir. 1996) ("[G]ang affiliation is particularly relevant, and has been held admissible, in cases where the interrelationship between people is a central issue."); *United States v. Johnson*, 28 F.3d 1487, 1497 (8th Cir. 1994) (testimony regarding gang membership and drug trafficking was

---

inextricably intertwined with the charged offenses. *United States v. Santiago*, 46 F.3d 885, 889 (9th Cir. 1995), which defendant also cites (AOB 31-32), makes this point directly.

appropriate because "specific and circumscribed evidence of gang association may be necessary in a trial to show the nature and extent of [the defendants'] association."); *see also United States v. Tocco*, 200 F.3d 401, 418 (6th Cir. 2000) (expert in case about organized crime may properly give expert testimony on the structure, the organization, and rules of the organized-crime entity).

In *United States v. Cutler*, 806 F.2d 933, 936 (9th Cir. 1986), one of many cases cited by defendant (AOB 32) that actually support the government's position, this Court upheld the admission of testimony in a murder-for-hire case about how a gang "was formed, its activities, oaths, sanctions for informers, and other background material. These witnesses also explained statements and references made in the videotapes" that were introduced at trial. The district court concluded that the testimony was relevant to rebut an entrapment defense and would also assist the jury to understand the videotaped events and defendant's motives; this Court affirmed. *Id.*

Here similarly, the gang evidence was relevant to proving defendant's leadership, an element of the CCE charge, and to rebutting his defense that he was not operating a CCE. As in the above cases, the

gang evidence also assisted the jury in understanding the videotaped events. Defendant repeatedly referenced his organization generally, the Mexican Mafia specifically, and his ability to monopolize geographic areas traditionally ruled by Sureño gangs. (GER 418, 424-26, 459, 460-61, 505, 524-60.) For example, he told his customer, CHS-2, "this organization that I'm under follows all the way to the federal penitentiary [referencing the Mexican Mafia.]" (GER 1130.) He also told CHS-2, "I have a lot of people" and "I contribute" "resources." (GER 1706.) In addition, defendant displayed his leadership at a nighttime meeting attended by a sizable group of Colonia Chiques gang members in Oxnard, repeatedly referencing his connection with the Mexican Mafia. (GER 165-191.)

Thus, defendant's gang affiliations and connection with the Mexican Mafia were inextricably a part of the case. The expert evidence explained defendant's conduct at the June 2011 gang meeting and confirmed that defendant was telling the truth when he claimed to be operating under Mexican Mafia authority, not just "puff[ing] himself up" as his counsel tried to argue. (GER 1436.) Defenddant really did have "a lot of people" and defendant really was connected to the

Mexican Mafia.  Accordingly, the experts' testimony was indisputably probative of defendant's leadership.  By showing why people would follow him, it helped to show that they were in fact following him, as he himself claimed and demonstrated in the recordings.[9]

Defendant's argument that a federal jury, who ordinarily would have no occasion to have any involvement in or credible knowledge of the Mexican Mafia, much less have ever heard of Ventura County's Colonia Chiques gang cannot be "provid[ed] context or explanation" regarding these entities (AOB 21) is insupportable.  To the contrary, "[l]aw-enforcement expertise is . . . relevant when it imparts evidence regarding the inner-workings of organized crime[, which] has been held to be a proper subject of expert opinion because such matters are generally beyond the understanding of the average layman."  *United*

_____

[9] The reasoning in an unpublished appeals court decision specifically buttresses this point in the context of a CCE charge.  *See United States v. Judd*, 42 Fed. Appx. 140, 146 (10th Cir. 2002) (*unpublished*)  (holding that evidence regarding gang culture was relevant and admissible where a CCE charge against a defendant was "based almost entirely upon his position as head of the [subject gang]" and noting that there was no reason to assume that jurors would be improperly influenced by this evidence).

*States v. Rios*, No. 14-2495, 2016 WL 3923881, at *3 (6th Cir. July 21, 2016) (internal quotation marks and citations omitted); *United States v. Kamahele*, 748 F.3d 984, 998 (10th Cir. 2014) (gang-expert testimony was helpful to the jury where expert would provide "expertise about [the gang's] structure, insignia and history," "[a]nd the district court could have assumed that a typical juror would lack knowledge of the gang terminology and the significance of [the] insignia").

In an effort to establish irrelevance, defendant cites *United States v. Echavarria-Olarte*, 904 F.2d 1391, 1398 (9th Cir. 1990) (AOB 24-25). But *Echavarria* fails defendant in that effort. In fact, in *Echavarria*, this Court expressed its approval of expert testimony of drug cartel operations that "would help the jury understand the role" that defendant played in a smuggling operation and related "to persons and acts that could be tied to the two smuggling operations with which Echavarria was charged." *Id.* The problem that arose in *Echavarria* was that the testimony that ultimately was given did not relate to the charged smuggling plots. *Id.* Echavarria himself was not a member of the cartel and his actions were not related to specific cartel members.

The expert did not even identify any hierarchy or central decision makers controlling the "thousands" of employees the cartel had. *Id.*

Here, there was clear, unrefuted evidence that defendant was a member of the Colonia Chiques and a validated Mexican Mafia associate who received his authority for his drug monopoly directly from Mexican Mafia member Michael Moreno. (*See, e.g.*, GER 765-66.) Defendant invoked the Mexican Mafia and used gang underlings and associates during his transactions, and he was recorded hosting a gang meeting discussing his drug trafficking (GER 165-191). In other words, this case had the direct affiliations and connections to the charged crimes that *Echavarria* stated *would* establish admissibility.

Here the gang experts' "special knowledge" of the operations of the Colonia Chiques and Mexican Mafia helped the "jury understand the role" that other evidence (i.e., the recordings) established defendant as playing in the charged drug and gun trafficking transactions. The theme of defendant's opening statement was that defendant was a man who did not "organize[] or control[]" but was simply a vulnerable "man who believed in a fake story and a dream about one deal." (GER 135.) The recordings – aided by the experts' specialized knowledge about who

defendant was, whom he represented, whom he spoke for, and whom he worked with – exposed the falsity of this claim.[10] Here, the hierarchy of the Mexican Mafia and the Colonia Chiques was identified and helped explain how defendant's $200,000 transaction was just another business deal (not a "dream deal"). (GER 135.) Further, it helped explain why defendant's invocation of the name of Mexican Mafia member Michael Moreno (GER 765-66) established defendant's authority.

