U.S. COURT OF APPEALS DOCKET NO. 15-50217

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

THE UNITED STATES OF AMERICA,

Plaintiff/Appellee,

vs.

LUIS MANUAL TAPIA,

Defendant/Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
D. CT. CASE NO. CR-11-1068-ODW
[THE HONORABLE OTIS D. WRIGHT]

_____

APPELLANT'S REPLY BRIEF

_____

Marilyn E. Bednarski, SBN105322
KAYE, McLANE, BEDNARSKI & LITT, LLP
234 East Colorado Boulevard, Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670
E-Mail: mbednarski@kmbllaw.com

I.   THE DISTRICT COURT ABUSED ITS DISCRETION IN
     DENYING THE WRIT FOR CHS-1 WHERE THE
     GOVERNMENT FAILED TO SHOW THAT THE PROFFER
     WAS UNTRUE OR FRIVILOUS, AND WHERE THE RECORD
     IS INSUFFICIENT TO BASE DENIAL ON CHS-1'S SAFETY..............1

     A. The Abuse of Discretion Standard is Narrowed by the
     Constitution................................................................................................1

     B. The District Court Abused That Narrower Discretion...........................2

     1. Rule 17(b) Does Not Require that the Showing be Made in Any
     Specific Format............................................................................................2

     2. Whether Or Not Mr. Tapia Could Have Called Other Witnesses
     Does Not Justify Denial Of The Writ.........................................................3

     3. The Proffered Reasons Were Not Found to Be Untrue or Illogical
     and Were Relevant to Material Issues In the Case ...................................3

               a.     The Proffered Testimony That CHS-1 Was Crime
                      Partners With Salazar and Supervised Armendariz
                      and Proffered Testimony Regarding the Beach
                      Meeting Would Have Undermined the
                      Government's Position Regarding Leadership................5

               b.     CHS-1's Proffered Testimony That He Stockpiled
                      Illegal Weapons and Provided At Least Some of
                      the Weapons Mr. Tapia Sold to CHS-2 Would
                      Have Supported A Defense of Outrageous
                      Government Misconduct  .................................8

     4. The Record Does Not Sufficiently Support The Government's
     Argument That The Court's Denial of the Writ Was Justified
     For Security Reasons.........................................................................10

     C.    Summary Regarding Denial of Writ ..................................................11

II.   THE CUMULATIVE EFFECT OF THE COURT'S ERRORS IN
      FAILING TO EXCLUDE THE INFLAMMATORY STATEMENTS
      TAKEN TOGETHER WITH THE OTHER ERRORS MERITS
      REVERSAL......................................................................................11

      A.   Dispute Concerning Standard of Review ...........................11

      B.   Each Statement Was Irrelevant and Overly Prejudicial ....................12

           1.   The Statement Referencing Deaths Resulting from
                Strong Heroin Was At Best Minimally Relevant and
                Overly Prejudicial ...................................................12

           2.   The Statement About Wanting A Gun That Shoots
                People Was At Best Minimally Relevant and Overly
                Prejudicial ...............................................................14

           3.   The Statements About Frightful Weaponry, Which
                Weaponry Was Not Possessed Or Sold, Were At Best
                Minimally Relevant and Overly Prejudicial ............15

      C.   The District Court's Exclusion of Exculpatory Evidence in
           Defense Clips of Recorded Conversations Compounded the
           Harm Of the Other Errors ..................................................17

      D.   These Errors Taken With the Other Errors Combined to Deny
           Mr. Tapia a Fair Trial .......................................................20

Certificate Of Related Cases....................................................................23

Certificate Of Compliance .......................................................................24

Certificate Of Service...............................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Brecht v. Abrahamson*,
  507 U.S. 619, 637 (1993)......................................................................20

*Chambers v. Mississippi*,
  410 U.S. 284, 290 n. 3, 298, 302–03 (1973) ......................................20

*Donnelly v. DeChristoforo*,
  416 U.S. 637, 643 (1974)......................................................................20

*United States v. Barker*,
  553 F.2d 1013, 1019 (6th Cir.1977) .......................................................1

*United States v. Berry*,
  627 F.2d 193, 201 (9th Cir.1980) .........................................................12

*United States v. Black*,
  733 F.3d 294, 305 (9th Cir. 2013) ......................................................8,9

*United States v. Boros*,
  668 F.3d 901 (7th Cir. 2012) ...............................................................14

*United States v. Citro*,
  842 F.2d 1149, 1152-3 (9th Cir.), *cert. denied*, 488 U.S. 866 (1988)................10

*United States v. Cooper*,
  591 F. 3d 582, 589-90 (7th Cir.), *cert. denied*, 561 U.S. 1036 (2010) ..........13, 14

*United States v. Cruz-Jiminez,*
  977 F.2d 95 (3d Cir. 1992) ......................................................1, 2, 4

*United States v. Fernandez,*
  388 F.3d 1199, 1256 (9th Cir.2004) ..............................................11

*United States v. Greene*,
  454 F.2d 783, 786 (9th Cir. 1971) ......................................................9

*United States v. Hegwood*,
    562 F.2d 946, 952 (5th Cir 1977) ....................................................................1

*United States v. Rinchack*
    820 F.2d 1557 (11th Cir.1987) ...............................................................2, 3

*United States v. Sims*
    637 F.2d 625 (9th Cir.1980) ...................................................................1,2

*United States v. Smith*,
    924 F.2d 889, 896 (9th Cir. 1991) .........................................................2, 3