In short, contrary to defendant's argument that gang evidence had "little probative value" and was "attenuated from the charges" (AOB 19-27), the evidence had strong probative value and was inextricably intertwined with the charges and with defendant's own recorded statements.

---

[10] Unlike in *Echavarria*, the experts here limited their testimony to individuals identified during defendant's recordings. And there was little, if any, specific testimony of "despicable" topics like that in *Echavarria*, namely, "'the Cartel's methods of its enforcing its will – bribery, torture, murder[.]" *Echavarria*, 904 F.2d at 1398.

3. ***The district court did not abuse its discretion by not excluding the evidence under Rule 403; the danger of unfair prejudice did not outweigh the probative value***

Defendant's analysis of the gang evidence under Rule 403 ignores the probative value of the evidence and grossly overstates the danger of unfair prejudice. The actual record demonstrates that the court did not abuse its discretion in admitting the evidence.

a. ***The probative value of the evidence was high***

As discussed above, the probative value of the gang evidence was high.

b. ***The evidence was tailored to the case and not inflammatory***

Generally, "[e]vidence will not be excluded as unduly prejudicial when it is not more inflammatory than the charged crime." *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999). Here, defendant was charged with orchestrating a number extremely serious drug and weapons crimes and the principal evidence against him was his own words and deeds, as shown on the recordings that consumed most of the trial time and were the central focus of the government's closing arguments. Given that defendant represented himself as operating under the auspices of the Mexican Mafia and himself invoked them and

Moreno's name, expert testimony describing "common MM tattoos, the CDCR process to determine MM validation, how powerful the MM was in California essentially controlling all narcotics and firearms criminal activity on the streets" (AOB 20) was not inflammatory; it was explanatory.

On key points, this case is similar to *United States v. Rodriguez*, 766 F.3d 970 (9th Cir. 2014) in which this Court upheld the introduction of expert testimony regarding the Mexican Mafia and Sureño gangs against a claim that it violated Rule 403:

> Agent Evanilla's expert testimony addressed the connection between the Sureños and the Mexican Mafia within the prison gang hierarchy. Given Appellants' admitted gang connections, the expert testimony concerning the Mexican Mafia and photographs of Appellants with members of the Mexican Mafia was not unduly prejudicial as the Mexican Mafia was not the entire theme of the trial, so as to infect the trial with the threat of guilt by association…This is particularly true in this case where the trial focused primarily on the events that transpired in [victim]'s cell and the jury was presented with numerous photographs and videos of the events without reference to Appellants' connections to the Mexican Mafia.
>
> Notably, the district court also took several steps to minimize any undue prejudice. In particular, the district court permitted only…brief testimony by qualified witnesses regarding the hierarchy, customs, practices and tenets of the Mexican Mafia and its relationship and connection to the Sureños.

*Id.* at 986-87 (internal quotation marks and citations omitted). Here, defendant was an undisputed, known gang member; he even had his gang tattooed on his head. (GER 289, 311-12, 1499). His role in the Colonia Chiques gang and affiliation with the Mexican Mafia was not, contrary to defendant's repeated assertions, the entire theme of the trial. The trial focused primarily on showing firsthand defendant's conduct of the drug and gun activities that formed the basis of the charges via recordings that showed defendant negotiating and making sales. The expert testimony consisted of comparatively brief testimony from qualified witnesses regarding the hierarchy, customs, practices and tenets of the Mexican Mafia and its relationship and connection to the Sureños. That testimony was coupled with additional testimony to assist the jury in understanding the terms and names used in the recordings. The major thrust of the government's case was the recordings, and while there certainly were references to the Mexican Mafia during some of these recordings, those references originated from defendant himself. Finally, as discussed below, the court gave a limiting instruction to minimize any undue prejudice.

### c.   Defendant Exaggerates the Length and Nature of the Challenged Evidence

In his Rule 403 argument, defendant portrays the expert testimony as a "wide ranging inquiry" that consumed "more than two days" of trial and transformed the case "into a trial about the MM, murder, robbery, and extortion."  (AOB 28-29.)   This is a gross exaggeration on all points.

First, the actual expert testimony consumed only about less than one day of trial spread over two days.  (*See* GER 1-339.)   Most of the first day was consumed with jury selection, opening statements and legal matters. (*See* GER 1-211.)  The second day included three witnesses in addition to the two experts.  Moreover, the time consumed by the expert testimony included preliminary questions to establish their expertise, cross-examination, and in the case of Long, substantial time spent playing and reviewing the recording.[11]

---

[11]  The expert testimony was introduced at the start of the trial because, as defendant acknowledges, the government's stated purpose was to provide "background" and "context" for the numerous recordings. (AOB 22.)  Thus, it was logical to provide the jury with the background and context *before* they heard the recordings.

Second, the expert testimony was tailored to the purpose authorized by the court, namely providing a framework for the jury to understand the recordings that constituted the principal evidence in the case and to appreciate defendant's leadership position in the CCE. Neither expert expounded on any "wide ranging inquiry" into any murders, robberies, or even extortion, apart from the Mexican Mafia taxation system. Long discussed murder only briefly: once when discussing how the Colonia Chiques might punish an individual for representing defendant's gang without being a formal member, and the other two times after defendant himself discussed the topic on a recording. (GER 158-59, 176, 189-90.) Long also only briefly mentioned robbery when he generically described the Colonia Chiques criminal activities. (GER 147, 239, 240.) SA Moreno testified generally about the hierarchy of the Mexican Mafia, their control over Southern California prisons and gangs, and their threats of assaults to operate their taxation program. (GER 294-338.) He did not testify at all about murder or robbery. *Id.*

These limited comments were hardly prejudicial (much less unduly so) in light of defendant's own references to violence in the

recordings (*see* GER 165-191) and the fact that the recordings showed defendant selling large quantities of drugs and guns. As this Court has recognized, "the drug industry . . . is a dangerous, violent business." *United States v. Johnson*, 886 F.2d 1120, 1123 (9th Cir. 1989); *United States v. Diaz*, 864 F.2d 544, 549 (7th Cir. 1988) ("When an individual conspires to take part in a street transaction involving a kilogram of cocaine worth $39,000, it certainly is quite reasonable to assume that a weapon of some kind would be carried."). Here, recorded transactions showed defendant in his own words: (a) seeking partnership with the historically brutal Italian Mafia; (b) discussing business dealings with the presently brutal Mexican drug cartels; (c) selling powerful weapons, including a fully automatic machine gun; (d) discussing knowledge of and obtaining caches of other deadly firearms; (e) discussing his personal preference for certain weapons, including an AK-47 with a bayonet; and more. In comparison with defendant's own statements and conduct, the experts' references were limited and comparatively sterile.