*United States v. Tuyet Thi-Bach Nguyen*,
    565 F.3d 668, 673-4 (9th Cir. 2009) ........................................................11

*United States v. Twigg*,
    588 F.2d 373, 380 (3d Cir. 1978) .............................................................9

*United States v. Villapondo-Rodriguez*,
    92 F. 3d 1195 (9th Cir. 1996) ...............................................................21

*United States v. Wallace*,
    848 F. 2d 1464, 1476 (9th Cir. 1988) ......................................................21

*United States v. Winslow*,
    962 F.2d 845 (9th Cir. 1992) ..................................................................10

## RULES

Fed. R. Crim. Proc. 17 ................................................................................3

## CONSTITUTIONAL PROVISIONS

U.S. Const. Amendment VI ..........................................................................3

# I.

## THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING THE WRIT FOR CHS-1 WHERE THE GOVERNMENT FAILED TO SHOW THAT THE PROFFER WAS UNTRUE OR FRIVOLOUS, AND WHERE THE RECORD IS INSUFFICIENT TO BASE DENIAL ON CHS-1'S SAFETY

### A. The Abuse of Discretion Standard is Narrowed by the Constitution

The parties generally agree that the standard of review on the issue of the court's denial of the writ *ad testificandum* to secure the presence of CHS-1 for the defense case is abuse of discretion. However, Mr. Tapia's position is the breadth of discretion here is "considerably narrowed" by the "Sixth Amendment right to have compulsory process for obtaining witnesses in the defendant's favor." *United States v. Hegwood*, 562 F.2d 946, 952 (5th Cir 1977). It has been said that, "[t]he latitude afforded the district court in making this determination is therefore considerably *narrower* than it is with respect to other decisions committed to its discretion." *United States v. Sims*, 637 F.2d 625, 629 (9th Cir.1980) (emphasis added) *quoting, United States v. Barker*, 553 F.2d 1013, 1019 (6th Cir.1977)). *See, United States v. Cruz-Jiminez,* 977 F.2d 95 (3d Cir. 1992)("we believe that in determining whether to grant or deny a Rule 17(b) subpoena or a writ of habeas corpus *ad testificandum*, a district court's discretion is plainly limited by the constitutional considerations involved").

### B. The District Court Abused That Narrower Discretion

The government argues in its brief that denial of the writ should be upheld because: 1. Mr. Tapia's proffer was based on defense counsel's declaration and not any witness declaration (GRB at 74-75); 2. Mr. Tapia could have called other witnesses in lieu of CHS-1 (GRB at 75); and, 3. "the proffered reasons, even if

true, did not go to any defense or undermine any element" (GRB 76). None of the government's arguments overcome Mr. Tapia's position. The government's first two grounds were not the basis of the district court's ruling and are unsupported by the law and facts. The *Smith* case sets forth that the writ must be granted, unless one of three circumstances exist: that the defendant's proffered facts are inherently incredible, or, that the government shows from the record or introduces evidence to show the averments are untrue or that the request is frivolous. *United States v. Smith*, 924 F.2d 889, 896 (9th Cir. 1991), *quoting United States v. Sims*, 637 F.2d 625, 627 (9th Cir. 1980) and *United States v. Cruz-Jimenez*, 977 F.2d 95, 103 (3d Cir. 1992) (*citing Smith* with approval and stating "Once the defendant has set forth sufficient facts in support of the writ to show that an incarcerated witness's testimony is necessary for an adequate defense, the burden of demonstrating lack of truth, frivolousness or abuse of process passes to the government"). Finally, the government's third ground fails because the proffered reasons were relevant to issues in the case.

## 1. Rule 17(b) Does Not Require that the Showing be Made in Any Specific Format

The government argues that the proffer failed to include affidavits from a witness and that counsel's declaration fails to "attach witness statements" or "provide witness names." GRB at 74. However, Rule 17 does not require that the defendant present the facts in a particular form or by any particular affiant. Fed. R. Crim. Proc. 17. Here, Mr. Tapia's application for the writ relied on a written proffer to the Court supported by trial counsel's five page declaration and 62 pages of exhibits. AER Vol. II, pp 162-239. Mr. Tapia proffered <u>specific</u> facts through counsel's declaration unlike in *United States v. Rinchack*, where Rinchack's attorney "did nothing more than tell the court that he would 'like to have the court issue a writ *ad testificandum* for [the two incarcerated witnesses] without further

explanation or elaboration." 820 F.2d 1557, 1568 (11th Cir. 1987). Furthermore, the proffer here was unlike the "unsupported and conclusory" proffer provided in *Smith,* in which the defendant, seeking the testimony of the informant to support his entrapment defense, merely asserted in his proffer that the informant "induced him" and that he was "not predisposed" [to deal drugs]. *Smith*, 924 F.2d at 896-7.

## 2. Whether Or Not Mr. Tapia Could Have Called Other Witnesses Does Not Justify Denial Of The Writ

The government argues that Mr. Tapia's pretrial proffer "fell short" because "if true" other people should have known these same facts and have been able to testify to them, thus rendering CHS-1 unnecessary. GRB at 75. This argument fails because Mr. Tapia is not required to call someone else other than CHS-1. Furthermore, the government's argument that the defense <u>could</u> have called other witnesses to testify to the proffered facts is speculative; the government presents no evidence of any witness who the defense could have called to testify to the facts proffered, and there is no record that CHS-1 would have been cumulative. Importantly, it is not for the trial court or government to choose the defense witness. Nothing in Rule 17 or case law requires otherwise. On the contrary, so long as the defendant asserts facts which accepted as true would be relevant to any issue, the writ *must* be granted. *Smith,* 924 F.2d at 896 (noting in contrast to this case, that two reasons for requested writ were in fact already established by other witnesses).