And they certainly did not transform the case into a trial about the Mexican Mafia, murder, robbery, or extortion. (AOB 28.) Following

the experts' testimony, the balance of the government's case and the

entirety of its closing argument and rebuttal were focused directly on

the charged crimes and the recordings, which formed the centerpiece of

the government's case, and used the gang evidence only for the limited

purpose for which it was admitted.  Far from becoming the "trial's

underlying theme" (AOB 28), it was a nonexistent theme, as the

government made *no* reference to any "murder," gang "robbery,"

"extortion," or Mexican Mafia assaults in its opening statement, its

closing argument, or its rebuttal argument.  (GER 107-135; 1342-1452.)

### d. The Evidence was Accompanied by a Limiting Instruction

"[A] district court does not abuse its discretion in admitting

relevant gang affiliation evidence when it takes steps to minimize any

undue prejudice that could flow therefrom."  *Takahashi*, 205 F.3d at

1165.  The court in this case took such steps by timely giving a limiting

instruction that defendant had proposed and drafted (but entirely

omitted from his brief).  (GER 230.)  That instruction expressly

circumscribed the jury's use of the gang evidence "only on the limited

issue of leadership," one of the CCE elements.  (*Id.*)  The instruction

also specifically stated that "this evidence is not admitted to show bad

character and that would be an impermissible purpose." (*Id.*)  Hence, the court unequivocally directed the jury not to use the evidence for an unfairly prejudicial purpose.

"This court has recognized the effectiveness of a properly-worded limiting instruction on numerous occasions." *United States v. Hankey*, 203 F3d 1173 n.11 (9th Cir. 2000) (citations omitted); *see also*, *United States v. Howell*, 231 F.3d 615, 629 (9th Cir. 2000) ("We have held that a district court that balances probity and prejudice and provides a limiting instruction did not abuse its discretion."); *United States v. Hadley*, 918 F.2d 848, 852 (9th Cir. 1990) ("The evidence was obviously prejudicial, but its prejudicial effect was limited by the instruction given by the district court.").

In this case, the effectiveness of the instruction was reinforced by the government, which specifically referenced the instruction in its closing argument, repeated the limitation that "you can consider the gang evidence that we did present for the limited purpose of showing

that defendant led his enterprise," and argued the evidence consistent with that limited purpose.[12]  (GER 1368-69.)

4. ***The probative value of the testimony outweighed any unfair prejudice to defendant***

Evidence is to be excluded under Rule 403 only if provides "its probative value is substantially outweighed by the danger of unfair prejudice."  Rule 403 is "an extraordinary remedy to be used sparingly because it permits the trial court to exclude otherwise relevant evidence."  *United States v. Patterson*, 819 F.2d 1495, 1504 (9th Cir. 1987) (upholding admission of evidence of a shooting in drug trafficking conspiracy).  As stated in a case admitting evidence of a criminal street gang's activities:

> *Relevant evidence is inherently prejudicial*; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403. *Unless trials are to be conducted as scenarios, or unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing*. Its major function is limited to excluding

---

[12] The government emphasized, "even the fact that I believe we've proven that defendant is a leading member of the Colonia Chiques, by itself makes this defendant guilty of no crime. I ask that you do not convict defendant of any crime if the only evidence is that he was a member of a gang. That's not the law and we'd ask that you not do that."  (GER 1368.)

matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.

*Hankey*, 203 F.3d at 1168-69 (quoting *United States v. Mills*, 704 F.2d 1553, 1559 (11th Cir. 1983)) (emphasis added).

Given all the circumstances set forth above, defendant has failed to establish that the district court abused its discretion in concluding that, circumscribed by a limiting instruction, the potential for unfair prejudice, as distinct from prejudice flowing from probative value, was so irrevocably high as to require exclusion of the expert testimony in this case.

5.    ***Any error was harmless***

Any abuse of discretion in the admission of the gang evidence was harmless, as defendant's own arguments virtually concede. Defendant describes the admissible evidence as sufficient to find that the government had met its burden on all counts without introduction of the gang evidence because "the months of surveillance and hours of clandestine audio and video recordings" of "numerous drug and firearm sales, and detailed explanations of Mr. Tapia's enterprise;" and defendant's "words and actions spoke for themselves," all of which "communicated all the jury needed to know," including "direct evidence

of the CCE[.]"  (AOB 19-23.)  While the government does not believe

this abundance of other effective evidence renders the district court's

decision to admit the gang evidence error, it does establish its

admission as harmless.

Here again, the *Echavarria* case, discussed above, supports the

government.  After concluding that Columbian drug cartel evidence had

been admitted improperly because it was not connected to defendant's

activities, this Court held that the error was harmless because the facts

showed Echavarria "deeply involved" in the charged conspiracies,

including participating in three meetings with an undercover agent

whose credibility was not challenged and whose testimony was

corroborated by two recordings and notes made by Echavarria.