## 3. The Proffered Reasons Were Not Found to Be Untrue or Illogical and Were Relevant to Material Issues In the Case

The government argues that it was not implausible or illogical for the district court to find that Mr. Tapia's averments were untrue or that the request was frivolous. GRB at 78. First, the district court <u>did not </u>make such findings. AER 67, CR 246. The district court comments at the hearing and in its written order

demonstrate that its basis for rejecting the writ was an "inadequate showing of the necessity or relevance."[1]

Secondly, the government's argument that the testimony was irrelevant is based on a faulty premise. The fact that the government may have a different interpretation of a fact or would ask the jury to draw a different inference from a fact does not make the proffered fact irrelevant. Nor does it make a proffered fact irrelevant that the government believes the witness would actually testify somewhat differently. *Cruz-Jimenez*, 977 F.2d at 104 (that the prosecutor proffered that the witness would testify differently than the defendant averred was not conclusive, the government needed more to carry its burden that the proffer was wholly lacking in truth or that the witness would not give any material testimony).

The purpose of a fair trial is for both parties to present the facts that support its position and argue those facts and inferences from the facts to persuade the jury. The logical extension of the government's faulty argument would mean if there was an inference which supported the government, then the proffered witness to that fact could properly be denied. It is demonstrated below with respect to the proffered facts that there were favorable defense inferences that could have been drawn from the proffered facts, showing that contrary to the government's one sided assessment, in fact the witness was relevant to issues in the case.

---

[1] At the pretrial hearing, the district court stated "I don't understand the relevance of it, . . . I don't see the purpose of it other than- - I don't know- -maybe to intimidate or send some other message. I don't know." 7/29/14 RT 33:22-34:1; AER 80-81. The district court's statement that the purpose of the writ was to intimidate or send a message was speculative as the district court revealed by remarking twice "I don't know." The district court subsequently issued a minute order denying the writ "on the basis of an inadequate showing of the necessity or relevance of his testimony." AER 67, CR 246.

### a. The Proffered Testimony That CHS-1 Was Crime Partners With Salazar and Supervised Armendariz and the Proffered Testimony Regarding the Beach Meeting Would Have Undermined the Government's Position Regarding Leadership

The government argues that the evidence proffered is irrelevant because even if CHS-1 supervised persons, that did not mean that Mr. Tapia did not supervise those same persons. GRB at 76. While the government may reach that conclusion, the jury may not have, and Mr. Tapia should have been entitled to elicit the facts and argue his own interpretations therefrom.

Defense counsel sought to elicit from CHS-1 that he was close personal friends with several of the people the government claimed Mr. Tapia supervised including his crime partner Salazar, his right hand man Armendariz, and his woman friend Diana Zamora. The government argued that Mr. Tapia employed in his organization numerous people including Armendariz and Salazar [2], the women including Zamora, Dibble, and Hynes and the members of the gang. All were alleged to be supervisees in the CCE. Mr. Tapia was denied facts from which he could have argued more strongly that the government was wrong about Armendariz and Salazar, and if it could be wrong about those two, it could be wrong about other alleged supervisees.

---

[2] The government's theory of the case included that Armendariz and Salazar were amongst the supervisees. (Bill of Particulars, AER 51-52). Despite the fact that the jury did not name Armendariz or Salazar as supervisees when asked to list 5 or more, the jury also did not exclude them. (Special Verdict, AER at 98). The government correctly identified a misstatement in the Appellant's Opening Brief: the jury did not specifically name Armendariz in its special verdict as a supervisee in the CCE. The special verdict said "re the CCE he [Tapia] occupied a position of management in relation to five or more other persons, including the following, Zamora, Cardenas, Dibble, Jimenez, Aguilar. RT 1455:7-13 (emphasis added).

Moreover CHS-1 could have explained his and Salazar's own drug sales activity in the area was <u>not</u> at the direction or control of Mr. Tapia, thereby undercutting the government's theory that Mr. Tapia controlled the drug trade in the area. The government presented CHS-1 as another associate who worked with Mr. Tapia. Mr. Tapia was denied the facts from which he could have argued that Mr. Tapia did not lead or control CHS-1 [or others in that whole area].

The government presented a scenario at trial with CHS-1 having a minor role in the investigation, merely introducing CHS-2 to Tapia and participating in some conversations and meetings before CHS-2 took the primary role. The proffer asserted facts that showed a greater role than the government portrayed to the jury. Specifically, Mr. Tapia sought to show the jury that CHS-1 was more manipulative than the government portrayed him, including stashing illegal firearms without the agents' knowledge, giving at least some of the firearms to Mr. Tapia to sell to CHS-2, promoting the beach gang meeting, harboring a hidden trap in his car, and using a second phone besides the one the agents gave him. These things supported he had the opportunity to continue his own gun and drug business in the area while an informant. AOB 47-49.

The government took the position in the case that Mr. Tapia was the leader of the June 14 beach gang member meeting because he did all the talking and all eyes were on him. Without CHS-1's presence, the government was free to argue as it did that Mr. Tapia used the gang as a pool from which to draw employees (RT 1361: 3-5) and that they were the people he managed because he had authority from the MM (RT 1362: 14-1363:1).