*Echavarria*, 904 F.2d at 1399.  Echavarria testified and did not deny

the meetings or conversations with the agent.  *Id.*  His defense consisted

of "attempting to explain his words and actions as an attempt 'to

impress' the agent" and another man.  *Id.*  In these circumstance, this

Court found, "It is not only more probable than not that the tainted

testimony did not materially affect the verdict: no reasonable jury, on

the properly-admitted evidence before it, could have done other than convict." *Id.*

Similarly in this case, the facts showing defendant "deeply involved" in the charged drug and gun trafficking conspiracy, were established by recordings showing defendant at numerous (far more than three) meetings. In the face of the recordings, the defense did not deny the meetings or conversations, but as in *Echavarria,* the defense consisted in attempting to explain defendant's words and actions as attempts "to impress," mere braggadocio. (GER 1436.) In these circumstances also, "no reasonable jury, on the properly-admitted evidence before it, could have done other than convict." *Id.*

## B.   The District Court Did Not Plainly Err In Admitting Defendant's Statements Regarding Drugs And Weaponry

### 1.   *Standard of review*

Because defendant failed to object at trial to the admission of his own statements, this Court reviews only for plain error. *United States v. Begay*, 673 F.3d 1038, 1046 (9th Cir. 2011). While defendant did raise these objections via a motion in limine before trial, the district court's ruling was explicitly tentative and subject to change. (GER 1606-07.) Accordingly, defendant was required to renew his objections

at trial in order to preserve his claim of error.  Fed. R. Evid. 103*; United States v. Whittemore*, 776 F.3d 1074, 1082 (9th Cir. 2015) (because district court's ruling was tentative and without prejudice to defendant renewing motion in limine to admit evidence, defendant's failure to renew his motion at trial failed to preserve claim of error); *Adkins v. Mireles*, 526 F.3d 531, 542 (9th Cir. 2008) ("Rulings on in limine motions are not final appealable orders under 28 U.S.C. § 1291.  Thus, in order to appeal an issue on which the district court ruled in limine, a party must first receive a final ruling on the issue.") (internal citation omitted).

Under the plain error standard, defendant bears the burden to establish (1) error, that was (2) "clear or obvious" under existing law, that (3) "affected . . . [his] substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings," and which (4) seriously "affects the fairness, integrity, or public reputation of judicial proceedings."  *United States v. Marcus*, 560 U.S. 258, 262 (2010) (internal quotation marks and alterations omitted).   Plain error is to be found "sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."  *United States v. Young*,

470 U.S. 1, 15 (1985).  No such circumstances exist here, as each of the challenged statements was directly relevant to the charged offenses and was not unfairly prejudicial.

Even if defendant had preserved his claims of error in the admission of his own statements, they would be subject to review for abuse of discretion.  *See Hinkson*, 585 F.3d at 1267.  Under that standard, defendant would have to show that the district court's rulings were "illogical, implausible, or without support in inferences that may be drawn from facts in the record."  *Id.* at 1263.  As noted above, rulings under Federal Rule of Evidence 403 are particularly "subject to great deference."  *Id.* at 1267.

### 2. *The district court did not err in admitting defendant's statements regarding the strength of his heroin*

Defendant's statements to CHS-2 that his heroin was "so strong that it already killed six people" were directly relevant to proving (1) that defendant was a drug trafficker, and specifically of heroin, as the jury was required to find for the drug charges; (2) that he was a trafficker of a certain scale, as required for the CCE charge; and (3) that he was trying to build an ongoing business relationship with CHS-2, relevant to both sets of charges.  It was also directly relevant to refuting

defendant's arguments that he was just a small-time crook who only dealt in small quantities before he was enticed into the charged conduct by CHS-2. The context of the statements is illustrative: defendant made the challenged statements in response to CHS-2's statement that he didn't really know much about heroin, but would like to just send some to his contacts in Las Vegas to see if they would be interested. As part of his sales pitch, defendant then bragged about the quality of his heroin, describing its potency.

The evidence to which defendant objects is thus categorically different from the cases he cites (AOB 36) as precedent for the extraordinary remedy of exclusion under Rule 403. *See United States v. Mende*, 43 F.3d 1298, 1302 (9th Cir. 1995) (exclusion under Rule 403 is "an extraordinary remedy to be used sparingly"). The government did not introduce evidence of anyone actually dying from defendant's heroin after he sold it to them, as the Seventh Circuit determined would be irrelevant in *United States v. Cooper*, 591 F.3d 582, 589-90 (7th Cir. 2010). Whether anyone actually perished would, the government agrees, be irrelevant. What *was* relevant, as the district court found, was that defendant bragged about the strength of his heroin to his

potential customer as an inducement to do business with him.

Similarly, the government did not produce expert testimony regarding what happens to people who take heroin, as the Seventh Circuit (again) found unfairly prejudicial in *United States v. Boros*, 668 F. 3d 901, 910 (7th Cir. 2012). In both *Cooper* and *Boros*, upon which defendant relies, the problematic evidence was external to, and independent of, the defendant's conduct itself; in this case, there was no such extraneous evidence – only defendant's own inculpatory, relevant, and appropriately prejudicial statements, made during the commission of the charged crimes. *See Hankey*, 203 F.3d at 1172 ("Relevant evidence is inherently prejudicial."). That defendant's statements were callous and ugly does not prevent their admission against him. Rule 403 does not operate to require that a trial be "scrub[bed]…clean of all evidence that may have an emotional impact" (*United States v. Ganoe*, 538 F.3d 1117, 1124 (9th Cir. 2008)),[13] particularly when the impact results from defendant's own statements during and in furtherance of the charged crimes.

---

[13] *Quoting United States v. Morales-Aldahondo*, 524 F.3d 115, 120 (1st Cir. 2008).

3. ***The court did not err in admitting defendant's statement about just wanting a gun that "shoots people"***

Defendant's statement about being interested in purchasing a gun as long as it "shoots people" is likewise categorically different than "evidence of uncharged murders" to which defendant points as being unfairly prejudicial. (AOB 39-40.) As with defendant's statements about his heroin, there was no evidence introduced at trial regarding any uncharged murders. Defendant himself in the challenged statement was not even claiming to have shot or killed anyone; he was merely expressing his preference for a gun that does its job, regardless of how it looked.