However what the jury did not get to hear was the evidence showing that the informant had coordinated getting the gang members there, including having Armendariz, his "right hand," driving CHS-1's mobile home to pick up the attendees and get them there. Mr. Tapia was deprived of these facts which support

that CHS-1 was a leader, and director of others, more than a simple "event planner" or driver operating under the direction of Mr. Tapia as the government argues. The inference that could have been argued favorable to the defense, was that CHS-1 controlled and directed Armendariz and others on that June 14 day.

The government argued that that fact that Mr. Tapia did all the talking and some of the things he said including about what "we [the older guys] did and what they [the younger gang members] needed to do" supported that he was the leader. RT 1360. Without affirmative testimony from CHS-1, Mr. Tapia was limited to arguing a weaker position that various words in the government's recording of the meeting supported the inference that Mr. Tapia was giving advice rather than directives, and was inviting the gang members to ask questions rather than telling them how to run their gang.

The government argues that it is not mutually exclusive that CHS-1 could supervise his close friends and associates and so could Tapia. GRB at 76. But that was not the government's theory at trial. The government argued to the jury in closing that "defendant operated a multifaceted criminal enterprise from Ventura" (RT 1337:9-10); that he ran the organization (RT 1337: 12-17); and, ran the drug trade in Ventura particularly for the younger members of the gang (RT 1357:22-23). Evidence that CHS-1 organized and promoted the June 14 beach meeting and got the young gang members to attend would not only have served to undermine the government's argument to the jury that Mr. Tapia ran things that day, it would also have undermined its overarching theory that he ran the drug trade all over Ventura County through younger gang members.

Had Mr. Tapia been able to call CHS-1 and elicit the proffered evidence, he would have had crucial factual support for his argument that Mr. Tapia was doing the deals with CHS-2 on his own, and that Mr. Tapia was not directing, organizing or instructing anyone in that regard. CHS-1 knew Mr. Tapia and numerous

associates of Mr. Tapia from childhood and talked to and had contact with Mr. Tapia and alleged associates throughout this investigation. He was a percipient witness to material events and knowledgeable about what Mr. Tapia did.

The court's denial of the writ deprived Mr. Tapia of support for his argument that there were no employees or division of labor. RT 1391: 3-25. The record shows that this was not a frivolous or untrue argument: Mr. Tapia never speaks in any recording with any of the gang members about CHS-2 or any of his transactions with CHS-2.

Without affirmative testimony from CHS-1, Mr. Tapia was relegated to argue a much weaker position: that the absence of evidence supported that he was doing the business with CHS-2 on his own and not as the leader of an organization. RT 1396: 13-14 ("no structure and no employees"); and RT 1413: 5-9 (there's not one transaction in this case where anyone [else] sells drugs for Tapia); RT 1391: 3-9 (no evidence that he's ever giving people named in the conspiracy orders, directions or instructions to do things); RT 1417: 8-10 (you would expect orders like sell this amount, sell this for me, pay me for this, but there is not).

### b. CHS-1's Proffered Testimony That He Stockpiled Illegal Weapons and Provided At Least Some of the Weapons Mr. Tapia Sold to CHS-2 Would Have Supported A Defense of Outrageous Government Misconduct

The government argues that it was irrelevant whether CHS-1 provided some of the firearms to Mr. Tapia. GRB at 77. However the government is wrong. The government's role in creating crime is a relevant consideration for the defense of outrageous government misconduct. Significant issues for such a defense include whether the government proposes the criminal activity, or if it merely attaches itself to already established and ongoing criminal activity by the defendant. *United States v. Black*, 733 F.3d 294, 305 (9th Cir. 2013).

Evidence that CHS-1 provided guns to Mr. Tapia would have demonstrated that he was promoting (not merely witnessing) Mr. Tapia's unlawful behavior.[3] The defense sought to present evidence to support that he initiated and promoted a gang meeting at the beach and initiated and promoted firearms trafficking by Mr. Tapia for the purpose of generating a greater benefit for himself as an informant. Here, there was no evidence that Mr. Tapia was involved in selling firearms before CHS-1 introduced him to CHS-2. Denying Mr. Tapia the opportunity to call CHS-1 as a witness denied Mr. Tapia the opportunity to present affirmative evidence of: CHS-1's prior experience with weapons; that he stockpiled firearms; and, that he provided some of the weapons to Mr. Tapia to sell to CHS-2. Courts have found it significant and relevant to the Due Process claim of outrageous government conduct that the government provided contraband necessary for criminal activity. *United States v. Twigg*, 588 F.2d 373, 380 (3d Cir. 1978)(reversing conviction where government furnished laboratory expertise and essential ingredients needed to manufacture methamphetamine); *United States v. Greene*, 454 F.2d 783, 786 (9th Cir. 1971)(reversing where government offered to provide a still, equipment, a site, operator and sugar needed for process). The Ninth Circuit noted in *Black* that even though the government proposed the crime, it found significant that the government provided no weapons or direction about how to perform the crime. *Black*, 733 F.3d at 309.