The district court cases cited by defendant (AOB 39) are thus wholly inapposite, as they involved introduction of evidence of specific, actual uncharged murders, not a generalized reference to the purpose of a firearm. In the first cited case, *United States v. Kassir*, 2009 WL 976821, *7 (S.D.N.Y. April 9, 2009), the court actually found that defendant's claims to have killed people were not, in fact, so prejudicial that the risk of undue prejudice outweighed their probative value. In the other case, the government sought to introduce circumstantial

evidence that the defendant was actually responsible for the murders of two specific individuals who had been killed in Guyana, which is substantially different from the case at hand, since defendant was not referring to any actual shootings, just the capability of a gun. *See United States v. Khan*, 591 F. Supp. 2d 202, 205-206 (E.D.N.Y. 2008).

Moreover, in contrast with the evidence at issue both *Kassir* and *Khan,* defendant's statement was directly relevant to crimes with which he was charged. Five of the guns in this matter were alleged to have been possessed in furtherance of defendant's drug trafficking crimes, in violation of 18 U.S.C. § 924(c). Their necessary purpose was, in that regard, specifically to provide the ability to "shoot people." To convict on the Section 924(c) counts, the jury was required to find that those weapons furthered defendant's drug business. If they had in fact been for hunting animals or for recreational target practice, they would not have facilitated his drug crimes. Defendant's statement was therefore highly probative as to the purpose of his weapons. Any prejudice he incurred by saying that out loud was not "unfair prejudice" under Rule 403. *See United States v. Bailleaux*, 685 F.2d 1105, 1111 & n.2 (9th Cir. 1982) (prejudicial evidence is unfair, for purposes of Rule 403, when

"results in some unfairness to the defendant because of its *non-probative* aspect"—that is, its tendency to "affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged") (emphasis added).

Finally, defendant's statement was not more serious or inflammatory than the charged crimes. (AOB 40-41.) The charged crimes included running a continuing criminal enterprise that involved large-scale drug distribution (an extremely serious crime),[14] and specifically included the possession of firearms in connection with this drug trafficking conduct. Far from being separate, "more serious" conduct, the concept that defendant would want firearms that could "shoot people" is inherent in such crimes – indeed, arguably a necessary part of their proof. Given that the jury heard other evidence that defendant sold 14 guns (including assault rifles of various sizes and

---

[14] As noted in *Khan,* "[i]ntimidation, violence, and the payment of debts is generally understood to be intertwined with the management and operation of narcotics conspiracies," and uncharged violent acts would in fact be relevant to a defendant's alleged leadership role. *Khan*, 591 F. Supp. 2d at 205 (but finding that the risk of prejudice from circumstantial evidence of defendant's responsibility for two uncharged murders nonetheless outweighed its probative value).

types and a fully automatic machinegun), and possessed five others for himself (including an AK-47 with a bayonet and a sawed-off shotgun), evidence that defendant didn't care what a gun looked like as long as it functioned was hardly out of line with the rest of the charged conduct.

4. ***The court did not err in admitting defendant's other statements regarding particular types of weaponry***

Defendant's statements that (1) he wanted to know how much grenades would "go for" and whether certain marks sold well, (2) he "want[ed] to buy a silencer" and had a machinist who could make them, and (3) he knew about guns that fired armor-piercing ammunition all provided direct, relevant evidence of the charged offenses; there was no "unfair" prejudice that inhered as a result, much less any such prejudice that substantially outweighed the probative value of the evidence.

Each of these statements demonstrated defendant's engagement in the charged firearms trafficking conspiracy, and in particular, proved that he was selling weapons "with the intent of making profits," a required element of the crime. (GER 1657-58.) Defendant's efforts to show his knowledge of various kinds of weapons and his interest in the money to be made in their sales prove that he knowingly, deliberately, and with the intent to make a profit entered into an agreement to

acquire and sell weapons, as charged.  The "prejudice" incurred from his statements thus was entirely within the bounds of "fair."  *See United States v. Cruz-Garcia*, 344 F.3d 951, 956 (9th Cir. 2003) ("That evidence may decimate an opponent's case is no ground for its exclusion under" Rule 403, which "excludes only evidence where the prejudice is 'unfair'—that is, based on something other than its persuasive weight.").

Defendant's expressed desire for a silencer also provided direct evidence of the connection between his firearms and his drug trafficking offenses.  The jury could reasonably infer that his interest in silencers was connected to his practical desire for weaponry that "shoots people," rather than for some other purpose, and thus that his weapons were in fact possessed in furtherance of his drug trafficking, a required element of the 18 U.S.C. § 924(c) charges. (GER 1667-69.)

Each of these statements also refuted defendant's repeated arguments that he was an ingénue in the field of weaponry, lured (or duped) into criminal conduct by CHS-1 and/or CHS-2.  At trial and in this appeal, defendant has asserted that CHS-2 knew about firearms and defendant did not, and that CHS-1 "promote[d]" defendant's illegal

conduct and fed defendant weapons to sell to CHS-2.[15]  (AOB 4, 12, 15,

48-50.)  Defendant's statements in fact make clear that he was eager

and willing to profit from sales of weaponry, including grenades or

anything else that might "go for" a profitable price.  (GER 1689.)  They

also indicate his independent desire to obtain weaponry for himself, and

his independent means of doing so – namely, that he wanted a silencer

and knew someone who could make them.  Defendant's statements

about such weaponry, including his explication (together with "Pancho")

to CHS-2 about the "*mata puercos*" that were used in Mexico to kill law

enforcement, demonstrated his familiarity with weaponry entirely

independent of CHS-2.  (GER 1758.)  Each of these statements was

therefore directly pertinent to refuting defendant's arguments that guns

weren't his "thing," he "[did]n't know about these things," he "wasn't in

the [gun] business," and that he "wasn't trying to promote this

business."  (GER 1394-1396.)  Defendant put his knowledge of firearms

_____

[15] This was not a legal defense to the charged offenses, but
defendant pursued it throughout the trial as a line of questioning and
as a main theme in his closing argument in an apparent attempt to
encourage the jury to acquit defendant on the firearms charges and/or
determine that he was not a leader for purposes of the continuing
criminal enterprise charge.

in issue; he cannot now claim it was "unfair" to introduce his own statements contradicting this assertion.