Mr. Tapia needed the facts to argue an outrageous level of inducement. That defense would not have been frivolous. There was no evidence presented that Mr. Tapia was in the business of selling firearms before this investigation. The

---

[3]     In closing argument, the government admitted that every time Mr. Tapia possessed, sold or controlled a gun he is charged with felon in possession. 9/12/14 RT 1366: 17-21. This necessarily means that any gun CHS-1 provided Mr. Tapia, which he in turn possessed or sold, was material to a charged count in the case.

proffered testimony would have supported that CHS-1 pushed him into gun sales, a criminal activity CHS-1 himself was previously involved in. *Cf.*, *United States v. Winslow*, 962 F.2d 845, 849 (9th Cir. 1992)(at the time the government first targeted the defendant for investigation, both defendant and co-conspirator had previously expressed interest in blowing up businesses frequented by homosexuals); and, *United States v. Citro*, 842 F.2d 1149, 1152-3 (9th Cir.), *cert. denied*, 488 U.S. 866 (1988)(affirming where government provided counterfeit credit cards and initially raised idea of credit card scheme but evidence showed defendant already involved in fraudulent credit card criminal activity).

**4. The Record Does Not Sufficiently Support The Government's Argument That The Court's Denial of the Writ Was Justified For Security Reasons**

The government argues that publically exposing the informant in a trial was a justifiable reason to deny the writ. It is worth noting that the district court did not rely on that ground as the basis for denying the writ. Nor is that argument supported by credible facts. There was <u>no</u> declaration or testimony from a U.S. Marshal or any jailer whose job it would be to protect CHCS-1 setting forth facts addressing whether he could be kept safe if writted to the trial. He was held in custody in the Ventura County jail (on a state matter) only an hour north of Mr. Tapia's trial courtroom. Travel time was of no real concern. The basis for such the government's "safety" argument is a statement made by an AUSA at the pretrial hearing that a threat to the informant had caused the placement of the informant in protective custody. The record is silent about whether he thereafter had any problems. While safety considerations can properly be considered by the district court when considering a writ, here any alleged threat was not tied to Mr. Tapia nor proven to have anything to do with him. There was no basis other than speculation from the government to argue that it could not protect CHS-1 if he

- 10 -

were brought to trial as a witness.  The government already had him in protective custody.

### C.    Summary Regarding Denial of Writ

Here the denial of the writ in essence denied Mr. Tapia the facts necessary to support his interpretation of the government's evidence regarding: the beach meeting; the outrageous provision of some of the weapons to Mr. Tapia; the lack of supervision and control of CHS-1 during the investigation; CHS-1's independent criminal activity within the Ventura area; and, the role of specific people named as supervisees.

## II.

## THE CUMULATIVE EFFECT OF THE COURT'S ERRORS IN FAILING TO EXCLUDE THE INFLAMMATORY STATEMENTS TAKEN TOGETHER WITH THE OTHER ERRORS MERITS REVERSAL

### A.    Dispute Concerning Standard of Review

The admission of the statements should be reviewed for abuse of discretion, rather than plain error.  Admittedly, the district court stated at the beginning of the motions *in limine* hearing that the parties should consider these tentative rulings (7/29/11 RT 4: 11-17).  However, because the substance of the inflammatory statements and Mr. Tapia's objections to them were matters thoroughly explored and the district court's ruling in advance of trial was explicit, the admission of the statements should be reviewed under the abuse of discretion standard.  *United States v. Tuyet Thi-Bach Nguyen*, 565 F.3d 668, 673-4 (9th Cir. 2009).

Even if this Court applies a plain error standard, the cumulative effect of the district court's errors merit reversal of the convictions.  *See United States v. Fernandez*, 388 F.3d 1199, 1256 (9th Cir.2004) (reversal required under the cumulative error doctrine "if it is more probable than not that, taken together, the

errors materially affected the verdict") *citing, United States v. Berry*, 627 F.2d 193, 201 (9th Cir.1980).

### A. Each Statement Was Irrelevant and Overly Prejudicial

### 1. The Statement Referencing Deaths Resulting from Strong Heroin Was At Best Minimally Relevant and Overly Prejudicial

Mr. Tapia's statement about having sold heroin so strong it killed six people was not relevant and was overly prejudicial. None of the four reasons the government argues in support of relevancy are convincing. GRB at 60-61 (arguing to show: 1) he trafficked in heroin; 2) at a certain scale; 3) he was trying to build a business with CHS-2; and, 4) to refute the defendant's argument that he was enticed into the charged conduct).

Moreover, the statement was overly prejudicial given the other evidence properly admitted to prove he trafficked heroin. The statement occurred in a recorded meeting in which Mr. Tapia gave CHS-2 a sample of .19 grams of heroin followed a few days later by a sale of 1.13 kilograms of heroin to CHS-2. The June 17 events were preceded by a recorded conversation on June 8 in which Mr. Tapia said he got heroin in kilogram quantities every week or two and paid $33,500 per kilogram. These statements and distributions of heroin as well as statements and distributions of methamphetamine and cocaine to CHS-2 were relevant to show he knowingly trafficked in illegal narcotics. That evidence was properly admitted.

However, the strength of the heroin was not an issue. In fact, the government did not offer any test results as to strength of the heroin nor was a qualitative as opposed to quantitative amount the subject of the drug stipulation entered into. Exhibit 408 (stipulation as to weight only and in the case of methamphetamine and cocaine weight and purity).

- 12 -

Second, deathly strength, even if true, would not tend to prove that he was a trafficker on any *scale* as it speaks to purity, not volume or frequency. Further, as argued in the opening brief, any probative value was far surpassed by admissible statements he made in that same June 8 recorded conversation about obtaining heroin in kilogram quantities every week or two. AOB at 37.