5. ***There was no plain or obvious error***

For an error to constitute plain error, it must be clear or obvious under current law. *Puckett v. United States*, 556 U.S. 129, 135 (2009); *United States v. Campos,* 217 F.3d 707, 713 (9th Cir. 2000) ("[T]o constitute 'plain error,' the error must be 'plain' or clear on its face under current law"). Defendant has not cited any cases establishing that the district court erred in admitting defendant's statements. As discussed above, the cases defendant cites do not present factual situations anything like his. None of them even involved exclusion of a defendant's own statements made during the course and in furtherance of the crimes with which he was charged. Defendant is in the odd position of complaining that his own words about the guns and drugs that were the subject of the case were used against him. Absent some much clearer and stronger authority than he has cited, he cannot claim that this was obvious error.

6.  ***The evidence did not affect defendant's substantial rights or the fairness, integrity or public reputation of the proceedings***

Even if the admission of the defendant's statements had been an obvious error, defendant cannot show that it had any material impact on the district court proceedings. *See United States v. Romero-Avila*, 210 F.3d 1017, 1022-23 (9th Cir. 2000). Defendant himself asserts that his objectionable statements were cumulative of the government's other overwhelming evidence. (AOB 35, 37, 41, 43.) If the evidence was cumulative, however, it was harmless. *See United States v. Studley*, 783 F.2d 934, 941 (9th Cir. 1986) ("Even if the evidence should have been suppressed, its admission was harmless beyond a reasonable doubt because the evidence was merely cumulative."). Defendant is correct in saying that there were "hours of audio and video surveillance of Mr. Tapia actually engaging in and leading the business at the heart of the CCE charge." (AOB 41.) That the statements at issue were a relatively small part of this evidence, however, demonstrates the harmless nature of their admission.

In addition, the district court provided instructions to the jury emphasizing that it was "only to determine whether the defendant is

guilty or not guilty of the charges in the indictment," and that

defendant was "not on trial for any conduct or offense not charged"

therein. (GER 1304.) Such a limiting instruction diminishes any

potential unfair prejudice. *Howell*, 231 F.3d at 629 ; *Hadley*, 918 F.2d

at 852 (9th Cir. 1990).

Accordingly, even if there was error in the admission of

defendant's statements, which there was not, such error would not fit

the third or fourth prongs of the plain error standard, and would in fact

be harmless.

C.  **The Court Did Not Abuse its Discretion in Denying the Writ Application for Testimony from an Unnecessary Confidential Source Whose Safety Would Be Further Jeopardized if Testimony Was Required**

1.  ***Standard of review***

The denial of a writ of habeas corpus *ad testificandum* is reviewed

for abuse of discretion. *United States v. Owen*, 580 F.2d 365, 368 (9th

Cir. 1978). A district court abuses its discretion only when its ruling

was "illogical, implausible, or without support in inferences that may be

drawn from facts in the record." *Hinkson*, 585 F.3d at 1263. Moreover,

"evidentiary decisions will be reversed for an abuse of discretion only if

such . . . error more likely than not affected the verdict." *Edwards*, 235

F.3d at 1178-79.  Arguments in support of the writ that were not raised below are reviewed for plain error.  *Begay*, 673 F.3d at 1046.

2.   ***Defendant's application to the district court failed to establish that CHS-1's testimony was necessary to his defense***

Generally, for writs ad testificandum, courts "require[] criminal defendants requesting such writs to comply with Fed. R. Crim. Proc. 17(b)[.]"  *United States v. Smith*, 924 F.2d 889, 896 (9th Cir. 1991).  This rule mandates "a satisfactory showing . . . that the presence of the witness is necessary to an adequate defense."  *Smith*, 924 F.2d at 896 (internal quotation marks and citation omitted).  This Court has set forth the following framework for analyzing such writs:

> [W]hether testimony would be cumulative, and the difficulties in securing a prisoner's testimony versus the actual need for such testimony. Furthermore, unsupported and conclusory claims are not sufficient to show error. The burden of proving necessity is on the defendant.

*Id.* (internal citations omitted).

Further, whether "it is 'necessary' to bring the prisoner into court to testify at trial depends on the nature of the testimony he is likely to give in relation to the substantive law governing the particular offense charged [and] [i]f the witness's likely testimony is material to a defense

that a defendant has properly raised[.]" *United States v. Cruz-Jiminez*, 977 F.2d 95, 100 (3d Cir. 1992); *see also United States v. Rigdon*, 459 F.2d 379, 380 (6th Cir. 1972) (no abuse of discretion for court to deny writ where defendant made insufficient proffer as to content of witness's expected testimony); *United States v. Bottom*, 469 F.2d 95 (9th Cir. 1972) (per curiam) (holding same). Moreover:

> Not every remotely relevant proffer will require the issuance of process to bring an incarcerated witness before the court. If the witness's testimony is only peripherally relevant, cumulative or otherwise insignificant, or if the other evidence against the defendant is so overwhelming that the proffered testimony could not affect the outcome, the proffered testimony is not material and issuance of the writ is not required.

*Cruz-Jiminez*, 977 F.2d at 100. "A defendant's failure to carry this burden is a legitimate basis to deny a request to procure the presence of a witness." *Cruz-Jiminez*, 977 F.2d at 103 (internal quotation marks and citation omitted). Such subpoenas are not to be used as fishing expeditions. *United States v. Rinchack*, 820 F.2d 1557, 1567 (11th Cir. 1987). ("A Rule 17(b) motion . . . is not designed to be a discovery device.")

Defendant argues the district court abused its discretion when it declined to compel and publicly expose an in-custody crime associate

who had limited connection to the legion of recorded evidence presented at trial.  (AOB 44-53.)  However, defendant's submission to the district court fell well short of establishing necessity.  In his filing, defendant proffered three bases for why CHS-1's testimony was necessary for an adequate defense: (1) many of defendant's alleged supervisees, including co-defendant Armendariz, were "close personal friends" of CHS-1 and were "supervised by CHS-1 not [defendant]"; (2) CHS-1 "was responsible for directing many of the participants" to attend defendant's June 2011 gang meeting; and (3) CHS-1 "supplied many of the firearms charged in this case" and operated "his own 'separate conspiracy' in that regard[.]"  (ER 168-69.)  The only declaration provided in support of these claims was a declaration from defense counsel, who made the statements based on "interviews with persons in Oxnard, California and my client."  (ER 172.)[16]  The declaration did not attach any witness statements or even provide witness names.