The government's third argument is unpersuasive: that the statement about his strong heroin killing six was relevant to prove Mr. Tapia was bragging in order to build a business with CHS-2. Other admitted evidence related to quality and supply were of greater probative value and significantly less risk of unfair prejudice. AOB at 37. Mr. Tapia gave a heroin sample to CHS-2 to give to his boss and a few days later sold CHS-2 over a kilogram of heroin. Properly admitted statements by Mr. Tapia about quantity, frequency, and geographic range, and his multiple sales to CHS-2 spoke to his ability to obtain narcotics for his customers.

Any arguably marginal probative value in Mr. Tapia's statement was substantially outweighed by the unfair prejudice. The government agrees whether anyone actually perished was irrelevant (GRB at 61). Despite that concession, the government attempts to distinguish the prejudice from the admission of the statement here from the *Cooper* case cited by Mr. Tapia arguing that, unlike in *Cooper*, the government did not introduce evidence of anyone actually dying from defendant's heroin. GRB at 61, *citing, United States v. Cooper*, 591 F. 3d 582, 589-90 (7th Cir.), *cert. denied*, 561 U.S. 1036 (2010). Importantly here, the government did not present evidence that no one died, nor did the government seek to mitigate the prejudice.

The government actually highlighted the statement. On the first day of trial, in opening statement, the government told the jury that Mr. Tapia had bragged about the heroin being so strong it already killed six people (RT 118:19-20). During the trial, the government played the audio recording of June 17, 2011 with

- 13 -

the challenged statement in which the phrase about the heroin being so strong it "killed six people" was repeated four times. Govt. Exh. 116A pp 11-12, GER 1684-5. The government never presented evidence nor argued to the jury the distinguishing characteristic it now says makes the prejudice here so much less than in the *Cooper* case, i.e., that there is no proof his heroin *actually* killed someone. The government did not argue to the jury the argument it makes here, that it was "just advertisement," a statement made to build a business, rather than a true statement.

The government also tries to distinguish *United States v. Boros*, 668 F. 3d 901, 910 (7th Cir. 2012) arguing there the government presented expert testimony regarding the potential harm for people who take heroin. GRB at 62. Here, the statement that his heroin killed people is worse than the expert testimony in *Boros* where the expert testified that heroin <u>can cause</u> birth defects and harmful side effects. Here the statement is worse (than *Boros*), that his heroin *did kill* people, and still worse, that it killed *not one person (*as in *Cooper), but six* people.

The trial court failed to fairly consider the profound prejudice from the admission of this statement. In fact, the trial court seemed to default to the fact that the statement was made by the defendant and was therefore admissible. After Mr. Tapia argued in the pretrial hearing that the challenged statements would incite the jury to be afraid and convict based on prejudice, the court responded that "these arguments would be more persuasive if coming from someone other than the defendant. 7/29/11 RT 8:4-8. The fact that Mr. Tapia (and not someone else) made the statements makes their admission more, not less, prejudicial.

## 2. The Statement About Wanting A Gun That Shoots People Was At Best Minimally Relevant and Overly Prejudicial

The government argues that admitting the statement that Mr. Tapia said he wanted a gun that shoots people is relevant because the 924(c) counts required

proof that he possessed guns in furtherance of his business of drug trafficking. GRB at 64. This statement had marginal, if any, probative value to that issue. The statement was not made in connection with any drug deal, or needing a gun for any drug transaction in the case. It was not made with reference to any gun he had or carried.

With respect to prejudice, the government argues it did not introduce evidence regarding any uncharged murders. GRB at 63-64. As stated above, this argument is unpersuasive. The government's claim that it sought to minimize prejudice is belied by the trial record. In fact on several occasions during trial the government suggested the very point it now claims it was not trying to suggest, that Mr. Tapia was a killer. *See* e.g., RT 418, 426-27 (over objection, government presents testimony that Mr. Tapia talked about having assaulted and killed people for the MM and that he would in the future assault and kill people for the MM).

### 3. The Statements About Frightful Weaponry, Which Weaponry Was Not Possessed Or Sold, Were At Best Minimally Relevant and Overly Prejudicial

The jury never should have heard Mr. Tapia's recorded statements: asking CHS-2 what grenades sell for; asking CHS-2 to get him a silencer that a machinist could use as a prototype; and, saying that he could obtain guns that fire "cop killer" ammunition capable of piercing vests.

The government argued the statements were relevant because they showed that: 1) he sold weapons for profit (GRB at 66); 2) his desire to get a [prototype] silencer showed that his weapons were possessed in furtherance of drug trafficking (GRB at 67); and, 3) he was not an "ingénue" in the field of weaponry (GRB at 67). Importantly, Mr. Tapia did <u>not</u> argue he was an ingénue, as the government now claims, rather he argued that "guns were not his thing" meaning not his business. RT 1394:14-20. He <u>never</u> said that he had not possessed guns. Mr.

- 15 -

Tapia's familiarity with firearms for the purpose of personal possession rather than business of sales was not at issue. Mr. Tapia argued that CHS-2 always wanted to buy guns, and pushed him to sell him guns. The agents observed no gun transactions other than what Mr. Tapia did with CHS-2. RT 1396. Rather than trying to promote a gun business as the government argued, Mr. Tapia argued that he responded to CHS-2's requests for guns. RT 1395. Mr. Tapia argued it was the government that promoted the gun business through CHS-1 and CHS-2. This was not a frivolous position. CHS-2 was recorded on multiple occasions telling Mr. Tapia that he wanted to teach him some gun business. RT 673:8-10.