---

[16] Counsel's declaration also stated that her investigation included a review of court records and discovery (ER 172), but the declaration used those sources primarily to show CHS-1's criminal history and unsavory past. (ER 173-76.)

Thus, counsel's declaration was essentially argument, unsupported by any evidence to support the proffer. Since the proffer was submitted in camera and not disclosed to the government until this appeal, there was no reason for the absence of evidentiary support. Defendant himself could have provided a declaration in camera.[17]

Moreover, the declaration did not establish the necessity of calling CHS-1 (whom one would expect to deny the recited allegations) to testify rather than the "persons in Oxnard" who provided counsel with the information. With the possible exception of the claim that CHS-1 provided guns to defendant, all of the stated reasons for the writ relate to matters that, if true, would be known to many people, not just CHS-1. Even as to that claim, there may well have been additional percipient witnesses; since defendant did not identify the sources of information for the proffer, one cannot tell.

_____

[17] Providing such a declaration to exercise a constitutional right would not require defendant to forego his Fifth Amendment right to not testify at trial. *See Simmons v. United States*, 390 U.S. 377, 393-394 (1968).

Finally, the proffered reasons, even if true, did not go to any defense or undermine any element. The first claim (CHS-1 had close friends and associates whom he supervised) in no way means that those same persons could not also be supervised by defendant. Even if it did, the only individual counsel mentioned by name in this regard, co-defendant Armendariz, was *not* one of supervisees the jury identified in its CCE verdict against defendant (ER 98), rendering the claim as to him moot.[18] The second claim (that CHS-1 and others worked to ensure attendance at defendant's June 2011 gang meeting) is similarly not inconsistent with defendant's supervisory role. Defendant was the uninterrupted and sole speaker for almost the entirety of the meeting, and the contents of his speech clearly showed him to be the leader of the assembled group. Against this backdrop, evidence that he had apparent event planners and drivers for "gang members who did not have rides" (ER 173) demonstrates defendant's leadership position in the gang, not the contrary. Likewise, the notion that defendant could indirectly

---

[18] Defendant appears to misstate the record when he suggests that Armendariz was "[o]ne of those persons" of the five that the jury found were supervised by defendant. (AOB 46.) They did not. (ER 98.)

compel attendees that he did not personally know to attend his gang meeting shows the "juice" and criminal credibility he held in Ventura County.  The third claim (that defendant obtained some of the firearms from CHS-1) is not relevant to any element of the charged crimes or any defense.  For every charged gun sale, defendant was recorded, on audio and video, selling guns to CHS-2.  Defendant's corollary claim that CHS-1 operated a "separate conspiracy" to sell guns is likewise irrelevant. CHS-1's operation of a separate gun trafficking conspiracy would in no way undermine the claim that defendant was also a member of one.  The relevant and charged gun trafficking conspiracy was the conspiracy the jury saw defendant operating and discussing in the abundance of recorded meetings.

The evidence adduced at trial, as defendant himself essentially concedes in his brief, consisted of a number of videos showing defendant either with CHS-2 or with defendant's subordinates, managing subordinates, receiving the services of subordinates, discussing how he utilizes subordinates, and holding court over others on how to run a successful criminal operation.  Notably absent from almost the entirety of this evidence was CHS-1.  That is not only because, on the

recordings, CHS-1 was not doing any of the above things defendant was captured doing, CHS-1 did not actually even *appear* in most of the recorded transactions that formed the core of the case.[19]  As reflected in the indictment, CHS-1 participated in a few recorded interactions with defendant early in the case, but was entirely absent (and almost entirely unmentioned) in the remaining *44* overt acts.  (ER 4-15.)  Hence, testimony from CHS-1 about the "nature and extent of Mr. Tapia's leadership with the alleged . . . CCE," direct evidence of which the jury observed over days of videos, would necessarily be "only peripherally relevant," "insignificant," and "could not affect the outcome" on any of the charges; thus, there was no basis for the writ. *Cruz-Jiminez*, 977 F.2d at 100.

It was not therefore implausible or illogical for the district court to find that based on "evidence or from matters already of record, that [defendant's] averments [were] untrue or that the request [was]

---

[19] In a single sentence in his appeal, defendant also claims that there were other recordings of CHS-1 that the district court refused to allow the defense to play.  (AOB 53.)  Again, defendant provides no record citation.  An undeveloped argument of this sort is waived. *See, e.g.*, *John–Charles v. California*, 646 F.3d 1243, 1247 n. 4 (9th Cir. 2011).

otherwise frivolous." *United States v. Sims*, 637 F.2d 625, 627 (9th Cir. 1980) (quotation omitted).   Defendant's offer of proof to the district court was irrelevant to the proffered purpose.

As the rest of defendant's brief makes clear, even if relevant, CHS-1's purported testimony would fall well short of overcoming the overwhelming evidence of defendant's management of his CCE.  *Cruz-Jiminez*, 977 F.2d at 100.  Further, in light of the overwhelming evidence of defendant's operation of his CCE, any error in denying the writ was harmless.  *See United States v. Lomeli*, 637 Fed. App'x 358, 359 (9th Cir. 2016) (any error in precluding two incarcerated witnesses from testifying was harmless in part because of the "limited nature" of the proffered testimony).

### 3. *Defendant's new claims on appeal also fail to establish necessity*

On appeal, defendant adds some new claims about how CHS-1 would have testified. (AOB 47-51.)  The new claims are reviewed for plain error.  *Begay*, 673 F.3d at 1046.

Defendant cannot establish error, much less clear error, as to the new claims.  The new claims are even more speculative and

unsupported than the arguments presented below.[20]  Error is not plain

unless "it is so clear-cut, so obvious, a competent district judge should

be able to avoid it without objection." *United States v. Turman*, 122

F.3d 1167, 1170 (9th Cir. 1997).  Defendant does not identify anything

about his additional claims that is so obvious that the district court

should have identified it as a basis for a writ.