Secondly, the questions Mr. Tapia asked CHS-2 about what a grenade cost, or whether CHS-2 could get him a silencer and the statement that he had guns that could shoot armor piercing ammunition did <u>not</u> show that he <u>sold</u> those things for profit. Additionally, there was no evidence presented that he ever possessed a silencer. In fact, the government successfully convinced the district court to exclude as hearsay a recorded clip in which Mr. Tapia told CHS-2 that he had never possessed, nor shot a gun with a silencer and did not know if a silencer would fit any gun or only certain guns. *See*, Defense Exhibit 1051, Clip of Recording September 8, 2011 (Disc. filed Dkt. No. 321).

The statement he made about the armor piercing ammunition was different. It was made in response to a comment by Pancho talking about a certain type of small bullets. Mr. Tapia said they call them "cop killer" bullets, because it "goes thru a vest." While the statement claimed he had guns that could shoot such bullets, the statement did not claim that he possessed any such bullets, nor that any such bullets were possessed in furtherance of narcotics activity. To the contrary, all locations associated with him were searched (homes, cars and parents' home) and no such bullets, grenades or silencers were found or seized. Additionally, there was no evidence any armor piercing ammunition, grenades or silencers were sold.

Any minimal probative value such statements had to showing that he could provide or possess illegal guns or ammunition was far outweighed by any unfair prejudice. The natural effect of such statements was to prejudice the jury to believe he was callous to human life.

C. **The District Court's Exclusion of Exculpatory Evidence in Defense Clips of Recorded Conversations Compounded the Harm Of the Other Errors**

Upon government objection, the district court excluded the defense exhibits containing exculpatory clips[4] from the law enforcement recorded conversations. It is unfair now for the government to argue it was entitled to admit evidence of statements showing Mr. Tapia's knowledge of weapons, but not his numerous statements documented in the excluded defense clips in which he made statements to CHS-1 and CHS-2 referencing his limited knowledge of guns, his lack of experience in selling them, his reliance on CHS-1 and CHS-2 about such knowledge, and referencing that CHS-1 was the source of at least some of the guns charged.

The government objected to the defense playing the clips claiming they were inadmissible hearsay. RT 590, 595. When Mr. Tapia's counsel started to explain the relevance and admissibility of the proffered clips, and to explain that some were admissible for state of mind and not for their truth and others were admissible

---

[4]     Mr. Tapia made a record of the erroneously excluded clips of recordings. *Cf.* GRB 78 fn. 19. Before the cross examination of FBI Agent Easter, Mr. Tapia advised the district court he wanted to use pre-marked clips of recordings which the government had cut out of its presentation of recordings. RT 581. Mr. Tapia's clips along with pre-marked prepared transcripts were provided to the court and government counsel. RT 593. After the trial, Mr. Tapia's counsel filed the proffered pre-marked clips and transcripts on a disc. Dkt. No. 318 (Notice) and No. 321 (Disc containing defense audio video and transcript exhibits for the record). The undersigned is preparing and will file a Motion for an Order that the District Court Clerk Transmit that Disc to the Ninth Circuit.

for other non-hearsay purposes.  RT 581-595.  The court refused to allow counsel to argue the basis for admissibility of each clip and ordered the clerk to bring the jury, telling counsel "I've ruled, let me do this in legalese you understand: I have now ruled."  RT 592: 14-22.  The court added it would only consider recordings which did not include statements by Mr. Tapia, stating "we can't talk about any statements of your client, that is the end of this discussion."  RT 592, 593-4, 595 (court again cutting short Mr. Tapia's argument and calling the jury).  Included in the excluded defense clips of recordings were:

Defense Exhibit 1001, part of a March 8, 2011 recording in which CHS-1 told Mr. Tapia he [CHS-1] had a hidden compartment [trap] in his own car.  Mr. Tapia argued that CHS-1's statement that he had a trap supported Mr. Tapia's argument that CHS-1 independently distributed drugs, and that Mr. Tapia did <u>not</u> control the drug trade in Oxnard.  RT 588-589.  This statement about his hidden trap also tended to impeach the government's suggestion that agents controlled and supervised CHS-1 in the investigation including searching him before and after meetings.  RT 603.

Defense Exhibit 1005 contained part of a March 18, 2011 recording between CHS-1 and Roger Armendariz.[5]  In it, Armendariz asks CHS-1 if he got his texts, and tells CHS-1 that he had repeatedly called him and he did not answer. Also in the clip, Salazar tells Mr. Tapia that he is trying to keep CHS-1 out of trouble. Whether the words were true or not, the statements by Armendariz and Salazar tended to support that they worked with, reported to and communicated with CHS-1 directly.  These facts tended to undercut the government's presentation that Mr. Tapia conspired with and supervised Armendariz and Salazar in the CCE.  The

---

[5]     Despite the court's earlier statement that conversations not involving Mr. Tapia were different (RT 592:21-25), the court sustained the government's hearsay objection and would not permit counsel to question the agent about the recording.

argument was not frivolous; there was testimony that the agent had heard Armendariz call CHS-1 "Chief." RT 612: 8-15. Furthermore, the exhibits filed with the writ established that CHS-1 and Salazar were still crime partners.

Defense Clip 1007, contained part of a conversation on March 31, 2011 between Mr. Tapia, Mr. Salazar and CHS-1. Mr. Tapia warns CHS-1 that he should be careful because he is in Ventura and word is out that some informant is working a dealer in Ventura. This circumstantially shows that Mr. Tapia believed CHS-1 to currently be a big enough dealer to be the focus of an informant. This fact would further support that Mr. Tapia was operating independently of CHS-1 and was not directing CHS-1 or his workers. Salazar's statement did not need to be true to be relevant: the effect on Mr. Tapia was also relevant. A listener including Mr. Tapia, could reasonably have concluded that CHS-1 was still dealing on his own in Ventura.