Nor can defendant establish any prejudice from the alleged error.

Even if CHS-1 had testified precisely as defendant hoped, such

testimony would have made no dent towards dismantling the video

evidence in which the jury saw defendant operating his CCE.

Moreover, much of the testimony that defendant speculates CHS-1

could have given is testimony that would incriminate CHS-1.  It is

unlikely any attorney for CHS-1 would have permitted such testimony,

further undercutting any claim of prejudice from denial of the writ.  *See*

*United States v. Murphy*, 460 Fed. App'x 122, 125 (3d Cir. 2012)

---

[20] For example, defendant newly claims there were "numerous
unrecorded conversations and meetings" between CHS-1 and defendant.
(AOB 50) (citing GER 600-01).  This claim is without support in the
record, and defendant's citation fails.  Unsupported arguments are
waived.  *John–Charles*, 646 F.3d at 1247.

(upholding district court's denial of writ where there was nothing in the record indicating that the prisoner witnesses would have provided testimony favorable to the defendant, "as counsel for [defendant] conceded he had been informed . . . that the attorneys for [the prisoner witnesses] were recommending that their clients invoke their Fifth Amendment rights and refuse to testify"); *United States v. Shirley*, 884 F.2d 1130, 1132–33 (9th Cir. 1989) (affirming decision to preclude testimony when it was cumulative and cross-examination would have been limited).

4. ***Publically exposing a confidential government informant in a case involving the Mexican Mafia escalates the safety risk***

The district court was required to balance the level of necessity of CHS-1's testimony against the very real danger presented to CHS-1 and CHS-1's family by testifying in a criminal trial targeting a significant figure in the Ventura County criminal world and a validated Mexican Mafia associate. *See Wiggins v. County of Alameda*, 717 F.2d 466, 468 n.1 (9th Cir. 1983) ("When determining whether it should issue a writ of habeas corpus ad testificandum in such instances, the district court must exercise its discretion based upon consideration of such factors as

… the security risks presented by the prisoner's presence, the expense of the prisoner's transportation and safekeeping[.]") (internal quotation marks and citation omitted). Below, and again on appeal, defendant expresses little recognition or concern for the self-evident danger of a confidential source against such a defendant testifying at a public trial. Obviously, defendant knew of CHS-1's status as result of discovery. However, exposing CHS-1 as a "snitch" to the entire public, including a host of criminals, aspiring Mexican Mafia members, and others who might find some reason to target CHS-1 or CHS-1's family, increases the risk to them exponentially. The district court was expressly and rightfully concerned with this danger. (GER 1622-23.)

Indeed, CHS-1 was in protective custody because, according to the government attorney, "there ha[d] been threats against [CHS-1]." (GER 1624.) Even if, as defendant asserts without any record citation, CHS-1 had been in such custody "without incident" prior to trial, that is no assurance that CHS-1 or CHS-1's family would remain safe if CHS-1's status was on display to the entire community. Many co-defendants did not know who the informants were and the recordings themselves did not announce who the informants were, particularly where the

recordings were, as here, surreptitious videos taken from hotel rooms (as opposed to a body camera affixed to a source). (GER 1624-25.) Defendant's suggestion that public and permanent outing of CHS-1 did not pose any additional danger to CHS-1 or CHS-1's family (AOB 52-53) defies common sense.

Even the physical transfer of a government informant from state custody to a federal facility for a public trial in Los Angeles, where defendant, a Mexican Mafia associate, was also housed, was not without risk or expense. Further, compelling a confidential government informant to testify in open court – where the source would provide the source's true name, have no measures in place to obscure the source's physical identity, and where a transcript would memorialize it all – necessarily puts that person and their family at increased risk of retaliation, particularly where that person is testifying against a validated Mexican Mafia associate facing life in prison.

Finally, the lack of "a protective order" on the discovery (AOB 52) is of no moment to this analysis. As the record below and defendant's own brief and excerpts of record confirm, the government sought at every turn to conceal CHS-1's identity. CHS-1 was never referred to by

CHS-1's true identity in any pleadings and where that information

appears in the supporting record the parties endeavored to redact it.

This further demonstrates the unimpeachable and continuing need for

protection of CHS-1.

# V

## CONCLUSION

Defendant's convictions should be affirmed.

DATED: October 6, 2016          Respectfully submitted,

EILEEN M. DECKER
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

*/s/ Mack E. Jenkins,*
*Cameron L. Schroeder*

MACK E. JENKINS
Assistant United States Attorney
Public Corruption and Civil Rights
   Section

CAMERON L. SCHROEDER
Assistant United States Attorney
Cyber and Intellectual Property
   Crimes Section

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

## NOTICE OF RELATED CASES

The following pending appellate matter arises out of the same district court case at issue in the instant appeal:

1.  *United States v. Jaime Cardenas* (CA No. 15-50029)

**Form 8.**  **Certificate of Compliance Pursuant to 9th Circuit Rules 29-2(c)(2) and (3), 32-2 or 32-4[1] for Case Number** <u>15-50217</u>

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (check appropriate option):

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b). The brief is [_____] words or [_____] pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable, and is filed by (1) ☐ separately represented parties; (2) ☐ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the longer length limit authorized by court order dated [_____]. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). This brief is [_____] words or [_____] pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

☒ This brief is accompanied by a motion for leave to file a longer brief pursuant to Circuit Rule 32-2(a) and is [15,937] words or [_____] pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Circuit Rule 29-2(c)(2) or (3) and is [_____] words or [_____] pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4. The brief is [_____] words or [_____] pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Signature of Attorney or Unrepresented Litigant [/s/ Mack E. Jenkins]  Date [Oct 6, 2016]

("s/" plus typed name is acceptable for electronically-filed documents)

---

[1] If filing a brief that falls within the length limitations set forth at Fed. R. App. P. 32(a)(7)(B), use Form 6, Federal Rules of Appellate Procedure.  *(Rev.7/1/16)*

| 9th Circuit Case Number(s) | 15-50217 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

*******************************************************************************

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) Oct 6, 2016 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format)    s/ Mack E. Jenkins

*******************************************************************************

## CERTIFICATE OF SERVICE
### When Not All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)