Defense Exhibits 1015, 1018 and 1020 were three clips from a May 19 conversation evidencing multiple statements by Mr. Tapia that guns were not his thing (which notably the government cut from the recordings it presented in Government's Exhibit 22). In the portion of the recording marked as Defense Exhibit 1018, Mr. Tapia tells CHS-2 that he is not making money [off the gun sales]. He repeats "guns are not my thing."

In Defense Exhibit 1026, a clip from a June 8 conversation, Mr. Tapia is speaking with CHS-1 who tells Mr. Tapia "Bring the Bushmaster, " and tells Mr. Tapia to "bring one, bring two." When questioned about this conversation, Agent Easter misleadingly testified that CHS-1 tells Mr. Tapia that he should bring the "one he feels is right." Defense counsel sought to impeach the agent's incorrect version with the actual recorded statement, but the district court refused, granting the government's hearsay objection. RT 659:10-20. Thus, the excluded clip was relevant to impeach the agent and to undermine the government inference that the

agents controlled supervised and monitored CHS-1 during the investigation.  In sum, multiple exculpatory recorded statements were excluded that tended to show Mr. Tapia was not promoting a gun business, but he was ingratiating himself with CHS-2 to get things going in a drug business.  See, Defense Exhibit 1048 (Mr. Tapia states that he did not know the business [of guns] that well,") and Defense Exhibit 1055 (Mr. Tapia says I make more money from the other stuff, this [guns] is just to get things [drug business with CHS-2] going).

> D.  **These Errors Taken With the Other Errors Combined to Deny Mr. Tapia a Fair Trial**

The combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Chambers v. Mississippi*, 410 U.S. 284, 290 n. 3, 298, 302–03 (1973).  The Supreme Court has explained that the fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense "far less persuasive" than it might otherwise have been (*Chambers v. Mississippi*, 410 U.S. 284, 294 (1973)) and thereby had a "substantial and injurious effect or influence" on the jury's verdict (*Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

This Circuit has said about analyzing prejudice suffered from accumulated error: ". . . we do not find that a balkanized, issue-by-issue harmless error review would be very enlightening in determining whether the appellants were prejudiced by the errors."  *United States v. Wallace*, 848 F. 2d 1464, 1476 (9th Cir. 1988)(remanding to the district court to determine the prejudicial effect of errors noted in the decision separately and cumulatively).

This Circuit has applied the cumulative error doctrine when separate errors affected a common issue.  In *United States v. Villapondo-Rodriguez*, 92 F.3d 1195

(9th Cir. 1996) (unpublished), the district court found cumulative error from two separate errors: first the government witness had testified incorrectly that defendant was convicted of murder when actually he was convicted of involuntary manslaughter and was not supposed to mention that, and the prosecutor argued incorrectly in closing that defendant had been previously been deported when there was no such evidence in the record. *Id.* at *1. Both errors cast defendant in a very negative light. The panel held that it lacked confidence that he had received a fair trial and reversed his conviction. *Id.* at *2.

Here Mr. Tapia's defenses, that he was a one man show and not an enterprise, that he was doing these deals with CHS-2 on his own and not as the leader of an organization, and that his business before this investigation did not involve gun sales, were far less persuasive without testimony from CHS-1, and without the defense clips of the recordings excluded by the court. This exclusion, combined with the admission of the inflammatory statements and lengthy expert testimony concerning the violent MM prison gang made it even less likely for the jury to fairly consider Mr. Tapia's defenses. These errors combined to unfairly affect the jury's consideration of whether Mr. Tapia was operating independently or as the leader of a criminal enterprise or drug and gun trafficking conspiracies. The district court prevented the presentation of affirmative defense evidence, and allowed the government to bolster its case with inadmissible and overly prejudicial bad character evidence of defendant being involved in assaults and murders, and statements suggesting his willingness to kill. For these reasons, the combined

* * *

effect of the district court's errors therefore had a substantial and injurious effect on the jury's verdict.

Respectfully submitted,

KAYE, McLANE, BEDNARSKI & LITT, LLP

DATED: January 18, 2017   By:   /S/ by Marilyn E. Bednarski
                                MARILYN E. BEDNARSKI
                                Attorney for Defendant-Appellant Luis Tapia

## CERTIFICATE OF RELATED CASES

Counsel for appellant certifies that he is unaware of any pending related cases or cases presenting an issue related to those in this brief.


DATED: January 18, 2017   By: _____/S/ by Marilyn E. Bednarski_____
                            MARILYN E. BEDNARSKI
                            Attorney for Defendant-Appellant Luis Tapia

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Circuit Rule 32-1, I certify that this brief is proportionally spaced, has a typeface of 14 points or more, and excluding the tables of contents and authorities and certificates contains 6895 words.


DATED: January 18, 2017   By: _____ /S/ by Marilyn E. Bednarski _____
                               MARILYN E. BEDNARSKI
                               Attorney for Defendant-Appellant Luis Tapia

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 18, 2017, I electronically filed the foregoing Appellant's Reply Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


DATED: January 18, 2017   By: _____/S/ by Marilyn E. Bednarski_____
                                         MARILYN E. BEDNARSKI
                                         Attorney for Defendant-Appellant Luis Tapia